No. 23-40650

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; TEXAS BANKERS ASSOCIATION,

*Plaintiffs – Appellees*

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT CHOPRA,

*Defendants – Appellants.*

On Appeal from the United States District Court
for the Eastern District of Texas
Case No. 1:22-cv-00381-JCB

## BRIEF OF APPELLANTS

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher Deal
  *Assistant General Counsel*
Justin M. Sandberg
Ryan Cooper
  *Senior Counsel*

Consumer Financial Protection
Bureau
1700 G Street NW
Washington, DC 20552
Justin.Sandberg@cfpb.gov
Ryan.Cooper@cfpb.gov
(202) 450-8786 (Sandberg)
(202) 702-7541 (Cooper)

## STATEMENT REGARDING ORAL ARGUMENT

The Consumer Financial Protection Bureau (CFPB or Bureau) believes that oral argument would facilitate the Court's consideration of the issues in this case.

# TABLE OF CONTENTS

INTRODUCTION...................................................................1

JURISDICTIONAL STATEMENT..............................................5

ISSUES PRESENTED............................................................6

STATEMENT.......................................................................7

    A.    The Consumer Financial Protection Act............................7

        1. The CFPB's UDAAP Authority.................................7

        2. The CFPB's Supervisory Authority............................8

    B.    The Manual Update.....................................................9

    C.    The Litigation...........................................................10

SUMMARY OF ARGUMENT..................................................14

STANDARD OF REVIEW......................................................16

ARGUMENT......................................................................17

    I.    Threshold Issues Require Reversal of the District Court's
       Decision...............................................................17

        A.    Plaintiffs Have Not Established
            Associational Standing.......................................17

            1. The Supreme Court's decision in *Summers*
              requires a plaintiff-association to name
              an injured member.......................................18

2. Even if a plaintiff-association can identify its injured members using pseudonyms, Plaintiffs have still failed to show standing.....................................24

   a. Plaintiffs have failed to submit competent evidence proving standing.............................25

   b. Plaintiffs' use of pseudonyms frustrates efforts to ascertain their standing................................33

3. The district court's approach undercuts the presumption in favor of open proceedings.............34

B. Venue is Improper in the Eastern District of Texas...36

   1. The only plaintiff that resides in the district does not have standing...........................................37

   2. Because the plaintiff on which venue is purportedly based lacks standing, the case must be dismissed.......................................................38

C. Plaintiffs Lack Standing to Challenge Hypothetical Supervisory and Enforcement Actions and to Recover for Unharmed Associations and Members................39

II. The Bureau has Statutory Authority to Treat Discriminatory Acts and Practices as Unfair, and the Bureau's Funding Statute is Constitutional..............................................43

   A. The District Court's Holding that the Bureau Lacked Statutory Authority is Flawed...................................43

   1. The CFPA authorizes treating discrimination as unfair.............................................................43

   2. The major questions doctrine focuses on questions of great economic and political significance..............52

3. The district court misapplied the major questions
doctrine.......................................................55

a. Applying § 5531 to discrimination does not raise
questions of vast economic or political
significance.............................................56

b. Congress clearly authorized the Bureau to treat
discrimination as unfair..............................64

B. There Is No Appropriations Clause Violation...............65

III. If Any Relief Were Appropriate, Vacatur Would Suffice, and,
in Any Case, the Injunctions and Declaratory Relief Are
Overbroad...................................................65

CONCLUSION..........................................................68

.

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Advoc. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) ................................................................. 23

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) ........................................................................ 54, 62

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) .......................................................... 25, 26

*Am. Airlines, Inc. v. N. Am. Airlines, Inc.*,
351 U.S. 79 (1956) ................................................................................ 48

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
103 F.4th 765 (11th Cir. 2024) ................................................ 19, 21, 22

*Assoc. Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*,
2024 WL 1078260 (W.D. La. Mar. 12, 2024) ....................................... 39

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ................................................................. *passim*

*Bradford v. U.S. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024) ............................................................ 57

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*,
17 F.4th 604 (5th Cir. 2021) ................................................................ 53

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) .............................................................. 22

*Career Coll. & Sch. of Tex. v. United States Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ................................................................ 41

*CFPB v. CFSA*,
601 U.S. 416 (2024) .................................................... 8, 14, 16, 61, 65

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) ................................................................................. 66

v

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................28, 29, 31, 40

*Clark & Reid Co. v. United States,*
   804 F.2d 3 (1st Cir. 1986)...............................................................38, 39

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022).......................................................8, 11, 65

*Contender Farms, L.L.P. v. USDA,*
   779 F.3d 258 (5th Cir. 2015) ...............................................................16

*Del Casal v. E. Airlines, Inc.,*
   634 F.2d 295 (5th Cir. 1981) ...............................................................55

*Do No Harm v. Pfizer, Inc.,*
   96 F.4th 106 (2d Cir. 2024) ........................................................ *passim*

*Doe v. McKesson,*
   945 F.3d 818 (5th Cir. 2019) ...............................................................35

*Doe v. Stegall,*
   653 F.2d 180 (5th Cir. 1981) ...............................................................35

*Fath v. Texas Dep't of Transportation,*
   924 F.3d 132 (5th Cir. 2018) ...............................................................17

*FDA v. All. For Hippocratic, Med.,*
   602 U.S. 367 (2024) ........................................................25, 26, 36, 42

*Fed'n of Ams. for Consumer Choice, Inc. v. United States Dep't of Lab.,*
   2023 WL 5682411 (N.D. Tex. June 30, 2023)......................................58

*FTC v. Accusearch Inc.,*
   570 F.3d 1187 (10th Cir. 2009) ...........................................................45

*FTC v. Kochava Inc.,*
   671 F. Supp. 3d 1161 (D. Idaho 2023) ...........................................63, 64

*FTC v. Sperry & Hutchinson Co.,*
   405 U.S. 233 (1972) .........................................................................8, 45

*FTC v. Wyndham Worldwide Corp.*,
  799 F.3d 236 (3d Cir. 2015) ................................................. 51

*FW/PBS, Inc. v. Dallas*,
  493 U.S. 215 (1990) ...................................................... 18, 20

*Ga. Republican Party v. SEC*,
  888 F.3d 1198 (11th Cir. 2018) ........................................ 39

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................ 17, 37, 42, 66

*In re First Buckingham Cmty., Inc.*,
  73 F.T.C. 938 (1968) ...................................................... 47

*In re Int'l Harvester Co.*,
  104 F.T.C. 949 (1984) .................................................... 48

*In re Pfizer Inc.*,
  81 F.T.C. 23 (1972) ....................................................... 48

*June Med.* Servs., *L.L.C. v. Phillips*,
  22 F.4th 512 (5th Cir. 2022) ......................................... 35, 36

*Lion Health Servs., Inc. v. Sebelius*,
  635 F.3d 693 (5th Cir. 2011) ........................................... 67

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ....................................................... 49

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................... 25, 26, 28, 29

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ....................................................... 40

*Miller v. Albright*,
  523 U.S. 420 (1998) .................................................... 38, 39

*Miller v. Michaels Stores, Inc.*,
  98 F.4th 211 (5th Cir. 2024) .......................................... 26

*Miss. State Democratic Party v. Barbour*,
  529 F.3d 538 (5th Cir. 2008) ............................................................... 27

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................... 16, 65, 66

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024) ........................................................... 29

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ............................................... 22

*OnPath Fed. Credit Union v. United States Dep't of Treasury*,
  73 F.4th 291 (5th Cir. 2023) .................................................... 16

*Religious Sisters of Mercy v. Becerra*,
  55 F.4th 583 (8th Cir. 2022) .................................................... 21

*Reno v. Flores*,
  507 U.S. 292 (1993) ....................................................... *passim*

*Rest. L. Ctr. v. United States Dep't of Lab.*,
  2023 WL 4375518 (W.D. Tex. July 6, 2023) ......................................... 57

*SEC v. Binance*,
  2024 WL 3225974 (D.D.C. June 28, 2024) .......................................... 63

*SEC v. Coinbase*,
  2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) .................................. 63, 64

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ................................................ 22

*Speech First, Inc. v. Shrum*,
  92 F.4th 947 (10th Cir. 2024) ................................................ 19, 21, 22

*Spivey v. Chitimacha Tribe of Louisiana*,
  79 F.4th 444 (5th Cir. 2023) ................................................... 44

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ....................................................... 27, 28

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ....................................................... *passim*

*Tenn. Republican Party v. SEC*,
  863 F.3d 507 (6th Cir. 2017) ................................................ 21

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ................................................ 17

*Torch, Inc. v. LeBlanc*,
  947 F.2d 193 (5th Cir. 1991) ............................................... 17

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ....................................................... *passim*

*Trois v. Apple Tree Auction Ctr., Inc.*,
  882 F.3d 485 (5th Cir. 2018) .............................................. 16

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) .................................................... 67

*Twin Rivers Paper Co. v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) ............................................. 23

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302, 324 (2014) .......................................... 54, 57, 63

*W. Virginia v. Env't Prot. Agency*,
  597 U.S. 697 (2022) ....................................................... *passim*

*Warth v. Seldin*,
  422 U.S. 490 (1975) ....................................................... 42

*Young Conservatives of Tex. Found. v. Smatresk*,
  73 F.4th 304 (5th Cir. 2023) .............................................. 38

*Zimmerman v. City of Austin*,
  881 F.3d 378 (5th Cir. 2018) .............................................. 28

**Statutes**

5 U.S.C. § 706(2)(A), (C) ..................................................... 11

12 U.S.C. § 5511(b)(2) ................................................................ 50, 64

12 U.S.C. § 5514 ............................................................................ 30

12 U.S.C. § 5514(a)(1) ..................................................................... 9

12 U.S.C. § 5515 ............................................................................ 30

12 U.S.C. § 5515(a) .......................................................................... 9

12 U.S.C. § 5515(b)(1) ...................................................................... 9

12 U.S.C. § 5531 ..................................................................... *passim*

12 U.S.C. § 5531(a) .................................................................. 43, 48

12 U.S.C. § 5531(b) .......................................................................... 7

12 U.S.C. § 5531(a), (b) ................................................................. 43

12 U.S.C. § 5531(c) ...................................................................... 1, 7

12 U.S.C. § 5531(c)(2) .............................................................. 44, 46

12 U.S.C. § 5536(a)(1)(B) ................................................................ 7

12 U.S.C. § 5552(a) ....................................................................... 13

12 U.S.C. § 5563 .............................................................................. 7

12 U.S.C. § 5564 .............................................................................. 7

15 U.S.C. § 41 ............................................................................... 62

15 U.S.C. § 45(n) ...................................................................... 8, 47

15 U.S.C. § 1591 ........................................................................... 62

15 U.S.C. § 1691 ........................................................................... 46

42 U.S.C. § 1981 ...................................................................... 47, 61

42 U.S.C. § 2000a ......................................................................... 47

42 U.S.C. § 2000a-1 ...................................................................47

42 U.S.C. § 2000e-2....................................................................47

49 U.S.C. § 41712(a) ..................................................................48

Fla. Stat. Ann. § 655.0323...........................................................31

Tenn. Code Ann. § 45-1-128 ........................................................31

## Rules

Fed. R. Civ. P. 10(a)....................................................................35

Fed. R. Evid. 801(c)....................................................................26

## Other Authorities

American Banker Association, *Joint Trades Call on CFPB to Rescind Revised Examination Manual*, Press Release (June 28, 2022), https://www.aba.com/about-us/press-room/press-releases/joint-trades-call-on-cfpb-to-rescind-revised-examination-manual ...........................5

Bank of America, Proxy Statement (March 11, 2024) ............................59

Br. of the Chamber of Commerce of the U.S. as Amicus Curiae, *Nat'l Ass'n of Mut. Ins. Cos. v. HUD*, No. 23-5275, 2024 WL 2078484 (D.C. Cir. May 8, 2024)..........................................31

Citigroup Inc., *Citigroup 2024 Notice of Annual Meeting and Proxy Statement* (March 19, 2024), https://www.citigroup.com/rcs/citigpa/storage/public/Citi-2024-proxy-statement.pdf ...........................................................................59

*Continental Airlines, Inc.*, No. OST 2004-16943, Order 2004-4-4, (DOT Apr. 2, 2004), 2004 WL 720318...........................................48

Dennis D. Hirsch, *From Individual Control to Social Protection: New Paradigms for Privacy Law in the Age of Predictive Analytics*, 79 Md. L. Rev. 439, 489 (2020) .............................................................46

Jeff Sovern, *Is Discrimination Unfair?*, U of Maryland Legal Studies Research Paper No. 2024–02 (May 27, 2024 draft), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4712271 .... 45, 46

J.P. Morgan Chase & Co, *Annual Meeting of Shareholders Proxy Statement 2023* (April 4, 2023), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/proxy-statement2023.pdf ......... 59

Letter from Kris. W. Kobach, Kansas Attorney General, et al., to Brian T. Moynihan, Chairman and CEO, Bank of America (April 15, 2024), https://ag.ks.gov/docs/default-source/documents/bank-of-america-letter.pdf ........................................................................................... 61

PayPal Holdings Inc., Letter from Raquel Fox, Counsel for Paypal, to SEC, Office of Chief Counsel, re: PayPal Holdings 2023 Annual Meeting Omission of Shareholder Proposal of the National Center for Public Policy Research (Jan. 20, 2023), https://www.sec.gov/files/litigation/admin/1999/ncpprpaypal041023-14a8.pdf ...................................................................................... 59, 60

Pet. Br., *United States v. State of Tex.*, 2022 WL 4278395 ................... 41

Press Release from Sen. Sherrod Brown, *Brown, Senate Democrats Introduce New Legislation to Combat Discrimination in Our Nation's Financial Services Industry* (Oct. 21, 2020), https://www.brown.senate.gov/newsroom/press/release/brown-senate-democrats-legislation-discrimination-financial-services-industry ...... 61

S. Rep. No. 63–597 (1914) ......................................................... 45

*United Air Lines, Inc.*, No. OST-2003-14194, Order 2003-11-13 (DOT Nov. 19, 2003), 2003 WL 25425041 ..................................................... 48

## INTRODUCTION

In its March 2022 updates to a staff manual for its examiners, the CFPB noted that discrimination can satisfy the statutory requirements for unfairness under the Consumer Financial Protection Act. In other words, the CFPB noted that discrimination can sometimes cause (or be likely to cause) substantial injury to consumers that is not reasonably avoidable and that is not outweighed by countervailing benefits to consumers or competition. *See* 12 U.S.C. § 5531(c). The Bureau did not determine that any particular discriminatory practice was unfair. Instead, the Bureau directed its examiners to collect information so that they could assess whether supervised institutions might be engaged in discriminatory conduct that satisfied the statutory unfairness standard.

Before the Bureau's examiners could do so, Plaintiffs, an array of business associations representing unnamed members, sued. The district court held that discrimination cannot be unfair under § 5531's three-prong test. The court also granted a de facto universal injunction in favor of the Plaintiff associations and their anonymous members, including future and unharmed members. As a result, if a financial institution were to debank a customer because of its

1

assessment of the customer's religious beliefs, the Bureau could not investigate to determine whether that conduct is unfair.

The district court erred throughout its analysis, beginning with standing. Plaintiff associations obtained a permanent injunction for their current and future members based solely on the associations' self-descriptions of their memberships and without ever identifying any individual member that suffered the requisite Article III harm. In the process, the district court put the burden on the Bureau to show that Plaintiffs' members weren't harmed. The Supreme Court rejected this approach to standing in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), and this Court should reject it here.

The standing defects also undercut venue: the plaintiff on which venue is based must have standing, and it doesn't here. The district court made no real effort to assess the standing of the venue securing Plaintiff, treating it as following necessarily from the fact that it concluded other Plaintiffs have standing. But that's not how standing works. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The standing problems don't end there, however. Even if Plaintiffs had standing to challenge the March 2022 updates to the manual as a

2

final rule, they do not have standing to challenge hypothetical supervisory and enforcement actions. After all, "standing is not dispensed in gross," *id.*, and federal courts don't "adjudicate hypothetical … disputes," *id.* at 423. Plaintiffs identify neither any present or imminent agency supervisory or enforcement actions that harmed their members nor anything that their members would do if discriminatory conduct can't be unfair under § 5531.

Not only did the Court overstep by acting in a case in which it lacked jurisdiction, but it compounded that error by making sweeping—and incorrect—pronouncements about the scope of the CFPB's statutory authority. The district court concluded that the Bureau can *never* treat *any* discrimination as unfair under § 5531. It did not base this counterintuitive holding on the text of the statute alone. It couldn't: discriminatory acts can easily satisfy the standard for unfairness Congress set out in § 5531. Instead, the district court grounded its holding in the major questions doctrine, *see W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022), concluding that discrimination can never be unfair under § 5531 largely because, in the future, the Bureau

3

might take actions the district court thought would present a major question.

The district court's analytical framework was flawed. To establish that discrimination is facially excluded from the Bureau's unfairness authority, plaintiffs would have had to show that there are *no circumstances* in which discrimination can be unfair consistent with the statute. *See, e.g., Reno v. Flores*, 507 U.S. 292, 301 (1993) (stating that a facial challenge to rule as lacking statutory authority can succeed only if there is no valid application of the rule). Plaintiffs cannot meet that heavy burden. Even assuming that the major questions doctrine could be relevant to what conduct qualifies as unfair under § 5531, Plaintiffs cannot show that the doctrine would always mean that discrimination cannot be unfair. Imagine a payments company refused to serve African Americans because of their race. Or a bank closed the accounts of customers because of their religion (or the bank's assumptions about their religion based on data mining). Or a prepaid card issuer charged higher fees to men based on their sex. Would it present a major question for the Bureau to conclude that this sort of conduct is unfair? Obviously not. *See, e.g., Biden v. Nebraska*, 143 S.

4

Ct. 2355, 2374 (2023). Indeed, several of the Plaintiffs have "reaffirm[ed]" that "discrimination has no place in the financial services marketplace,"[1] many financial institutions agree, *see* § II.A.3.a., and states have outlawed political and religious discrimination by financial institutions, *see* § I.A.2.a. Thus, the district court erred by holding that the Bureau lacked the statutory authority to ever treat discrimination as unfair.

Lastly, the district court ordered an overbroad remedy, extending injunctive relief to all Plaintiffs and their members without regard to their standing, and issuing declaratory relief that prohibits the CFPB from doing that which the statute allows.

This Court should reverse the district court's judgment.

## JURISDICTIONAL STATEMENT

Plaintiffs asserted claims under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court entered a final judgment in

---

[1] American Banker Association, *Joint Trades Call on CFPB to Rescind Revised Examination Manual*, Press Release (June 28, 2022), https://www.aba.com/about-us/press-room/press-releases/joint-trades-call-on-cfpb-to-rescind-revised-examination-manual.

favor of Plaintiffs on September 8, 2023. ROA.3109–10. Defendants filed a timely notice of appeal on November 6, 2023. ROA.3131. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Was the district court right to reach the merits of this lawsuit even though the Plaintiff associations use declarations relying on second-hand testimony to establish the standing of anonymous members, including the Plaintiff on which venue is based, and raise claims about hypothetical supervisory and enforcement actions that may never occur?

2.    Is it categorically impossible for discrimination to satisfy the statutory standard for unfairness under 12 U.S.C. § 5531?

3.     Does the Bureau's funding statute comply with the Appropriations Clause?

4.    Assuming any remedy is appropriate, did the district court appropriately issue declaratory and injunctive relief, when vacatur would remedy the alleged injuries, the injunction runs to future association members, and the declaratory relief declares lawful conduct impermissible?

## STATEMENT

### A.   The Consumer Financial Protection Act

The CFPB was created through the Consumer Financial Protection Act (CFPA), 124 Stat. 1376. The statute authorized the Bureau, in relevant part, to: (1) prohibit unfair, deceptive or abusive acts or practices, and (2) supervise certain financial institutions.

### 1.   The CFPB's UDAAP Authority

Congress prohibited certain participants in consumer-financial markets from engaging in any "unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1)(B), commonly referred to as a "UDAAP." The CFPB has the authority to define unfair acts or practices by regulation, *id.* § 5531(b), and to enforce the statutory prohibitions on them, *id.* §§ 5563, 5564. Congress established that, before determining that an act or practice is "unfair," the CFPB must have "a reasonable basis to conclude that—(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *Id.* § 5531(c).

There is no exception in the definition of "unfair" acts and practices for discriminatory conduct.

The language in the CFPA defining an "unfair" act or practice is drawn from the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(n). *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB ("CFSA")*, 51 F.4th 616, 627 (5th Cir. 2022), *rev'd and remanded*, 601 U.S. 416 (2024) (explaining that the CFPB's unfairness authority is interpreted in light of "the analogous standard in the Federal Trade Commission Act"). Consistent with Congressional intent, courts have long understood that the statutory prohibition on unfairness is not confined "to fixed and unyielding categories." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 243 (1972) (quotation marks omitted); *see also id.* at 240 ("It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field." (quoting H.R. Rep. No. 63-1142, at 19 (1914) (Conf. Rep.)).

### 2.    The CFPB's Supervisory Authority

Congress authorized the CFPB to supervise certain financial entities, including insured depository institutions and credit unions (with total assets in excess of $10 billion) and certain nonbanks. 12

8

U.S.C. §§ 5514(a)(1), 5515(a). The purpose of this supervisory authority is to enable the CFPB to "assess[] compliance with the requirements of Federal consumer financial laws," to "obtain[ ] information" about "compliance systems or procedures," and to "detect[] and assess[] … risks to consumers and to markets for consumer financial products and services." *Id.* § 5515(b)(1).

The CFPB is authorized to conduct examinations of the entities it supervises. Over the course of an exam, the CFPB collects information from the supervised entity, assesses the adequacy of the entity's compliance management systems, identifies practices that may violate federal law, and consults with the entity regarding potential follow-up actions. *See* ROA.300–01. Prior to conducting an examination, CFPB personnel determine the scope of the examination, i.e., what topics will be the subject of the examination. ROA.301. No exam covers all topics. *Id.* To assist its examiners, the CFPB issues a Supervision and Examination Manual ("Exam Manual"). ROA.296–348.

## B.    The Manual Update

In March 2022, the CFPB revised the chapter of the Exam Manual on UDAAPs. The UDAAP chapter has two parts. The first part provides

examples of UDAAPs and describes the legal standards that govern those UDAAPs. ROA.310-19. The second part provides instructions to CFPB examiners regarding examination objectives. ROA.320–28.

The CFPB revised both parts. As to the first part, the CFPB revised its description of unfairness by explicitly recognizing what had been unspoken in the Manual: that discriminatory conduct can be unfair if it meets the statutory standards for unfairness. ROA.311–12. The Exam Manual did not previously say otherwise; it simply did not specifically mention discriminatory conduct, just as it did not explicitly mention many other potential strains of unfair conduct. With regard to the second part, the Bureau provided clarity to examiners about the types of questions they should ask and the factual assessments they should make to allow the Bureau to assess whether potentially discriminatory conduct satisfies the statutory unfairness standard. ROA.322–27.

## C.    This Litigation

Plaintiffs—a group of trade associations—filed suit in the Eastern District of Texas on behalf of unnamed members that purport to have been injured as a result of the Manual Update. ROA.12-36. Plaintiffs

alleged that the Manual Update: (1) exceeded the CFPB's statutory authority and thereby violated the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C), because the CFPB's authority to regulate unfair acts or practices does not reach discrimination; (2) violated the APA's prohibition on arbitrary-and-capricious agency action, *id.* § 706(2)(A), because "it contradicts the historical use and understanding of the term 'unfair'" and also because the CFPB "failed to adopt safeguards that are essential for pursuing disparate-impact liability"; and (3) violated the APA's notice-and-comment requirement, *id.* § 553. Plaintiffs also alleged the CFPB relied on a funding scheme that this Court had previously held to be unconstitutional, *see CFSA,* 51 F.4th 633–44. ROA.32–35.

Plaintiffs moved for summary judgment on all of their claims. ROA.178–218. They asked the district court not only to vacate the Manual Update but also to "declare that the CFPB has no UDAAP authority over discrimination and enter a permanent injunction barring the CFPB from exercising that authority." ROA.211. The CFPB opposed Plaintiffs' motion for summary judgment and moved for dismissal or, in the alternative, for partial summary judgment. ROA.1441–90

On September 8, the district court issued its decision. ROA.3086–3108. The district court concluded that Plaintiffs all have standing, that venue was proper in the Eastern District of Texas, and that the Manual Update was final agency action. ROA.3090–97. The court granted Plaintiffs summary judgment on their claim that CFPB's funding structure was unconstitutional, noting the "binding force" of this Court's decision in *CFSA*. ROA.3097. The court also granted Plaintiffs summary judgment on their claim that the Manual Update exceeded the CFPB's statutory authority. ROA.3097-3104. In assessing whether discrimination can fall within the scope of the CFPB's unfairness authority, the court applied the "major questions canon." ROA.3098. It held that "whether the CFPB has authority to police the financial services industry for discrimination … is a question of major economic and political significance." ROA.3098. And it held that the language in the CFPA "authorizing the CFPB to regulate unfair acts or practices is not the sort of exceedingly clear language that the major questions doctrine demands." ROA.3103.

The court vacated the Manual Update. ROA.3109. But it did not stop there. It also declared "that the pursuit of any examination,

supervision, or enforcement action against any member of a plaintiff organization based on the [CFPB]'s interpretations of its UDAAP authority announced in the March 2022 update … would be unlawful." ROA.3109. And it entered a permanent injunction barring the CFPB and "all persons in active concert or participation with them" from pursuing any examination, supervision, or enforcement action against any of Plaintiffs' members that is based on the CFPB's interpretation of its unfairness authority set forth in the Manual Update.[2] *Id.* The injunction applies to all of Plaintiffs' current—and future—members, and there is nothing to stop a company from paying to join one of the plaintiff associations at any point in the future in order to enjoy the benefit of the injunction.

---

[2] The logic of the district court's decision would also undercut the ability of state attorneys general to enforce the prohibition on unfairness, as permitted by 12 U.S.C. § 5552(a).

While this appeal was pending, the Supreme Court reversed this Court's *CFSA* decision, holding that the CFPB's "funding mechanism complies with the Appropriations Clause." *CFSA*, 601 U.S. at 421.

## SUMMARY OF ARGUMENT

The district court's decision should be reversed because the court erred with respect to threshold matters, the merits, and the scope of relief. Threshold issues first. Plaintiffs lack standing to sue at all for two reasons. First, Plaintiffs have not properly identified the members on whose behalf they are suing, notwithstanding the Supreme Court's directive in *Summers*, 555 U.S. at 498, that standing depends on doing so. Second, Plaintiffs did not submit the kind of evidence needed to establish standing at the summary judgment phase of the case, relying on hazy second-hand statements about members' alleged injuries. Relatedly, the district court was not a proper venue for this case because, even if some Plaintiffs had standing, the only Plaintiff residing in the venue did not. Finally with respect to threshold issues, even if Plaintiffs have standing to challenge the changes to the Manual, they lack standing to challenge hypothetical future supervisory and

14

enforcement actions that may never occur. They also lack standing to obtain relief for unharmed associations and members.

The case for reversal based on the merits is equally strong. The only natural reading of § 5531 is that unfairness can encompass discriminatory acts. But the district court held, relying on the major questions doctrine, that, as a facial matter, discriminatory acts or practices cannot be unfair under § 5531. This holding depends on there being no valid application of the statute to discriminatory conduct. *See Reno*, 507 U.S. at 301 (stating that one valid application defeats facial challenge to claim of lack of statutory authority). But treating discriminatory conduct as unfair under § 5531 would not necessarily raise a major question. For example, it would not raise a major question to treat intentional race, sex, or religious discrimination as unfair. There is no serious debate about whether such discrimination is appropriate—nor is there any credible argument that prohibiting intentional racial, sexual, or religious bigotry would impose a vast cost on banks or other financial service providers (especially as many already claim to forbid such conduct by their employees). Lastly on the merits, the Supreme Court has rejected the conclusion that the

Bureau's funding statute violates the Appropriations Clause. *CFSA*, 601 U.S. at 421.

Finally, the court erred with respect to remedy. If any remedy were appropriate, then it would be vacatur. Given the sufficiency of vacatur, no injunction is warranted. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 160-66 (2010). At a minimum, under basic standing principles and traditional remedial principles, the injunction should not extend to future members of the Plaintiff associations. Lastly, the district court issued overly broad declaratory relief, which declares conduct authorized by statute as unlawful.

## STANDARDS OF REVIEW

Issues of standing and ripeness are reviewed de novo. *See Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015). Venue issues are generally reviewed for abuse of discretion. *See Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 492 (5th Cir. 2018).

The district court's grant of summary judgment and its resolution of legal questions, including those under the APA and the Constitution, are reviewed de novo. *OnPath Fed. Credit Union v. United States Dep't*

*of Treasury*, 73 F.4th 291, 296 (5th Cir. 2023); *Fath v. Texas Dep't of Transportation*, 924 F.3d 132, 136 (5th Cir. 2018).

Finally, courts review the issuance of permanent injunctions and declaratory relief for an abuse of discretion. *See Texas v. United States*, 50 F.4th 498, 530 (5th Cir. 2022); *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).

## ARGUMENT

## I.     Threshold Issues Require Reversal of the District Court's Decision

### A.     Plaintiffs Have Not Established Associational Standing.

This case should be dismissed for want of jurisdiction because the Plaintiff associations have failed to show Article III standing. To bring suit on behalf of its members, a plaintiff-association must establish that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs have not met their burden because they have refused

17

to name their members and failed to prove that any of their unnamed members would have standing to bring suit on their own.

### 1. The Supreme Court's decision in *Summers* requires a plaintiff-association to name an injured member.

In *Summers*, the Supreme Court held that to establish associational standing a plaintiff-association must "name" its members "who were harmed" by the challenged conduct. 555 U.S. at 498 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990)). The Court explained that "this requirement of naming the affected members" is well-established in the Court's precedent and "has never been dispensed with" except in the rare circumstance "where *all* the members of the organization are affected by the challenged activity." *Id.* at 498–99. It concluded that to allow an association to establish standing without naming its injured members "would make a mockery" of the Court's Article III jurisprudence, *id.* at 498, and vitiate the foundational principle that standing "requires … a factual showing of perceptible harm," *id.* at 499.

The courts of appeals disagree as to whether (and when) the naming requirement can be satisfied using pseudonyms. *Compare Do No Harm v. Pfizer, Inc.*, 96 F.4th 106 (2d Cir. 2024) *with Speech First,*

*Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024), and *Am. All. for Equal Rts. v. Fearless Fund Mgmt.*, LLC, 103 F.4th 765 (11th Cir. 2024). But, if nothing else, *Summers* requires a plaintiff-association "to make specific allegations establishing that at least one identified member had suffered or would suffer harm." 555 U.S. at 498. Most of the Plaintiffs in this case have failed to identify any specific member injured by the Manual Update—by legal name, by pseudonym, or otherwise. Those Plaintiffs—including the Longview Chamber of Commerce ("Longview Chamber"), the only Plaintiff that resides in the Eastern District of Texas—all lack standing.

That leaves the Chamber of Commerce of the United States ("U.S. Chamber") and the American Bankers Association ("ABA"). These two Plaintiffs each submitted a declaration that discusses injuries purportedly suffered by pseudonymously identified members. ROA.225-26, 233-34. But vague references to "Member A" or "Member B" are not enough to establish standing. That is because the best reading of

*Summers* is that a plaintiff-association must, at least at final judgment, identify its injured members by name.

For one, that is what the Supreme Court said. The *Summers* decision explicitly recognized a "requirement of *naming* … affected members." 555 U.S. at 498 (emphasis added). When an association references a member by pseudonym, it has not named the member because the pseudonym is not the member's actual name. As the Second Circuit recently explained, in *Summers*, "the Supreme Court said what it meant and meant what it said." *Do No Harm*, 96 F.4th at 116.

And, if there were any doubt, the *Summers* Court's reliance on *FW/PBS*, 493 U.S. 215, makes clear that an affidavit's reference to injuries purportedly suffered by an unnamed third party is not enough for standing. There, the plaintiffs premised their standing, in part, on an affidavit stating that two specific (albeit unnamed) businesses had licenses revoked as a result of the challenged ordinance. That affidavit was insufficient to prove standing at summary judgment because it "fail[ed] to identify the individuals whose licenses were revoked." *Id.* at 216. Or as the Supreme Court later put it, the affidavit was insufficient "because it did not name the individuals who were harmed by the

challenged license-revocation program." *Summers*, 555 U.S. at 498. At bottom, reading *Summers* as allowing a plaintiff-association to establish standing on the basis of injuries to unnamed members "would ignore the decision's clear language and undermine the Supreme Court precedent upon which it relied." *Do No Harm*, 96 F.4th at 116.

This reading of *Summers* is consistent with the overwhelming weight of authority. In the fifteen years since *Summers* was decided, the courts of appeals have faithfully followed its direction and required plaintiff-associations to *name* their injured members in order to show standing at summary judgment. *E.g.*, *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 118 (2d Cir. 2024); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017).

As noted above, two courts of appeals have recently held that a plaintiff-association can sometimes satisfy *Summers* by identifying its injured members using pseudonyms. *See Speech First*, 92 F.4th 947; *Fearless Fund*, 103 F.4th 765. But both cases pertain only to what is required to show standing at the outset of the litigation. In *Speech First*, the Tenth Circuit held that pseudonyms can be sufficient to

establish standing "at the pleading stage" where the plaintiff's "burden in establishing standing is lightened considerably." 92 F.4th at 950 n.1 (quotation omitted). Likewise, in *Fearless Fund*, the Eleventh Circuit held that pseudonyms can be sufficient to establish standing to seek a preliminary injunction, 103 F.4th at 773, and, in the Eleventh Circuit, the pleading standard is used to assess standing on a preliminary injunction motion, *see Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022). Neither case stands for the proposition that a plaintiff-association's members may conceal their identity from the opposing party and the court all the way through final judgment.

*Speech First* and *Fearless Fund* are consistent with a line of cases holding that the naming requirement does not apply with full force at the pleading stage. *E.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). As a result, "whether an organizational plaintiff asserting associational standing need specifically identify an injured member at the pleading stage is unsettled and at the center of a circuit split." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1116 (9th Cir. 2024) (Baker, J., concurring). But "no such uncertainty exists at summary judgment." *Id. Summers* was decided after trial, and "at

22

summary judgment or trial an organizational plaintiff is undoubtedly obligated to identify one or more of its injured members—among other 'specific facts' detailing the nature of their asserted injury."[3] *Id.*

Here, the only Plaintiff that identified any of its members by name is the Consumer Bankers Association ("CBA"). But the CBA submitted a public list of *all* of its corporate members. ROA.245-54. (It also indicated which of those members, based on public data, are subject to CFPB supervision. ROA.261.) The problem is that by listing all of its members, regardless of whether those members purported to have been injured by the Manual Update, CBA failed to "make *specific* allegations establishing that at least one identified member" would have standing to sue on its own. *Summers*, 555 U.S. at 498 (emphasis

---

[3] In *Advoc. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586 (D.C. Cir. 2022), the D.C. Circuit held that a plaintiff-association may not need to name a specific injured member where the standing of one of its members is "apparent from the administrative record." *Id.* at 593 (quoting *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019)). That case is inapplicable here because, among other reasons, Plaintiffs do not claim that the "record establishes" that any members "have standing in their own right." *Id.* Plaintiffs rely entirely on extra-record affidavits offering only "unsubstantiated generalizations" about the effect of the Manual Update on their members. *Id.* That is not enough to establish standing at summary judgment.

23

added). The CBA's declaration does not attest that all of its members (or even all of its members subject to CFPB supervision) have been injured by the Manual Update. *Summers* requires a plaintiff-association to name a specific member that has been injured by the challenged conduct. It is not enough to attach the association's membership rolls, leaving the court to guess which if any of the members would have standing to sue in their own right.

The district court granted Plaintiffs summary judgment and entered a permanent injunction binding a federal agency in perpetuity without ever knowing the identities of the real parties in interest. That holding finds no support in the caselaw.

> **2.    Even if a plaintiff-association can identify its injured members using pseudonyms, Plaintiffs have still failed to show standing.**

Even assuming pseudonyms can sometimes suffice, Plaintiffs' summary judgment evidence still falls far short of establishing Plaintiffs' standing. In *Summers*, the Supreme Court held that courts cannot "accept[] … organizations' self-descriptions of their membership, on the simple ground that no one denies them." 555 U.S. at 499 (cleaned up). That's because courts have "an independent obligation to assure

that standing exists, regardless of whether it is challenged by any of the parties." *Id.* And "[w]ithout individual affidavits," the Supreme Court questioned "how…the court [is] to assure itself" of each of the facts necessary to establish that one or more of the organization's members actually suffered an Article III injury. *Id.*

In this case, as in *Summers*, the plaintiff organizations cannot demonstrate standing based merely on the organizations' say-so. In holding otherwise, the district court relied on declarations from the organizations' representatives that lacked competent evidence establishing that one or more specific members of each organization had standing.

### a. Plaintiffs have failed to submit competent evidence proving standing.

At summary judgment, a plaintiff-association must "submit affidavits or other evidence showing, through specific facts, … that one or more of [its] members would thereby be 'directly affected'" by the challenged conduct. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) (cleaned up). To meet this burden, a plaintiff-association must submit evidence from its members proving their own injuries. *Summers*, 555 U.S. at 497, 499; *see also All. for Hippocratic Med. v. FDA*, 78 F.4th

210, 234–35 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

This rule makes sense. It is well established that Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 555. It is also well-established that "[h]earsay is not competent summary judgment evidence." *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024). A declaration from a plaintiff-association relaying a secondhand description of injuries purportedly suffered by the association's members is a paradigmatic example of inadmissible hearsay. *See* Fed. R. Evid. 801(c).

Here, none of the Plaintiffs has submitted competent summary-judgment evidence proving that any of their members has been injured. Each of the Plaintiff associations submitted a declaration from one of its executives providing a secondhand description of its members' purported injuries. ROA.219-94. None of the declarants have firsthand knowledge of the purported injuries: they are simply relaying what they have been told. *E.g.*, ROA.239 (attesting that the declaration is based on

"information provided by … members"). These hearsay declarations offer nothing more than Plaintiffs' "self-descriptions," *Summers*, 555 U.S. at 497, 499, of their members' purported injuries. They are therefore insufficient to establish standing.

Even if Plaintiffs' hearsay declarations were appropriately considered at summary judgment, they are insufficient to establish the elements of standing with respect to any of Plaintiffs' members.[4] The "irreducible constitutional minimum" of standing comprises three elements, namely (i) that Plaintiff has suffered an injury in fact (ii) that is fairly traceable to the challenged conduct of the defendant, and (iii) that is likely to be remedied by a favorable order from the court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 339. Federal courts don't "adjudicate hypothetical … disputes." *TransUnion*, 594 U.S. at

---

[4] Their claims are not ripe for the same reason. *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) (demonstrating that standing and ripeness inquiries overlap with regard to concreteness of harm).

423. When a Plaintiff raises a pre-enforcement challenge to a law based on a threat of enforcement by the government, to establish standing, it must demonstrate a "serious intention to engage in conduct proscribed by law," *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018), or the expenditure of resources to avoid a concrete and imminent prospect of government enforcement, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416–18 (2013). Otherwise, a plaintiffs' claimed injury based on the threat of enforcement is purely "conjectural or hypothetical," *Spokeo*, 578 U.S. at 339, and a claimed injury based on compliance costs is self-inflicted, *Clapper*, 568 U.S. at 418.

Plaintiffs' declarations make a variety of generic assertions about how the Manual Update is resulting in increased compliance costs for supervised entities. For example, the U.S. Chamber's declaration vaguely attests that unnamed members "have already begun complying … by expanding their UDAAP compliance systems … to include nondiscrimination" and "monitoring and reviewing potential discrimination claims." ROA.225. The other Plaintiffs' declarations all include nearly identical perfunctory language. *E.g.*, ROA.233-34. But at summary judgment standing must be based on "specific facts." *Lujan*,

504 U.S. at 563. Accordingly, Plaintiffs' abstract descriptions of how the Manual Update is leading to increased compliance costs are not enough. Plaintiffs each need to show a "specific instance" of how the Manual Update resulted in one of their members suffering "identifiable harm." *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024).

While some of Plaintiffs' declarations do offer a few specific examples of compliance measures taken by their members, these examples are brief and void of any factual detail necessary to demonstrate standing. For one of Plaintiffs' members to have standing based on compliance measures it took in response to the Exam Manual, that member would have to establish that the compliance measures were "fairly traceable" to a future harm that is "certainly impending." *Clapper*, 568 U.S. at 416. But none of the declarations support that conclusion with respect to any specific Plaintiff member.

For example, the U.S. Chamber's declaration states that "Member B updated its policies, controls, and training materials to include discrimination considerations for non-credit products." ROA.225. But what was that certainly impending harm? The declaration does not say. To the extent that Member B believed that its new compliance

29

measures were needed to prepare for a future CFPB examination based on the Manual Updates, the court is left to guess whether such an examination was "certainly impending." Is Member B subject to the CFPB's supervisory authority? If so, will the CPFB examine Member B soon? And if an examination of Member B were imminent, would that examination include any inquiry related to discrimination in non-credit products? Who knows. The Bureau has supervisory authority over thousands of entities, including payday lenders and large depository institutions, *see* 12 U.S.C. §§ 5514, 5515, and while the largest entities are frequently examined, some smaller entities never have been. And no exam covers all topics. ROA.301.

What's more, the declaration does not establish why Member B updated its policies. It's possible—and entirely consistent with the declaration—that Member B revised its policies because it determined that it was appropriate for the policies, controls, and training materials for all of its products to incorporate "discrimination considerations." Indeed, the U.S. Chamber has separately emphasized to the D.C. Circuit that "[t]he Chamber and its members are strongly committed to the eradication of discrimination from the marketplace, and to ensuring

that financial services are provided to all consumers in a fair and even-handed manner." Br. of the Chamber of Commerce of the U.S. as Amicus Curiae at 5, *Nat'l Ass'n of Mut. Ins. Cos. v. HUD*, No. 23-5275, 2024 WL 2078484, *5 (D.C. Cir. May 8, 2024).

Member B might have also been concerned about the prospect of actions by other regulators—both state and federal—as well as by private litigants. Such a concern would have been well-founded because, as discussed below, a variety of actors have begun probing whether banks and other financial institutions have violated state or federal law by utilizing discriminatory de-banking practices. Indeed, it is now unlawful in Tennessee and Florida for financial institutions to discriminate on the basis of political viewpoint or religious affiliation. *See* Tenn. Code Ann. § 45-1-128; Fla. Stat. Ann. § 655.0323. The fact that Member B may have had "similar incentive to engage in many of the countermeasures" with or without the Manual Updates is another reason why Member B has not established that it has suffered an injury that is "fairly traceable" to the Updates. *Clapper*, 568 U.S. at 417.

Relatedly, it is unclear whether the injury purportedly suffered by Member B is redressable by an order of the court. If the Manual Update

31

were vacated, would Member B rescind its updated policies so that Member B stops accounting for "discrimination considerations" for its non-credit products altogether, notwithstanding the risk of actions by private parties and other regulators and despite being "strongly committed to the eradication of discrimination from the marketplace"? Again, the declaration does not say. Thus, not only does the declaration fail to prove that Member B's injury was caused by the Manual Update or hypothetical future supervisory actions, but it also fails to show redressability.

The other examples of specific compliance measures taken by Plaintiffs' members are all similarly void of facts necessary to prove standing. In each instance, the declaration asserts that some unnamed member has undertaken a compliance measure, but never represents that such member did so to avoid a certainly impending injury and never represents that the associated compliance costs could be

remediated through judicial intervention. For that reason alone,

Plaintiffs have failed to show standing.

> **b.    Plaintiffs' use of pseudonyms frustrates efforts to ascertain their standing.**

Plaintiffs' use of pseudonyms exacerbates the deficiencies in

Plaintiffs' showing of standing. To begin, Plaintiffs' approach made it

impossible for Defendants to rebut Plaintiffs' standing allegations. Had

the CFPB known the identities of Plaintiffs' members, it could have

submitted evidence already in its possession or in the public domain

discrediting their asserted injuries. Many financial institutions under

the CFPB's supervision have made sweeping public commitments to

non-discrimination and are subject to regulation and enforcement by

many other regulators. These institutions claim to be engaged in

extensive efforts to monitor their business practices for discrimination

for reasons that have nothing to do with the Manual Update.

Accordingly, one could reasonably doubt Plaintiffs' assertion that their

members have incurred new compliance costs as a result of the Manual

Update above and beyond their existing anti-discrimination efforts or

that judicial relief would reduce any such costs. But because Plaintiffs'

members were allowed to conceal their identifies, the CFPB was denied the opportunity to disprove their purported injuries.

The district court compounded that error by concluding that "the evidence of plaintiffs' standing is uncontested" because the CFPB did not "serve[] discovery requests seeking the names of plaintiffs' members who are suffering costs from the new manual provisions." ROA.3096. But the court overlooked that the CFPB *did* request "[l]imited jurisdictional discovery" in order "to determine whether Plaintiffs' members have been injured by the manual update." ROA.1809. In any event, as the Supreme Court held in *Summers*, courts may not accept organizations' self-descriptions of their membership on the ground that no one denies them. 555 U.S. at 499. Based on the record before it, the district court was in no position to assure itself that Plaintiffs had, in fact, identified a member who suffered the requisite harm. *See Do No Harm*, 96 F.4th at 117 n.6.

### 3. The district court's approach undercuts the presumption in favor of open proceedings.

The district court asserted jurisdiction to issue a permanent injunction based on factually insubstantial hearsay declarations attesting to injuries purportedly suffered by Plaintiffs' unnamed

members. Allowing the real parties in interest to remain anonymous through final judgment is inconsistent with the well-established presumption of open access to judicial proceedings, *e.g., June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 519–22 & n.5 (5th Cir. 2022).

Generally, given the importance of open judicial proceedings, plaintiffs must "disclose their names" in order "to commence a lawsuit." *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981) (citing Fed. R. Civ. P. 10(a)); *see, e.g., Doe v. McKesson*, 945 F.3d 818, 835 (5th Cir. 2019), *rev'd on other grounds*, 592 U.S. 1 (2020). The interest in open proceedings does not disappear as soon as associational standing is invoked. And while the Plaintiff associations are identified by name, their members—the real parties in interest—are not. Of course, there may be times when a plaintiff-association's members are entitled to anonymity. But consistency demands that those members be required to make the same showing that would be required of them had they brought suit on their own. *See Do No Harm*, 96 F.4th at 117 (explaining that it would be "incongruous" to "allow an association to rest its standing on anonymous member declarations when we would not allow those members…to proceed anonymously to the court in their own

right"). Indeed, under Fifth Circuit law, parties cannot litigate anonymously based on "generalized concerns," *June Med.*, 22 F.4th at 520 n.5, yet Plaintiffs offer nothing else, ROA.1762.

Ultimately, the district court's holding exacerbates existing "tension between associational standing and other areas of the law." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 402 (2024) (Thomas, J. concurring). As Justice Thomas recently explained, associational standing doctrine arguably operates to create a set of rules for plaintiff-associations that materially differ from the rules that apply to individual litigants. *Id.* Allowing associational standing to become a tool litigants can employ to avoid revealing their identities and to evade public scrutiny of judicial proceedings would simply make this problem worse.

### B.    Venue is Improper in the Eastern District of Texas.

Even if the Court finds that one or more Plaintiffs have standing, this case must nonetheless be dismissed for improper venue. That is because the only Plaintiff that resides in the Eastern District of Texas—

the Longview Chamber—has failed to show standing, and dismissal is proper when the venue-creating plaintiff lacks standing.

### 1. The only plaintiff that resides in the district does not have standing.

The Longview Chamber has failed to show Article III standing for all of the reasons stated above—and one more. First, the Longview Chamber's declaration, ROA.272–79, fails to name the members on whose behalf it brought suit. *See* § I.A.1. Second, while the Longview Chamber's declaration refers vaguely to its "members," it never identifies (even by pseudonym) a member that has been injured by the Manual Update. *See* § I.A.1. Third, the only evidence the Longview Chamber submitted in support of its standing is a declaration from its own president providing a secondhand account of injuries purportedly suffered by the association's members. *See* § I.A.2. Fourth, the Longview Chamber's declaration does not prove the elements of standing as to any of its members. *See* § I.A.2.

There is one additional point: The failure of the Longview Chamber to name its members not only runs afoul *Summers*, but it also prevents the Court from determining whether "the interests it seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at

343; *see also Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 n.2 (5th Cir. 2023). The Longview Chamber asserts that its purpose is "to enhance economic growth of the Longview trade area." ROA.272. But the allegedly injured members, whose interests it seeks to protect, may be far-flung financial institutions with no ties to Longview who joined the Longview Chamber to facilitate this suit. The Court has no way of knowing given the Longview Chamber's stonewalling.

### 2.    Because the plaintiff on which venue is purportedly based lacks standing, the case must be dismissed.

Venue is only proper in the Eastern District of Texas if the Longview Chamber is a proper party to the litigation. Plaintiffs contend that venue is proper under 28 U.S.C. § 1391(e)(3), which provides that a civil action against a federal defendant may generally be brought in any district where a plaintiff resides. But the only Plaintiff that resides in the Eastern District of Texas, the Longview Chamber, lacks standing. And the venue-creating plaintiff "must have standing." *Clark & Reid Co. v. United States*, 804 F.2d 3, 5 (1st Cir. 1986).

Venue cannot be predicated on the inclusion of a party that lacks Article III standing. That principle is uncontroversial. *See Miller v.*

38

*Albright*, 523 U.S. 420, 426–27 (1998). Federal courts consistently transfer or dismiss cases where the venue-creating plaintiff failed to show standing. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202–05 (11th Cir. 2018); *Clark & Reid Co.*, 804 F.2d at 5–7; *Assoc. Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*, No. 6:24-cv-00037, 2024 WL 1078260, at *7–9 (W.D. La. Mar. 12, 2024). Here, because the Longview Chamber lacks standing, the case should be dismissed for improper venue.

### C. Plaintiffs Lack Standing to Challenge Hypothetical Supervisory and Enforcement Actions and to Recover for Unharmed Associations and Members.

Plaintiffs lack standing to seek declaratory and injunctive relief with respect to hypothetical supervisory and enforcement actions. Their claims for such relief are unripe for similar reasons. In addition, Plaintiffs lack standing to sue on behalf of unharmed associations and members.

To begin, even if one thinks that Plaintiffs had standing to challenge the Manual Update, e.g., because of a lack of notice and comment rulemaking, they do not have standing to obtain declaratory and injunctive relief with respect to the Bureau's statutory authority to

bring *hypothetical* supervisory and enforcement actions: "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. And the doctrine of constitutional ripeness contains the same limitation on jurisdictional bootstrapping. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990).

Plaintiffs' allegations do not suffice to secure standing to challenge hypothetical supervisory or enforcement actions. They assert that their members have been required to incur certain prophylactic compliance costs to avoid supervisory and enforcement actions. *See, e.g.*, ROA.26. But Plaintiffs do not claim that any member intends to engage in a course of conduct that is even arguably proscribed by § 5531. Thus, Plaintiffs have not demonstrated that, without bearing the alleged compliance costs, they would otherwise face "certainly impending" enforcement by the CFPB. Any compliances costs expended to avoid enforcement, then, are non-cognizable self-inflicted injuries. *Clapper*, 568 U.S. at 416. Their claims for declaratory and injunctive relief are unripe for the similar reasons.

Even assuming that some members of some Plaintiffs did have
standing to seek declaratory and injunctive relief with respect to
hypothetical future supervisory or enforcement actions (they don't), that
would still not permit granting that relief to Plaintiffs (or members of
Plaintiffs) that have not demonstrated such standing.  With respect to
vacatur of the March 2022 updates, it does not matter how many
entities have standing because, under this Court's precedent, vacatur is
universal.[5] *See, e.g., Career Coll. & Sch. of Tex. v. United States Dep't
of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). But the same is not true of
injunctive relief. The Bureau's conduct would be constrained with
respect to a different number of parties depending on how many
Plaintiffs (and how many of Plaintiffs' members) have standing. *See
TransUnion*, 594 U.S. at 431. Thus, at a minimum, the Court should
vacate the entry of declaratory and injunctive relief in favor of any
Plaintiffs (and, by extension, their members) who do not have standing.

---

[5] The United States has challenged the conclusion that the authority to
set aside final agency actions under the APA authorizes universal relief,
Pet. Br., *United States v. State of Tex.*, 2022 WL 4278395, at *40 –44,
but this Court has concluded otherwise and, in any case, need not
address that issue here.

Similarly, the injunction sweeps too broadly because it applies to association members without standing, i.e., uninjured members. *See* ROA.3109–3110. An association has standing to sue if, among other things, "its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. But that one or two members *may* have standing is not a license to issue an injunction that applies to other members who would not have had standing. An injunction for the unharmed is inconsistent with Article III. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks…[an] injunction…it can reasonably be supposed that the remedy…will inure to the benefit of those members of the association actually injured."). Moreover, by its very nature, associational standing is in tension with Article III standing requirements. *Hippocratic Med.*, 602 U.S. at 397 (Thomas, J., concurring). Extending injunctive relief to uninjured members would only make things worse. The injunction, if not vacated entirely, should be limited to members with standing.

II.     **The Bureau has Statutory Authority to Treat Discriminatory Acts and Practices as Unfair, and the Bureau's Funding Statute is Constitutional.**

The district court's holding that the Bureau lacks the statutory authority to treat discriminatory acts or practices as unfair under 12 U.S.C. § 5531 is flawed. The holding that the Bureau's funding statute violates the Constitution is no better. The Court should reverse.

A.     **The District Court's Holding that the Bureau Lacked Statutory Authority is Flawed.**

1.     **The CFPA authorizes treating discrimination as unfair.**

Without the gloss of the major questions doctrine (which does not apply anyway, see below), discriminatory acts and practices can clearly satisfy § 5531's standard for unfairness. We start our discussion with the text of the statute. Section 5531 provides that the Bureau can declare an act or practice unfair if it satisfies three criteria: 1) "the act or practice causes or is likely to cause substantial injury to consumers"; 2) the injury is not "reasonably avoidable by consumers"; and 3) the "injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(a), (b). It also states that when "determining whether an act or practice is unfair, the Bureau may

43

consider established public policies as evidence to be considered with all other evidence," though "public policy considerations may not serve as a primary basis for such determination." *Id.* § 5531(c)(2).

As a textual matter, a discriminatory act or practice could satisfy the statutory standard for unfairness. A discriminatory act—such as debanking a Christian based on their religion—could cause a substantial injury (the loss of banking services, for example), which is not reasonably avoidable (discrimination is rarely advertised), and which offers no benefit to consumers or competition (limiting consumers' options based on irrelevant criteria certainly would not aid consumers or the market). Under the district court's logic, the Bureau could not even investigate this intentional religious discrimination to determine if it's unfair. But here Congress created no exception to unfairness for discriminatory acts or practices, *see id.* § 5531, and it was not the district court's job to create one, *see, e.g., Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 447 (5th Cir. 2023) ("Congress's omission of any exceptions emphatically forbids us from writing [an] … exception into the statute.").

Creating an atextual exception to the statutory standard for
unfairness would flout Congress's decision to establish unfairness as a
broad concept, encompassing (among other things) "unfair practices
that have not yet been contemplated by more specific laws" and
"practices [that] violate some other statute that the [agency] lacks
authority to administer." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1194–
95 (10th Cir. 2009). Indeed, Congress has declined to "enumerat[e] the
particular practices to which [unfairness] was intended to apply,"
*Sperry & Hutchinson Co.*, 405 U.S. at 239–40, because there are "too
many unfair practices to define, and after writing 20 of them into the
law it would be quite possible to invent others," S. Rep. No. 63–597, at
13 (1914); *see also, e.g.*, ROA.100–101 (providing examples of conduct
that has been deemed unfair by other regulators, including refusing to
release a lien after all payments were made). In addition, it would be
particularly odd for unfairness to silently exclude discrimination
because dictionary definitions of the term "discrimination" establish
that it has long referred to acts thought to be unfair. Jeff Sovern, *Is
Discrimination Unfair?*, U of Maryland Legal Studies Research Paper

No. 2024–02 (forthcoming in Georgia St. Law Rev.), at 28 (May 27, 2024 draft), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4712271.

Moreover, the consideration of established public policy, in accord with 12 U.S.C. § 5531(c)(2), reinforces the conclusion that there is no discrimination exception to the unfairness standard. The consideration of established public policy "tethers…unfairness judgments to the values that Congress and the courts have articulated elsewhere." Dennis D. Hirsch, *From Individual Control to Social Protection: New Paradigms for Privacy Law in the Age of Predictive Analytics*, 79 Md. L. Rev. 439, 489 (2020) (addressing unfairness under nearly identical FTC authority). Established public policies, "used in this context, mean policies that are widely followed, and embodied in statutes, judicial decisions, or the Constitution." *Id.* (cleaned up). And "it is difficult to identify a public policy more established than that against discrimination." Sovern, *Is Discrimination Unfair?*, at 36. Indeed, Congress has expressed its disapproval of many forms of discrimination, including in consumer transactions, by outlawing them. *See, e.g.*, 15 U.S.C. § 1691 (prohibiting discrimination in credit transactions on, among other grounds, "race, color, religion, national origin, sex or

marital status, or age"); 42 U.S.C. § 1981 (prohibiting racial discrimination in contracting), 42 U.S.C. § 2000a (prohibiting race, color, national origin, and religious discrimination in public accommodations), *id.* § 2000a-1 (prohibiting race, color, national origin, and religious discrimination "at any establishment or place" when the discrimination is required by state or local law), *id.* § 2000e-2 (prohibiting adverse employment actions based on an employee's "race, color, religion, sex, or national origin").

History too supports the conclusion that unfairness under § 5531 can encompass discriminatory acts or practices. As noted earlier, the unfair act or practice language is drawn from the FTC Act, 15 U.S.C. § 45(n). And decades ago, the FTC concluded that a discriminatory act or practice could be unfair. In 1968, the Commission declined to recognize an exception to the prohibition on deception—the FTC Act, like the CFPA, specifies that deceptive practices are prohibited, 15 U.S.C. § 45(n)—for conduct that may also be discriminatory. *See In re First Buckingham Cmty., Inc.*, 73 F.T.C. 938, Docket 8750, at *7 (1968). This decision provides more than just inferential support for the conclusion that there is no exception to unfairness for discrimination;

unfairness and deception are not just two concepts mentioned in the same statutory provision, *see* 12 U.S.C. § 5531(a). Instead, the FTC has long recognized deception as a subset of unfairness. *See In re Int'l Harvester Co.*, 104 F.T.C. 949, 1060 (1984) ("[U]nfairness is the set of general principles of which deception is a particularly well-established and streamlined subset."). *Buckingham*, then, is a decision about unfairness—a fact the FTC explicitly recognized in *In re Pfizer Inc.*, 81 F.T.C. 23, 27 n.5 (1972). And the upshot is this: the FTC made clear decades ago that discriminatory acts or practices can be unfair.

Other agencies have reached the same conclusion as the FTC about discrimination and unfairness. The Department of Transportation (DOT), applying an unfairness provision (49 U.S.C. § 41712(a)) modeled on the Federal Trade Commission's, *see Am. Airlines, Inc. v. N. Am. Airlines, Inc.*, 351 U.S. 79, 82 (1956), has interpreted the prohibition on unfair acts and practices to apply to discrimination. *See*, *e.g., United Air Lines, Inc.*, No. OST-2003-14194, Order 2003-11-13, at 1 (DOT Nov. 19, 2003), 2003 WL 25425041; *Continental Airlines, Inc.*, No. OST 2004-16943, Order 2004-4-4, at 1 (DOT Apr. 2, 2004), 2004 WL 720318. And the Federal Reserve Board

and the Federal Deposit Insurance Corporation concluded, in 2004, that "[u]nfair or deceptive practices that target or have a disparate impact on consumers who are members of these protected classes may violate … the FTC Act." ROA.2797.

Taken together, this history establishes that, by 2010, when Congress enacted § 5531, agencies with unfairness authority had, over many years, consistently interpreted "unfairness" to encompass discriminatory acts and practices. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978). In light of the text and history of the statute, then, the CFPB's interpretation that unfairness can encompass discriminatory acts and practices is the right one.

The arguments to the contrary are unconvincing. The district court held there was no clear statutory authorization to treat discrimination as unfair because the "Dodd–Frank Act treats discrimination and unfairness as distinct concepts," the "statutory definition of 'unfairness' makes no mention of discrimination," and the history of the text does not "refute [the] ambiguity" about the scope of unfairness provision. ROA.3100–03. It is wrong about each point.

49

Start first with the "distinct concepts" point. The district court
highlighted that when establishing the agency's objectives, Congress
treated unfairness and discrimination as separate concepts, by
authorizing the Bureau to protect consumers from "unfair, deceptive or
abusive acts and practices *and* from discrimination," 12 U.S.C.
§ 5511(b)(2) (emphasis added). ROA.3100. To be sure, discrimination is
a distinct concept from unfairness. Distinct does not mean mutually
exclusive, however, and the court's holding depends on the concepts
being mutually exclusive (i.e., that discrimination cannot be unfair).
The district court's opinion offers no support for the proposition that
"and" in § 5531 indicates that the item that follows is mutually
exclusive from the ones that precede it. Use of the word "and" does not,
as a logical matter, denote mutual exclusivity. For example, if a person
states that they like "juice, coffee and milk," one would not assume that
the person only drinks their coffee black. *See Nebraska*, 143 S. Ct. at
2380 (Barrett, J.,concurring) (explaining that context, including
"commonsense principles of communication," can help define scope of
delegation). Importantly, courts have recognized that the other distinct
concepts in the statute overlap, namely, the distinct prohibitions in

50

§ 5531 on unfair conduct and deceptive conduct. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245 (3d Cir. 2015) (collecting cases discussing the overlap).

That the statutory definition of "unfairness" does not explicitly mention discrimination is similarly unpersuasive. As noted above, unfairness is a broad concept, the statute does not specifically enumerate any unfair practices, and there is no exception for discrimination. The best interpretation of the statute, then, is that "unfairness" encompasses discrimination.

Finally, the district court concluded that the history of the text did not refute the ambiguity that it had identified. ROA.3102–03. It explained that "legal views on the FTC Act's 'unfairness' definition have changed over the decades, leaving it unclear that Congress meant to adopt a broad view on that major question in the Dodd–Frank Act." *Id.* According to the district court, "[a]t times, the FTC has … stat[ed] that the principal focus of our unfairness policy is on the maintenance of consumer choice or consumer sovereignty…" ROA.3102 (cleaned up).

The district court was wrong. Prior to 2011, the FTC may have varied its approach to unfairness in certain ways, including by shifting

51

the focus from consumer choice to equity. *See id.* But any variance was not relevant to whether discrimination could be considered unfair. As discussed above, the FTC—and other agencies implementing similar unfairness authority—consistently understood unfairness to encompass discrimination, from the 1970s through 2010. *See* § II.A.1. This makes sense. Not only is invidious discrimination inequitable, but it also deprives consumers of choice. If a bank refuses to open an account for an African American because of their race or a Christian because of their religion, then that individual is deprived of a free choice, given to otherwise similarly situated consumers, about where to hold their money.

### 2.    The major questions doctrine focuses on questions of great economic and political significance.

The district court did not rest its analysis on the text, however. Instead, the district court invoked the major questions doctrine. ROA.3098. The major questions doctrine provides that there are certain "extraordinary cases" in which the "history and the breadth of the authority that the agency has asserted" and the vast "economic and political significance" of the assertion of authority by the agency "provide a reason to hesitate before concluding that Congress meant to

confer such authority." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697,

721 (2022) (cleaned up). The "hestitat[ion]" manifests itself in a

requirement that "the agency…point to clear congressional

authorization for the power it claims." *Id.* at 723 (quotation marks

omitted). Neither the Supreme Court nor this Court has provided a firm

definition of what level of economic significance suffices to support

invocation of the doctrine, but the cases invoking economic significance

have involved billions of dollars in expenditures (by the government or

regulated entities) and/or a fundamental restructuring of a sector of the

economy. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023)

(estimating that the agency's action would "cost taxpayers between

$469 billion and $519 billion") (cleaned up); *BST Holdings, L.L.C. v.

Occupational Safety & Health Admin.*, 17 F.4th 604, 617 (5th Cir. 2021)

(concluding that "nearly $3 billion in compliance costs" supported

invocation of the doctrine when combined with numerous other factors

supporting its application). To determine whether a question is of

sufficient political significance to support the invocation of the doctrine,

the Supreme Court has looked at whether it is a "matter of earnest and

profound debate across the country." *Nebraska*, 143 S. Ct. at 2374 (cleaned up).

Courts have identified other factors, accompanying the questions of economic and political significance, that may indicate the presence of a major question, including whether the authority asserted by the agency (i) "intrudes into an area that is the particular domain of state law," *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021), (ii) constitutes a "transformative expansion in [its] regulatory authority," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), and (iii) falls inside the agency's realm of expertise, *W. Virginia*, 597 U.S. at 729.

If the major questions doctrine applies, then "the Government must…point to clear congressional authorization to regulate in that manner." *W. Virginia*, 597 U.S. at 732 (quotation marks omitted). That said, none of the major question doctrine cases "requires an unequivocal declaration from Congress authorizing the *precise* agency action under review, as our clear-statement cases do in their respective domains." *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring).

54

### 3. The district court misapplied the major questions doctrine.

The district court erred in concluding that the Bureau lacks the authority to determine that a discriminatory act or practice is unfair, even if it satisfies the express terms of § 5531's unfairness test. The court concluded that subjecting discriminatory acts and practices to § 5531's unfairness test necessarily raises a major question. ROA.3098. This holding can stand only if applying § 5531 to such acts or practices *always* presents a major question. *See Reno*, 507 U.S. at 301 (holding that a facial challenge based on a lack of statutory authority requires showing no valid application). But that's not the case. As the district court otherwise recognized, the law provides many different standards for discrimination, with different protected bases, intent requirements, and defenses.[6] ROA.3099–3100. Thus, not every application of § 5531 to discriminatory conduct is the same, and the major questions doctrine analysis depends on specific authority asserted by the Bureau under

---

[6] And, in many cases, discrimination involves arbitrary treatment lacking a rational basis. *See, e.g., Del Casal v. E. Airlines, Inc.*, 634 F.2d 295, 301 (5th Cir. 1981) ("[D]iscrimination against nonmember employees who are part of the bargaining unit is impermissibly arbitrary if no relevant distinctions exist between the union and nonunion employees.")

§ 5531. Would it be a major question for the Bureau to conclude that it was unfair for a bank to intentionally charge a consumer a higher fee based on their race? What about debanking a consumer because of their religion? There are more potential hypotheticals. But the point is clear: whether applying § 5531 to a discriminatory act or practice would trigger the major questions doctrine does not lend itself to a one-size-fits-all solution. And many assertions of authority related to the application of unfairness to discriminatory conduct come nowhere close to implicating the doctrine. Thus, the district court's holding that the Bureau lacks the statutory authority to ever assess whether discrimination is unfair is wrong.  And, in any case, Congress authorized the Bureau to treat discriminatory conduct as unfair.

> a.    **Applying § 5531 to discrimination does not raise questions of vast economic or political significance.**

We start first with economic considerations. Plaintiffs and the court lump all possible, theoretical agency assertions of discriminatory-unfairness authority together when considering economic costs. This flawed approach overestimates the relevant compliance costs. Under the major questions doctrine, the question is whether a specific

challenged assertion of authority presents a major question, not whether all similar possible assertions considered together do. *Cf. Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 725 n.5 (10th Cir. 2024). It was wrong therefore for the district court to bar the Bureau from, among other things, bringing any supervisory or enforcement action under § 5531 for intentional racial or religious discrimination based on the district court's concern about the costs of hypothetical assertions of agency authority involving disparate impact.

In any case, even when conflating these various costs, Plaintiffs don't contend that treating discrimination as unfair would lead to billions in compliance costs. They argue only that it would lead to millions in costs, a claim that the district court echoed. *See* ROA.208, 3098. But even if Plaintiffs had provided an adequate basis to support the proposition that their members will incur millions of dollars in compliance costs (which they have not), that would not be enough to support the invocation of the major questions doctrine, which is reserved for assertions of authority of "vast economic…significance," *Util. Air*, 573 U.S. at 324. *See Rest. L. Ctr. v. United States Dep't of Lab.*, 2023 WL 4375518, at *13 (W.D. Tex. July 6, 2023) (determining

that a rule that will impose average annual costs of $183.6 million is not of vast significance); *Fed'n of Americans for Consumer Choice, Inc. v. United States Dep't of Lab.*, 2023 WL 5682411, at *15 (N.D. Tex. June 30, 2023) (holding that $80 million in annual compliance costs do not constitute vast significance). Indeed, if millions in expenditure sufficed, then, given the size and scope of the American economy, the major questions doctrine would no longer be reserved only for "extraordinary cases." *W. Virginia*, 597 U.S. at 721. Rather, every year, scores of rules issued by federal agencies could trigger the doctrine, especially in the financial services industry, where even the smallest change can lead to millions of dollars in effects, *see Fed'n of Ams. for Consumer Choice*, 2023 WL 5682411, at *15.

From here, things only get worse for Plaintiffs. Take the example of intentional discrimination. *See Reno*, 507 U.S. at 301 (holding that one valid application defeats facial challenge).[7] Prominent institutions

---

[7] The district court concluded that the major questions doctrine should apply, in part, because the "CFPB's claimed authority to prohibit disparate-impact discrimination is something that Congress rarely authorizes[.]" ROA.3099. But, on this facial challenge to the Bureau's statutory authority, the relevant question is whether there is any valid application of § 5531 to discrimination, *see Reno*, 507 U.S. at 301, and

have made it clear that they already forbid their employees from intentionally discriminating on many grounds. For example, in a 2024 proxy statement, Bank of America proclaimed that "the company does not make decisions regarding its client relationships on the basis of any client's political viewpoint, religious affiliation, or other discriminatory characteristics that would be inconsistent with our Human Rights Statement." Bank of America, Proxy Statement, at 99 (March 11, 2024).[8] JPMorgan Chase has made a similar proclamation, as have Citibank and Paypal.[9] We presume other institution also similarly

---

treating (at least) some types of intentional discrimination as unfair certainly would not raise major questions. This suffices to justify reversal of the district court's decision. Hypothetical questions about the treatment of disparate impact discrimination under § 5531 need not be resolved in this case.

[8]Available at https://investor.bankofamerica.com/regulatory-and-other-filings/all-sec-filings/content/0001193125-24-064529/0001193125-24-064529.pdf.

[9] J.P. Morgan Chase & Co, *Annual Meeting of Shareholders Proxy Statement 2023*, 100 (April 4, 2023), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/proxy-statement2023.pdf; Citigroup Inc., *Citigroup 2024 Notice of Annual Meeting and Proxy Statement*, 136 (March 19, 2024), https://www.citigroup.com/rcs/citigpa/storage/public/Citi-2024-proxy-statement.pdf; PayPal Holdings Inc., Letter from Raquel Fox, Counsel for Paypal, to SEC, Office of Chief Counsel, re: PayPal Holdings 2023 Annual Meeting Omission of Shareholder Proposal of the National Center for Public Policy Research, 9 (Jan. 20, 2023),

forbid their employees from intentionally discriminating against customers. Thus, there should be no—or minimal—additional compliance costs attributable to treating many forms of discrimination as unfair, and acts of discrimination can be treated as unfair without imposing vast economic costs.

Turning from the economic to the political does not aid Plaintiffs' effort to show that there are no valid applications of § 5531 to discrimination. *See Reno*, 507 U.S. at 301. The district court opined that treating discriminatory acts or practices as unfair under § 5531 is a major question because it would deprive Congress of the ability to decide "major questions" related to prohibiting discrimination, such as "what classes are protected, what outcomes or actions are prohibited, and defenses to liability." ROA.3099. But the application of § 5531 to discrimination does not invariably raise questions of great political significance. For example, there is no "earnest and profound debate across the country," *Nebraska*, 143 S. Ct. at 2374 (cleaned up), about whether banks should be allowed to intentionally discriminate on the

---

https://www.sec.gov/files/litigation/admin/1999/ncpprpaypal041023-14a8.pdf.

basis of race or religion. Instead, there is broad agreement, from across the political spectrum, that such discrimination is improper. *See, e.g.*, Letter from Kris. W. Kobach, Kansas Attorney General, et al., to Brian T. Moynihan, Chairman and CEO, Bank of America (April 15, 2024), https://ag.ks.gov/docs/default-source/documents/bank-of-america-letter.pdf; Press Release from Sen. Sherrod Brown, *Brown, Senate Democrats Introduce New Legislation to Combat Discrimination in Our Nation's Financial Services Industry* (Oct. 21, 2020), https://www.brown.senate.gov/newsroom/press/release/brown-senate-democrats-legislation-discrimination-financial-services-industry. The financial institutions agree with this consensus, as demonstrated by their anti-discrimination policies. And Congress has made its judgment clear by outlawing discrimination in many forms over decades.[10] *See* § II.A.1.[11] To say, that there is a profound debate about the propriety of

---

[10] Indeed, as to race, Congress settled the underlying discrimination question at issue in this example more than 150 years ago. *See* 42 U.S.C. § 1981 (outlawing racial discrimination in contracting).

[11] The district court also opined that Congress was especially unlikely to grant the Bureau the authority to treat discrimination as unfair because of its "anomalous" funding structure, ROA.3099, but the Supreme Court has since upheld the Bureau's funding statute, *CFSA*, 601 U.S. at 421.

long-repudiated forms of intentional discrimination is simply implausible. Thus, Plaintiffs cannot show that there are no valid applications of § 5531 to discrimination. *See Reno*, 507 U.S. at 301.

The district court did not limit its assessment of politically significant questions to federal interbranch relations; it also concluded that allowing any discriminatory acts or practices to be treated as unfair would unsettle federal-state relations. *See* ROA.3099. This conclusion is incorrect. Under Supreme Court precedent, the operative question is whether the agency's action will "intrude[ ] into an area that is the particular domain of state law." *Alabama Ass'n of Realtors*, 594 U.S. at 764. But, for example, treating intentional discrimination on the basis of race or religion as unfair under § 5531 would not intrude into a state-centric domain. The vast array of federal anti-discrimination and consumer protection laws demonstrate that the federal government has long taken a broad and active role in fighting discrimination and protecting consumers. *See, e.g.*, FTC Act, 15 U.S.C. § 41 *et seq.*; Equal Credit Opportunity Act, 15 U.S.C. § 1591 *et seq.*; *see also* § II.A.1. (listing laws).

The district court applied the wrong test. It asked whether treating discrimination as unfair would "displace the balances struck by the States" regarding how to handle discrimination. ROA.3099. This approach would create a kind of reverse field preemption whereby *state law* would occupy a field absent a clear statement from Congress. But the Supreme Court has never indicated that the major questions doctrine is intended to upend federal-state relations in this way. Moreover, given the number of areas of overlapping jurisdiction, if the district court's test applied, the major questions doctrine would no longer be reserved for "extraordinary cases," *W. Virginia*, 597 U.S. at 721.

The district court also failed to address two factors that demonstrate that any application of § 5531 to discrimination would not raise a major question. First, courts have recognized that the implementation of existing statutory prohibitions through enforcement actions does not constitute a "transformative expansion in regulatory authority," *Util. Air*, 573 U.S. at 324. *See, e.g., SEC v. Binance*, 2024 WL 3225974, at *42 (D.D.C. June 28, 2024); *SEC v. Coinbase*, 2024 WL 1304037, at *15 (S.D.N.Y. Mar. 27, 2024); *FTC v. Kochava Inc.*, 671 F.

Supp. 3d 1161, 1180 (D. Idaho 2023). To paraphrase the *Coinbase*

decision, "[u]sing [supervision and] enforcement actions to address

[discrimination] is simply the latest chapter in a long history of giving

meaning to the [unfairness] laws through iterative application to new

situations." *Coinbase*, 2024 WL 1304037, at *15. Second, the treatment

of discriminatory acts or practices as unfair is well within the scope of

the Bureau's expertise, as Congress has tasked it with policing

unfairness and discrimination in consumer finance, 12 U.S.C.

§ 5511(b)(2). *W. Virginia*, 597 U.S. at 729 (indicating that the major

questions doctrine is less likely to apply to matters within an agency's

field of expertise).

> **b.    Congress clearly authorized the Bureau to treat discrimination as unfair.**

Even if there were a major question about whether discriminatory

acts or practices can be treated as "unfair" under § 5531, the district

court's order would be unwarranted because Congress has provided

"clear congressional authorization to regulate in that manner." *W.*

*Virginia*, 597 U.S. at 732 (quotation marks omitted); *see* § II.A.1.

### B.    There Is No Appropriations Clause Violation.

The district court declared that the Bureau could not treat any discriminatory acts or practices as unfair because the funding to do so is distributed in violation of the Appropriations Clause. ROA.3109. The district court based its holding on *CFSA*. ROA.3097; *CFSA*, 51 F.4th at 635–642. But the Supreme Court has reversed *CFSA*, concluding that the Bureau's "funding mechanism complies with the Appropriations Clause." *CFSA*, 601 U.S. at 421. Accordingly, the district court's constitutional holding should be reversed.

### III.    If Any Relief Were Appropriate, Vacatur Would Suffice, and, in Any Case, the Injunctions and Declaratory Relief Are Overbroad.

If any remedy were warranted, vacatur of the March 2022 updates would suffice. No injunction is warranted. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 160–66 (2010). Even if injunctive relief were appropriate, the Court erred by extending that relief to future association members (i.e., current nonmembers). Finally, the court issued overly broad declaratory relief.

No injunction is warranted. The Supreme Court has held that "[i]f a less drastic remedy" such as vacatur is sufficient to redress a plaintiff's injuries, then "no recourse to the additional and

65

extraordinary relief of an injunction [i]s warranted." *Monsanto*, 561 U.S. at 165–66. If Plaintiffs are entitled to any remedy, vacatur of the changes to the manual would suffice. Plaintiffs have attributed their alleged injuries to the March 2022 manual updates. ROA.24, 26. Vacating the Manual updates, then, would provide Plaintiffs with full relief from their alleged injuries because it would put them in the same position they were in before the updates were made. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). Thus, "no recourse to the additional and extraordinary relief of an injunction [i]s warranted." *Monsanto*, 561 U.S. at 165–66.

The injunction is not only unwarranted, but it is also overbroad: it applies to future members of Plaintiff organizations. This was an error for two reasons. First, Plaintiffs lack standing to assert claims on behalf of future members. The Supreme Court has never recognized an association's standing to bring suit on behalf of nonmembers—and future members are just that: current nonmembers. *Hunt*, 432 U.S. at 343 (recognizing associational standing to sue for members). Second, traditional remedial principles also weigh against extending relief to future members. "[I]njunctive relief should be no more burdensome to

the defendant than necessary to provide complete relief to the plaintiffs." *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (quotation marks and citation omitted). Injunctive relief directed to Plaintiffs' current members will provide complete relief to Plaintiff associations. Importantly, an injunction that extends to future members operates as a de facto universal injunction, and, thus, raises some of the same troubling issues as a traditional universal injunction. *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). Here, there is another concern: tying the injunction to organizational membership effectively empowers Plaintiffs to issue licenses for access to its benefits as a perk of membership.

Finally, a word about declaratory relief. The declaratory relief awarded by the court is overbroad. The court declared that the Bureau lacks the statutory authority to ever treat a discriminatory act or practice as unfair. ROA.3109. But as demonstrated earlier, this is incorrect. In its opinion, the court noted that the Bureau "concede[d] that 'declaratory relief would be an appropriate remedy' if the court credits any of plaintiffs' claims." ROA.3104. But the premise of the concession, of course, was that only "appropriate" declaratory relief

would be an appropriate remedy. For example, the Bureau's position could not be taken as a concession that the district court could declare that Bureau lacks the authority to regulate financial institutions in any way. The same logic applies here. The declaratory relief issued by the district court is overbroad. It should be vacated.

## CONCLUSION

For these reasons, the Court should reverse the district court's judgment.

Dated: August 7, 2024                    Respectfully submitted,

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher Deal
  *Assistant General Counsel*

  s/ *Justin M. Sandberg*
Justin M. Sandberg
Ryan Cooper
  *Senior Counsel*
Consumer Financial Protection
Bureau
1700 G Street NW
Washington, DC 20552
Justin.Sandberg@cfpb.gov
Ryan.Cooper@cfpb.gov
(202) 450-8786 (Sandberg)
(202) 702-7541 (Cooper)

## CERTIFICATE OF SERVICE

I hereby certify on this 7th Day of August, 2024, a true and correct copy of this document was served electronically by the Court's CM/ECF system to all counsel of record who have identified email as their preferred method of service.


*s/ Justin M. Sandberg*
Justin M. Sandberg

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 12,789 words. The motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Office 365 Pro Plus in Century 14-point font, a proportionally spaced typeface.

*/s/ Justin M. Sandberg*
Justin M. Sandberg
