No. 23-40650

# In the United States Court of Appeals for the Fifth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW
CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER
BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS
ASSOCIATION OF BUSINESS; TEXAS BANKERS ASSOCIATION,
*Plaintiffs-Appellees*,

v.

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT CHOPRA,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Texas
Trial Court No. 6:22-cv-00381

**BRIEF OF AMICI CURIAE RISE ECONOMY, NATIONAL COMMUNITY
REINVESTMENT COALITION, NATIONAL ASSOCIATION FOR
LATINO COMMUNITY ASSET BUILDERS, CENTER FOR
RESPONSIBLE LENDING, TEXAS APPLESEED, NATIONAL
CONSUMER LAW CENTER, AND AMERICANS FOR FINANCIAL
REFORM EDUCATION FUND IN SUPPORT OF APPELLANTS
CONSUMER FINANCIAL PROTECTION BUREAU AND ROHIT
CHOPRA**

Rachel L. Fried
Orlando Economos
Victoria Nugent
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons are entities as described in the fourth sentence of Rule 28.2.1 as having an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellees* | *Counsel for Plaintiffs-Appellees* |
| --- | --- |
| Chamber of Commerce of the United States of America<br>Longview Chamber of Commerce<br>American Bankers Association<br>Consumer Bankers Association<br>Independent Bankers Association of Texas<br>Texas Association of Business<br>Texas Bankers Association | Cameron Thomas Norris<br>Jennifer B. Dickey<br>Bruce Alan Smith<br>Jordan Landrum Von Bokern<br>Bryan K. Weir<br>David Pommerehn |
| *Defendants-Appellants* | *Counsel for Defendants-Appellants* |
| Consumer Financial Protection Bureau<br>Rohit Chopra | Justin Michael Sandberg<br>Ryan Cooper |
| **Amici Curiae** | *Counsel for Amici Curiae* |
| RISE Economy<br>National Community Reinvestment Coalition<br>National Association for Latino Community Asset Builders<br>Center for Responsible Lending<br>Texas Appleseed<br>National Consumer Law Center<br>Americans for Financial Reform Education Fund | Rachel L. Fried<br>Orlando Economos<br>Victoria Nugent |

## CORPORATE DISCLOSURE STATEMENT

RISE Economy (RISE) is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of RISE.

National Community Reinvestment Coalition (NCRC) is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of NCRC.

National Association for Latino Community Asset Builders (NALCAB) is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of NALCAB.

Center for Responsible Lending (CRL) is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of CRL. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions.

Texas Appleseed is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of Texas Appleseed.

The National Consumer Law Center (NCLC) is a Massachusetts non-profit corporation established in 1969 and incorporated in 1971. It is a national research and advocacy organization focusing specifically on the legal needs of low-income, financially distressed, and elderly consumers. NCLC operates as a tax-exempt organization under the provisions of § 501(c)(3) of the Internal Revenue Code. It

has no parent corporations and no publicly held company owns 10% or more of its stock. NCLC states that this brief was not authored in whole or in part by any party or its counsel, and that no person other than NCLC, its members, or its counsel contributed any money that was intended to fund the preparation and submission of this brief.

Americans for Financial Reform Education Fund (AFREF) is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of AFREF.

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................v

Interests of Amici Curiae .......................................................................1

Introduction ...........................................................................................1

Argument................................................................................................2

    I.    Discrimination in the financial services industry persists....................2

           A.    Statistical, survey, and anecdotal evidence demonstrate the persistence of discrimination in consumer finance....................3

           i.    Discrimination in the provision of personal and household financial services........................................................................3

           ii.    Discrimination in small business lending ...................................9

           B.    Financial firms may use technology to discriminate on the basis of irrelevant factors ..................................................................13

    II.    Discrimination may be "unfair." .......................................................16

           A.    Discrimination may qualify as an "unfair" practice under the Dodd-Frank Act ........................................................................17

                1.    Discriminatory practices may impose substantial injury on consumers ................................................................18

                2.    Consumers cannot reasonably avoid all discriminatory practices ........................................................................21

                3.    Discriminatory practices may not be outweighed by countervailing benefits ................................................24

            B.    The district court erred by subjugating the statutory definition of an "unfair" practice to extra-textual considerations.............25

Conclusion ...........................................................................................28

Certificate of Compliance .....................................................................29

Certificate of Service ............................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698
  (C.D. Cal. Nov. 17, 2016) ............................................................. 21, 23

*CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015) .................18

*CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853
  (S.D. Fla. Sept. 5, 2019) ...............................................................20

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616
  (5th Cir. 2022) ............................................................... 20, 21, 23, 28

*FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925 (N.D. Ill. 2008)............................18

*Groff v. DeJoy*, 600 U.S. 447 (2023) ........................................................25

*Morris v. BNSF Ry. Co.*, 429 F. Supp. 3d 545 (N.D. Ill. 2019) ............................26

*Pagan v. Calderon*, 448 F.3d 16 (1st Cir. 2006) ........................................26

*Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018)...................20

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)........................................25

*United Packinghouse v. NLRB*, 416 F.2d 1126 (D.C. Cir. 1969)............................26

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...............................................17

## Statutes, Rules & Regulations

12 U.S.C. § 5531 ................................................................ 1, 12, 17, 24

12 U.S.C. § 5536..............................................................................17

15 U.S.C. § 45 ..............................................................................18

15 U.S.C. §§ 1691–1691f ...................................................................3, 23

42 U.S.C. § 12101 ..........................................................................26

## Other Authorities

Aaron Klein, *Reducing Bias in AI-Based Financial Services*, Brookings Inst.
(July 10, 2020), https://brook.gs/3GcAfYu ........................................................ 13

Alexander W. Butler et al., *Racial Discrimination in the Auto Loan Market*,
Rev. Fin. Studs., May 19, 2022, https://doi.org/10.1093/rfs/hhac029 .................. 9

Amber Lee et al., Nat'l Cmty. Reinvestment Coal., *Disinvestment,
Discouragement and Inequality in Small Business Lending* (2019),
https://ncrc.org/wp-content/uploads/2023/07/NCRC-Small-Business-
Research-FINAL.pdf ................................................................................... 11, 19

Ann Marie Wiersch & Lucas Misera, Fed. Rsrv. Banks, *Small Business Credit
Survey: 2022 Report of Firms Owned by People of Color* (2022),
https://www.fedsmallbusiness.org/survey/2022/2022-report-on-firms-owned-
by-people-of-color ...................................................................................... 11

Anneliese Lederer & Sara Oros, Nat'l Cmty. Reinvestment Coal., *Lending
Discrimination within the Paycheck Protection Program* (2020),
https://ncrc.org/wp-content/uploads/dlm_uploads/2020/07/Lending-
Discrimination-within-the-PPP-v3.pdf .......................................................... 12

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*
(2012) .................................................................................................... 27

Aria Florant et al., McKinsey Inst. for Black Econ. Mobility, *The Case for
Accelerating Financial Inclusion in Black Communities*, McKinsey & Co.
(Feb. 25, 2020), https://mck.co/3BRnPmf ...................................................... 20

Bruce C. Mitchell et al., Nat'l Cmty. Reinvestment Coal., *Decades of
Disinvestment: Historic Redlining and Mortgage Lending Since 1981* (2024),
https://ncrc.org/wp-content/uploads/2024/05/Decades-of-Disinvestment-
FINALg.pdf ............................................................................................. 3, 7

Cal. Reinvestment Coal. & S.F. Off. Fin. Empowerment, *Pre-Existing
Conditions: Assessing the Financial Services Response to Racism, Inequality,
and COVID-19* (2020), https://sfgov.org/ofe/sites/default/files/2021-01/Pre-
Existing%20Conditions%20Banking%20Report%20v3.pdf .............................. 19

Christine Hauser, *A Bank Wouldn't Take His Bias Settlement Money. So He's Suing*, N.Y. Times (Jan. 23, 2020), https://nyti.ms/3HWLB4o .............................6

Compl. Ex. A, *Chamber of Com. v. CFPB*, No. 22-cv-00381 (E.D. Tex. Sept. 28, 2022), ECF No. 1-2 ....................................................................................1

Compl., *FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-TDC (D. Md. Oct. 18, 2022), ECF No. 1 ...................................................................................18

Dave Castillo et al., Nat'l Cmty. Reinvestment Coal., *Redlining the Reservation: The Brutal Cost of Financial Services Inaccessibility in Native Communities* (2023), https://ncrc.org/wp-content/uploads/2023/11/Tribal-Lands-Report-v14.pdf................................................................................................................9

David G. Blanchflower et al., *Discrimination in the Small-Business Credit Market*, 85 Rev. Econ. & Stats. 930 (2003) ...........................................................9

Debbie Gruenstein Bocian et al., *Race, Ethnicity, and Subprime Home Loan Pricing*, 60 J. Econ. & Bus. 110 (2008) ...............................................................7

Deborah Liu, *Simplifying Payments with Facebook Pay*, Meta (Nov. 12, 2019), https://about.fb.com/news/2019/11/simplifying-payments-with-facebook-pay/. 14

Dulce Gonzalez et al., Urb. Inst., *Perceptions of Unfair Treatment or Judgment Due to Race or Ethnicity in Five Settings* (2021), https://urbn.is/3WkYYQ2.....19

Elizabeth Asiedu et al., *Access to Credit by Small Businesses: How Relevant Are Race, Ethnicity, and Gender?*, 102 Am. Econ. Rev. 532 (2012), https://www.researchgate.net/profile/Akwasi-Nti-Addae/publication/254383451_Access_to_Credit_by_Small_Businesses_How_Relevant_Are_Race_Ethnicity_and_Gender/links/56bd66dd08ae9ca20a4db2d0/Access-to-Credit-by-Small-Businesses-How-Relevant-Are-Race-Ethnicity-and-Gender.pdf.................................................................................................10

Emily DiVito, Roosevelt Inst., *Banking for the People: Lessons from California on the Failures of the Banking Status Quo* (2022), https://rooseveltinstitute.org/wp-content/uploads/2022/09/RI_BankingForThePeople_202209.pdf ........................4

Emily Flitter, *'Banking While Black': How Cashing a Check Can Be a Minefield*, N.Y. Times (June 18, 2020), https://nyti.ms/3FQzOld....................6, 7

Eugene Volokh, *PayPal Still Threatens $2500 Fines for Promoting "Discriminatory" "Intolerance" (Even if Not "Misinformation")*, Reason (Oct. 9, 2022), https://reason.com/volokh/2022/10/09/paypal-still-threatens-2500-fines-for-promoting-discriminatory-intolerance-even-if-not-misinformation/ ...................................................................................15

Jacob Faber & Terri Friedline, New Am., *The Racialized Costs of Banking* (2018), https://www.newamerica.org/family-centered-social-policy/reports/racialized-costs-banking/the-racialized-costs-of-banking/ .............5

Jake Lilien, Nat'l Cmty. Reinvestment Coal., *Faulty Foundations: Mystery-Shopper Testing in Home Appraisals Exposes Racial Bias Undermining Black Wealth* (2022), https://ncrc.org/faulty-foundations-mystery-shopper-testing-in-home-appraisals-exposes-racial-bias-undermining-black-wealth/........................9

Jamie Buell & Kevin Stein, Cal. Reinvestment Coal., *Exploring Mortgage Trends in California: Charting Lending Patterns in California Communities Using NCRC's 2018 – 2020 Fair Lending Tool and 2021 Home Mortgage Disclosure Act Data* (2022), https://rise-economy.org/wp-content/uploads/2023/04/Charting-Lending-Patterns-in-California-Communities-HMDA.pdf.......................................................................................8

Joey Solitro, *Google Pay To Add Buy Now, Pay Later Options*, Kiplinger (Dec. 20, 2023), https://www.kiplinger.com/personal-finance/shopping/google-pay-to-add-buy-now-pay-later-options........................................................14

Jonathan D. Glater, *Law School, Debt, and Discrimination*, 68 J. Legal Educ. 548 (2019)......................................................................................7, 22

Kevin Cavalluzzo & John Wolken, *Small Business Loan Turndowns, Personal Wealth, and Discrimination*, 78 J. Bus. 2153 (2005), https://doi.org/10.1086/497045 ..............................................................9

Kevin Stein & Gina Charusombat, Cal. Reinvestment Coal., *Displacement, Discrimination and Determination: Small Business Owners Struggle to Access Affordable Credit* (2017), https://calreinvest.org/wp-content/uploads/2018/08/CRC20Small20Business20Report.pdf .........................6

Kristen Broady et al., *An Analysis of Financial Institutions in Black-Majority Communities: Black Borrowers and Depositors Face Considerable*

*Challenges in Accessing Banking Services*, Brookings Inst. (Nov. 2, 2021), https://brook.gs/3G7XR0y ...............................................................3, 4

Loren Henderson et al., *Credit Where Credit is Due?: Race, Gender, and Discrimination in the Credit Scores of Business Startups*, 42 Rev. Black Pol. Econ. 459 (2015) ...........................................................................10

Lorena Rodriguez, *All Data Is Not Credit Data: Closing the Gap between the Fair Housing Act and Algorithmic Decisionmaking in the Lending Industry*, 120 Colum. L. Rev. 1843 (2020).........................................................22

Matthew Adam Bruckner, *The Promise and Perils of Algorithmic Lenders' Use of Big Data*, 93 Chi.-Kent L. Rev. 3 (2018), https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?article=4192&context= cklawreview ............................................................................... 13, 22

Maxwell Young & Lex Suvanto, *Financial Firms are Still Falling Short at Serving Communities of Color*, Fortune (Jan. 21, 2022), https://fortune.com/2022/01/21/financial-firms-are-still-falling-short-at-serving-communities-of-color-banks-diversity-edelman/......................... 5, 19, 20

Maya Oubre et al., S.F. Off. of Fin. Empowerment, *Blacklisted: How ChexSystems Contributes to Systemic Financial Exclusion* (2021), https://www.sfgov.org/ofe/sites/default/files/2021-06/Blacklisted-How%20ChexSystems%20Contributes%20to%20Systematic%20Financial%2 0Exclusions%20-%20FINAL.pdf .........................................................5

Press Release, Apple, *Apple Introduces Apple Pay Later to Allow Consumers to Pay for Purchases Over Time* (Mar. 28, 2023), https://www.apple.com/newsroom/2023/03/apple-introduces-apple-pay-later/..14

Press Release, CFPB, *CFPB Orders Citi to Pay $25.9 Million for Intentional, Illegal Discrimination Against Armenian Americans* (Nov. 8, 2023), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-citi-to-pay-25-9-million-for-intentional-illegal-discrimination-against-armenian-americans/ ...............................................................................16

Press Release, Fed. Deposit Ins. Corp., *Despite COVID-19 Pandemic, Record 96% of U.S. Households Were Banked in 2021* (Oct. 25, 2022), https://www.fdic.gov/news/press-releases/2022/pr22075.html ...........................4

Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012) ............7

Robby Soave, *PayPal Says It Won't Fine Users $2,500 for Misinformation, but It Will Fine Them for 'Intolerance'*, Reason (Oct. 10, 2022), https://reason.com/2022/10/10/paypal-misinformation-fine-hate-censorship/ ....15

Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era* (Nat'l Bureau of Econ. Rsch., Working Paper No. 25943, 2019), https://www.nber.org/papers/w25943 ...........................................................8, 14

Robert W. Fairlie et al., *Black and White: Access to Capital Among Minority-Owned Startups* (Nat'l Bureau of Econ. Rsch., Working Paper No. 28154, 2020), https://www.nber.org/system/files/working_papers/w28154/w28154.pdf ..........12

Sarah D. Wolff, Ctr. for Responsible Lending, *The Cumulative Costs of Predatory Practices* (2015), https://www.responsiblelending.org/sites/default/files/uploads/13-cumulative-impact.pdf .................................................................................. 7, 19, 20

Scott Shephard et al., Viewpoint Diversity Score, *Statement on Debanking and Free Speech* (Nov. 10, 2022), https://www.viewpointdiversityscore.org/news/statement-on-debanking-and-free-speech ...........................................................................................................15

Stipulated Order, *FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-TDC (D. Md. Oct. 21, 2022), ECF No. 10 .........................................................................18

Student Borrower Prot. Ctr., *Educational Redlining* (2020), https://protectborrowers.org/wp-content/uploads/2020/02/Education-Redlining-Report.pdf................................................................................... 13, 14

Timothy Bates & Alicia Robb, *Impacts of Owner Race and Geographic Context on Access to Small-Business Financing*, 30 Econ. Dev. Q. 159 (2015) ..............10

## INTERESTS OF AMICI CURIAE

RISE Economy, National Community Reinvestment Coalition, National Association for Latino Community Asset Builders, Center for Responsible Lending, Texas Appleseed, National Consumer Law Center, and Americans for Financial Reform Education Fund are consumer advocacy organizations that represent, advocate for, or work with individual consumers and small businesses across the country, including individuals who may or have faced discrimination within the financial services industry. Amici are dedicated to building an inclusive economy that is equitable and fair. Amici are also at the forefront of research on discrimination within the credit and banking industries.[1]

## INTRODUCTION

In March 2022, the Consumer Financial Protection Bureau (CFPB) clarified in its Supervision and Examination Manual that "discriminatory acts or practices" in the provision of financial services may be "unfair" under the Dodd-Frank Act, 12 U.S.C. § 5531(c).[2] This clarification—recognizing that discrimination in consumer financial products or services, and particularly, discrimination based on factors irrelevant to a financial transaction, may be "unfair"—is well-supported by

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than amici and their counsel contributed money to fund this brief. All parties have consented to the filing of this brief.

[2] Compl. Ex. A at 12, *Chamber of Com. v. CFPB*, No. 22-cv-00381 (E.D. Tex. Sept. 28, 2022), ECF No. 1-2 [hereinafter Manual].

Congressional intent and empirical data. Ample evidence shows that discrimination in the financial services industry persists and may be "unfair" in every sense of the word—including, most importantly, the explicit statutory test Congress established to guide the CFPB in determining whether a practice is "unfair."

The district court disagreed. But as advocates for communities of color and low-income communities in the banking and business sectors, amici know all too well the extent of discrimination in consumer finance and its negative effects on individuals, businesses, and the economy. Amici submit this brief to underscore the substantial evidence of discriminatory practices in the consumer finance industry and to explain how such discrimination may be "unfair" under the relevant statutory definition. Section I of this brief sets forth the evidence that discrimination in the financial services industry persists. Section II establishes that discriminatory practices may meet the statutory criteria of "unfairness." Should this Court reach the merits, it should reverse the judgment of the district court and hold that the CFPB has statutory authority to consider discriminatory conduct an "unfair" practice where the conduct meets the definition designated by Congress.

## ARGUMENT

## I.     Discrimination in the financial services industry persists.

Financial institutions have a long history of preventing people of color and other marginalized populations from participating fully and fairly in the mainstream

financial economy.[3] Despite the passage of laws such as the Equal Credit Opportunity Act of 1974 (ECOA), 15 U.S.C. §§ 1691–1691f, people and communities of color and women still face significant barriers to full and equitable participation in the financial economy. As further discussed below, these barriers include inadequate access to financial services; higher rates of denial of loans and banking services; and higher interest rates, costs, and fees for consumers and small businesses. This discrimination arises from racial profiling and appears in racially biased algorithms.

### A.    Statistical, survey, and anecdotal evidence demonstrate the persistence of discrimination in consumer finance.

Significant evidence shows that discrimination on the basis of race, ethnicity, national origin, and sex persists in personal and household finance as well as small business lending.

### i.    Discrimination in the provision of personal and household financial services.

First, people of color have inadequate access to financial services. Racial discrimination and market failure have led to "banking and credit deserts" in many communities.[4] In 2021, Black Americans were more than five times as likely as

---

[3] *See* Bruce C. Mitchell et al., Nat'l Cmty. Reinvestment Coal., *Decades of Disinvestment: Historic Redlining and Mortgage Lending Since 1981* (2024), https://ncrc.org/wp-content/uploads/2024/05/Decades-of-Disinvestment-FINALg.pdf.

[4] Kristen Broady et al., *An Analysis of Financial Institutions in Black-Majority Communities: Black Borrowers and Depositors Face Considerable Challenges in Accessing Banking Services*, Brookings Inst. (Nov. 2, 2021), https://brook.gs/3G7XR0y.

white Americans not to have a bank account, and Latino Americans were more than four times as likely.[5] Unbanked individuals more often need to turn to alternative financial services such as check cashing services and payday loans, which in turn may have higher interest rates or predatory terms.[6]

Second, consumers may be discriminated against in attempts to open a bank account. In a 2022 field survey, canvassers visited more than 100 bank branches across five counties in California and asked to speak to a banker about opening an account.[7] Canvassers of color were turned away by bank staff 30% of the time; white canvassers were turned away only 4% of the time.[8] Canvassers speaking Spanish were likewise turned away significantly more frequently than canvassers speaking English.[9] A recent report on ChexSystems, which tracks people's banking histories and reports negative information to banks, details how its systemic flaws disproportionately impact Black consumers and other low-income consumers of color, thereby contributing to the racial gap in bank account access.[10] People of color

---

[5] Press Release, Fed. Deposit Ins. Corp., *Despite COVID-19 Pandemic, Record 96% of U.S. Households Were Banked in 2021* (Oct. 25, 2022), https://www.fdic.gov/news/press-releases/2022/pr22075.html.

[6] Broady et al., *supra* note 4.

[7] Emily DiVito, Roosevelt Inst., *Banking for the People: Lessons from California on the Failures of the Banking Status Quo* 8 (2022), https://rooseveltinstitute.org/wp-content/uploads/2022/09/RI_BankingForThePeople_202209.pdf.

[8] *Id.* at 10 tbl. 1.

[9] *Id.* at 11 tbl. 2.

[10] Maya Oubre et al., S.F. Off. of Fin. Empowerment, *Blacklisted: How ChexSystems Contributes to Systemic Financial Exclusion* 7 (2021),

also pay higher fees for bank accounts. White checking account holders pay, on average, significantly lower monthly bank fees than Black and Latino account holders, and account fees are lower in majority-white neighborhoods than they are in majority-Latino, majority-Black, and other neighborhoods.[11]

In practice, denial of service inconveniences and degrades consumers of color. Three in-depth surveys conducted during 2021 showed that "Black, Latinx, and Asian respondents reported disproportionate discrimination across the financial services spectrum, including in mortgage and auto lending, banking, credit cards, asset management, and insurance."[12] For example, "[t]wenty-three percent of Latinx respondents and 13% of Black respondents with annual incomes under $50,000 said they have been denied service altogether, compared with just 6% of white Americans in the same income bracket."[13] Ninety percent of respondents in a California

---

https://www.sfgov.org/ofe/sites/default/files/2021-06/Blacklisted-How%20ChexSystems%20Contributes%20to%20Systematic%20Financial%20Exclusions%20-%20FINAL.pdf.

[11] Jacob Faber & Terri Friedline, New Am., *The Racialized Costs of Banking* 4–5 (2018), https://www.newamerica.org/family-centered-social-policy/reports/racialized-costs-banking/the-racialized-costs-of-banking/.

[12] Maxwell Young & Lex Suvanto, *Financial Firms are Still Falling Short at Serving Communities of Color*, Fortune (Jan. 21, 2022), https://fortune.com/2022/01/21/financial-firms-are-still-falling-short-at-serving-communities-of-color-banks-diversity-edelman/.

[13] *Id.*

Reinvestment Coalition survey indicated that small business owners face discrimination.[14]

Ample anecdotal evidence shows how financial institutions racially profile people of color and deny them services they provide to white customers. A Black woman tried to cash a check at a Wells Fargo branch in a wealthy, predominantly white neighborhood. Although three employees examined her check and identification, they refused to look at additional proof she offered, declared the check fraudulent, and called the police.[15] Needless to say, her check was not fraudulent and her identification was valid.[16] Similarly, a Black man who tried to withdraw money from his Wells Fargo account also came out empty-handed. After a teller questioned his driver's license—which was valid—the branch manager told him to leave and threatened to call the police.[17] Yet another Black customer's attempt to deposit a check in his TCF Bank account led to an accusation of fraud and hour-long questioning by two police officers.[18] Given that the majority of people who

---

[14] Kevin Stein & Gina Charusombat, Cal. Reinvestment Coal., *Displacement, Discrimination and Determination: Small Business Owners Struggle to Access Affordable Credit* 13 (2017), https://calreinvest.org/wp-content/uploads/2018/08/CRC20Small20Business20Report.pdf.

[15] Emily Flitter, *'Banking While Black': How Cashing a Check Can Be a Minefield*, N.Y. Times (June 18, 2020), https://nyti.ms/3FQzOld.

[16] *Id.*

[17] *Id.*

[18] Christine Hauser, *A Bank Wouldn't Take His Bias Settlement Money. So He's Suing*, N.Y. Times (Jan. 23, 2020), https://nyti.ms/3HWLB4o.

experience racial profiling do not report it,[19] these examples are likely just the tip of the iceberg—as the survey data discussed above reflects.

Third, people of color may also receive discriminatory consumer and mortgage loan terms—if they can get a home loan at all. Longitudinal analysis of the new data collected under the Home Mortgage Disclosure Act by NCRC reveals that historically redlined neighborhoods have, on average, gotten 3,000 fewer mortgages than neighborhoods considered more "desirable," even after taking into account legitimate market factors related to housing availability.[20] And when lenders make mortgage loans, they "systematically charg[e] higher rates to borrowers who are African American."[21] All else equal, Black and Latino borrowers are significantly more likely than non-Latino white borrowers to receive a higher-rate home loan.[22] According to a 2015 report on predatory lending in the United States by CRL, "families of color receive predatory loans at higher rates than white borrowers" in almost every type of loan examined.[23] And the true extent of the

---

[19] Flitter, *supra* note 15.

[20] Mitchell et al., *supra* note 3.

[21] Jonathan D. Glater, *Law School, Debt, and Discrimination*, 68 J. Legal Educ. 548, 549 (2019), (citing Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012)).

[22] Debbie Gruenstein Bocian et al., *Race, Ethnicity, and Subprime Home Loan Pricing*, 60 J. Econ. & Bus. 110, 121 (2008).

[23] Sarah D. Wolff, Ctr. for Responsible Lending, *The Cumulative Costs of Predatory Practices* 23 (2015), https://www.responsiblelending.org/sites/default/files/uploads/13-cumulative-impact.pdf.

problem is obscured: analysis of mortgage trends in California by RISE shows that an increasing number of credit unions and mortgage companies neglect to collect race data on the loans they make.[24] Where such data is available, it shows that "[b]anks continue to underperform among nonwhite borrowers" and that no loan institution's lending to Black borrowers is on parity with their share of the population.[25]

A recent analysis of national mortgage loan data found that "Latinx and African-American borrowers pay 7.9 and 3.6 basis points more in interest for home purchase and refinance mortgages respectively because of *discrimination*," and not creditworthiness or other relevant factors.[26] The evidence also suggested that "at least 6% of Latinx and African-American applications are rejected, but would have been accepted had the applicant not been in these minority groups," which amounted to a "rejection of 0.74 to 1.3 million creditworthy minority applications."[27] And a 2021 study observed evidence of racial discrimination in auto loan approvals,

---

[24] Jamie Buell & Kevin Stein, Cal. Reinvestment Coal., *Exploring Mortgage Trends in California: Charting Lending Patterns in California Communities Using NCRC's 2018 – 2020 Fair Lending Tool and 2021 Home Mortgage Disclosure Act Data* 11 (2022), https://rise-economy.org/wp-content/uploads/2023/04/Charting-Lending-Patterns-in-California-Communities-HMDA.pdf.

[25] *Id.*

[26] Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era* 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 25943, 2019), https://www.nber.org/papers/w25943 (emphasis added).

[27] *Id.* at 21.

interest rates, and defaults.[28] In a 2022 "mystery shopper" study, NCRC documented racial bias in the home appraisal industry: white testers received home valuations $7,000 higher on average than Black testers who showed the same home, and appraisers more often subjected Black testers to serious unprofessional conduct such as an eleven-week delay in receiving an appraisal report following inspection.[29]

### ii.    Discrimination in small business lending.

Discrimination likewise persists in small business lending. Analytical research has long shown that banks discriminate against Black-owned businesses seeking credit, even after controlling for other factors.[30] And American Indian and Alaskan Natives rarely receive credit at all: low- and middle-income census tracts in non-tribal areas get business loans at a rate sixteen times higher than do tracts in tribal areas.[31] Even after controlling for observable factors that influence loan decisions, businesses owned by white men have higher loan approval rates and lower

---

[28] Alexander W. Butler et al., *Racial Discrimination in the Auto Loan Market*, Rev. Fin. Studs., May 19, 2022, at 2, https://doi.org/10.1093/rfs/hhac029.

[29] Jake Lilien, Nat'l Cmty. Reinvestment Coal., *Faulty Foundations: Mystery-Shopper Testing in Home Appraisals Exposes Racial Bias Undermining Black Wealth* (2022), https://ncrc.org/faulty-foundations-mystery-shopper-testing-in-home-appraisals-exposes-racial-bias-undermining-black-wealth/.

[30] *See, e.g.*, David G. Blanchflower et al., *Discrimination in the Small-Business Credit Market*, 85 Rev. Econ. & Stats. 930, 930 (2003); Kevin Cavalluzzo & John Wolken, *Small Business Loan Turndowns, Personal Wealth, and Discrimination*, 78 J. Bus. 2153, 2154 (2005), https://doi.org/10.1086/497045.

[31] Dave Castillo et al., Nat'l Cmty. Reinvestment Coal., *Redlining the Reservation: The Brutal Cost of Financial Services Inaccessibility in Native Communities* 5 (2023), https://ncrc.org/wp-content/uploads/2023/11/Tribal-Lands-Report-v14.pdf.

interest rates than businesses owned by people of color or white women.[32] A 2015 analysis of national credit data found that Black-owned startups receive lower-than-expected business credit scores, even after controlling for other factors, and that men were treated more favorably than women in attempts to access credit.[33] The authors' model suggested:

> [C]redit lines for Black-owned businesses would more than double, Latino-owned businesses' lines of credit would nearly triple, Asian-owned businesses' lines of credit would more than triple, and those where the primary owners are women would be more than twice as large if their business lines of credit were determined in the same way as those for businesses owned primarily by Whites and by men.[34]

Another study of national data on small business loans similarly observed that, "[c]ontrolling for risk factors," a business's "location in a minority or inner-city neighborhood has no apparent impact on loan availability or size," whereas "[o]wner race/ethnicity, in contrast, is important."[35] According to the Federal Reserve, even when businesses owned by people of color get approved for loans, they are

---

[32] Elizabeth Asiedu et al., *Access to Credit by Small Businesses: How Relevant Are Race, Ethnicity, and Gender?*, 102 Am. Econ. Rev. 532, 532 (2012), https://www.researchgate.net/profile/Akwasi-Nti-Addae/publication/254383451_Access_to_Credit_by_Small_Businesses_How_Relevant_Are_R ace_Ethnicity_and_Gender/links/56bd66dd08ae9ca20a4db2d0/Access-to-Credit-by-Small-Businesses-How-Relevant-Are-Race-Ethnicity-and-Gender.pdf.

[33] Loren Henderson et al., *Credit Where Credit is Due?: Race, Gender, and Discrimination in the Credit Scores of Business Startups*, 42 Rev. Black Pol. Econ. 459, 459 (2015).

[34] *Id.*

[35] Timothy Bates & Alicia Robb, *Impacts of Owner Race and Geographic Context on Access to Small-Business Financing*, 30 Econ. Dev. Q. 159, 159 (2015).

significantly less likely than their white counterparts to get approved for the full amount sought.[36]

In 2018, NCRC conducted a study using testers of different races and ethnicities—with similar, and exceptionally strong, business, income, and credit profiles—to seek business loans. The study revealed significant discrepancies in treatment. Notably, "Black and Hispanic testers were requested to provide more information than their white counterparts"; Hispanic and Black testers were asked to provide personal income tax statements 32% and 28% more frequently than their white counterparts respectively.[37] Conversely, "[w]hite testers were given significantly better information about business loan products," and were given information on loan fees 44% and 35% more frequently than Hispanic and Black testers respectively.[38]

NCRC also conducted "matched-pair" testing in 2020 in which both Black and white business owners requested loans under the Paycheck Protection Program. The study showed disparate treatment in 44% of cases, with bank personnel providing Black and women testers with less information about loan products,

---

[36] Ann Marie Wiersch & Lucas Misera, Fed. Rsrv. Banks, *Small Business Credit Survey: 2022 Report of Firms Owned by People of Color* 13 (2022), https://www.fedsmallbusiness.org/survey/2022/2022-report-on-firms-owned-by-people-of-color.

[37] Amber Lee et al., Nat'l Cmty. Reinvestment Coal., *Disinvestment, Discouragement and Inequality in Small Business Lending* 5 (2019), https://ncrc.org/wp-content/uploads/2023/07/NCRC-Small-Business-Research-FINAL.pdf.

[38] *Id.*

requesting more information from Black testers, and encouraging white men to apply for loans significantly more often than white or Black women.[39] Another 2020 study concluded that "Black startups report substantially higher levels of loan denials and overall unmet need for capital than white startups, even after controlling for differences in credit scores and founder wealth."[40]

The studies and surveys described above are examples of the social science documenting ongoing discrimination in finance. The evidence demonstrates not only that people of color and businesses owned by them are under-served relative to white people and white-owned businesses, but also that discrimination is a significant explanation for the disparate treatment. At bottom, discriminatory practices may harm consumers, regardless of whether those practices are intentionally discriminatory.[41]

---

[39] Anneliese Lederer & Sara Oros, Nat'l Cmty. Reinvestment Coal., *Lending Discrimination within the Paycheck Protection Program* 5, 10 (2020), https://ncrc.org/wp-content/uploads/dlm_uploads/2020/07/Lending-Discrimination-within-the-PPP-v3.pdf.

[40] Robert W. Fairlie et al., *Black and White: Access to Capital Among Minority-Owned Startups* 31 (Nat'l Bureau of Econ. Rsch., Working Paper No. 28154, 2020), https://www.nber.org/system/files/working_papers/w28154/w28154.pdf.

[41] The district court mistakenly asserted that the CFPB "claim[s] authority to prohibit disparate-impact discrimination." ROA.3099. As discussed further in Section II below, however, the CFPB must have a "reasonable basis to conclude" that a practice that may produce a racially disparate impact—like any other practice—is "unfair" under the statutory definition before taking any enforcement action. *See* 12 U.S.C. §§ 5531(a), (c)(1). To the extent that any practices with a racially disparate impact *also* meet the statutory definition of unfairness, it is and has already been within the CFPB's authority to prevent those practices.

## B.     Financial firms may use technology to discriminate on the basis of irrelevant factors.

The potential for discrimination on the basis of factors irrelevant to consumers' creditworthiness—like race, ethnicity, sex, or even ideology, national origin, or religion—is especially pronounced in light of the rise of financial technology (FinTech) firms in the credit and financial services industry. FinTech firms rely on large data sets and artificial intelligence such as learning algorithms.[42] Indeed, the banking industry generally increasingly incorporates and relies upon financial technology to conduct business. Algorithms are written by people; they can reflect "human biases and therefore create discriminatory outcomes."[43] FinTech firms' use of technology thus poses a risk of exacerbating existing bias.[44]

The use of certain types of data in financial technology may result in disparate outcomes for consumers based on race or ethnicity. For example, lenders' use of education data in underwriting algorithms "risks discriminating against borrowers of color and exacerbating income equality across the population at large."[45] A study found that the FinTech company Upstart penalizes borrowers who went to

---

[42] Matthew Adam Bruckner, *The Promise and Perils of Algorithmic Lenders' Use of Big Data*, 93 Chi.-Kent L. Rev. 3, 8–11 (2018), https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?article=4192&context=cklawreview.

[43] *Id.* at 25, 26.

[44] *See* Aaron Klein, *Reducing Bias in AI-Based Financial Services*, Brookings Inst. (July 10, 2020), https://brook.gs/3GcAfYu.

[45] Student Borrower Prot. Ctr., *Educational Redlining* 9 (2020), https://protectborrowers.org/wp-content/uploads/2020/02/Education-Redlining-Report.pdf.

historically Black colleges or universities or to Hispanic-serving institutions; Upstart charges a hypothetical Howard University graduate "nearly $3,499 more over the life of a five-year loan than a similarly situated NYU graduate" and charges a New Mexico State University graduate "at least $1,724 more over the life of a five-year loan when compared to a similarly situated NYU graduate."[46] And although lenders using algorithms commit less overt discrimination than face-to-face lenders, "Latinx and African-American [borrowers] pay 5.3 basis points more in interest for purchase mortgages and 2.0 basis points [more] for refinance mortgages originated on FinTech platforms."[47] Given that more and more technology firms offer financial services,[48] the discrimination against people of color that has historically pervaded the consumer finance industry not only persists, but also now threatens to continue in new and insidious ways if left unchecked.

Some FinTech firms have begun to refuse service or impose penalties based on what affected consumers contend is their political ideology. For example, in October 2022 PayPal released an updated User Agreement that threatened to fine

---

[46] *Id.* at 4–5.

[47] Bartlett et al., *supra* note 26, at 4.

[48] Press Release, Apple, *Apple Introduces Apple Pay Later to Allow Consumers to Pay for Purchases Over Time* (Mar. 28, 2023), https://www.apple.com/newsroom/2023/03/apple-introduces-apple-pay-later/; Joey Solitro, *Google Pay To Add Buy Now, Pay Later Options*, Kiplinger (Dec. 20, 2023), https://www.kiplinger.com/personal-finance/shopping/google-pay-to-add-buy-now-pay-later-options; Deborah Liu, *Simplifying Payments with Facebook Pay*, Meta (Nov. 12, 2019), https://about.fb.com/news/2019/11/simplifying-payments-with-facebook-pay/.

users up to $2,500 per violation of their Acceptable Use Policy, taken directly from users' PayPal accounts, if they used the service to "promote misinformation" or in connection with "the promotion of hate, violence, racial or other forms of intolerance that is discriminatory," as determined by PayPal in its "sole discretion."[49] PayPal disabled the account of the Free Speech Union, an advocacy organization that claims to support freedom of expression and academic freedom; PayPal subsequently reinstated the group's account.[50] PayPal rolled back the "misinformation" provision, saying it was released in error.[51] JP Morgan Chase has also been accused of "debanking" organizations with conservative viewpoints.[52] It is not amici*'s* position that these examples necessarily constitute unfair or discriminatory behavior. Amici note, however, that certain consumers fear the financial industry may, armed with such policies and the technology to target individuals engaging in disfavored expression, discriminate against consumers on the basis of their political ideology.[53]

---

[49] Eugene Volokh, *PayPal Still Threatens $2500 Fines for Promoting "Discriminatory" "Intolerance" (Even if Not "Misinformation")*, Reason (Oct. 9, 2022), https://reason.com/volokh/2022/10/09/paypal-still-threatens-2500-fines-for-promoting-discriminatory-intolerance-even-if-not-misinformation/.

[50] Scott Shephard et al., Viewpoint Diversity Score, *Statement on Debanking and Free Speech* (Nov. 10, 2022), https://www.viewpointdiversityscore.org/news/statement-on-debanking-and-free-speech.

[51] Robby Soave, *PayPal Says It Won't Fine Users $2,500 for Misinformation, but It Will Fine Them for 'Intolerance'*, Reason (Oct. 10, 2022), https://reason.com/2022/10/10/paypal-misinformation-fine-hate-censorship/.

[52] Scott Shephard et al., Viewpoint Diversity Score, *supra* note 50.

[53] *Id.*

Discrimination on the basis of national origin or religion may also meet the statutory definition of an "unfair" practice. For example, Citibank intentionally discriminated against Armenian Americans by declining credit card applications from consumers with surnames ending in "-ian" or "-yan," and scrutinizing applications from majority-Armenian neighborhoods.[54] Stripping the CFPB of authority to regulate unfair discrimination leaves consumers vulnerable, especially when technology makes it easy for banks and FinTech to identify consumers en masse based on certain factors.

## II.    Discrimination may be "unfair."

It may seem obvious that a financial service provider's practice that invidiously discriminates against consumers based on their race, ethnicity, gender, or other immutable factor may be deemed "unfair." In revising the guidance set forth in its Manual, the CFPB makes clear that liability for unfair acts or practices exists under the Dodd-Frank Act when allegedly discriminatory conduct meets the definition of "unfair" established by Congress. This clarification does not mean that any act that might be construed as discriminatory is actionable; it means that the use of factors irrelevant to one's creditworthiness—like race, ethnicity, national origin, gender, religion, or potentially even ideology—as the basis for providing or denying

---

[54] Press Release, CFPB, *CFPB Orders Citi to Pay $25.9 Million for Intentional, Illegal Discrimination Against Armenian Americans* (Nov. 8, 2023), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-citi-to-pay-25-9-million-for-intentional-illegal-discrimination-against-armenian-americans/.

financial services may violate the Dodd-Frank Act in addition to any other federal or state laws barring discrimination.

## A. Discrimination may qualify as an "unfair" practice under the Dodd-Frank Act.

Under the Dodd-Frank Act, it is "unlawful" for a consumer financial service provider or other person covered under the Act "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). An "unfair" practice is one that (1) "causes or is likely to cause substantial injury to consumers," where such injury is (2) "not reasonably avoidable by consumers" and (3) "not outweighed by countervailing benefits to consumers or to competition." *Id*. § 5531(c)(1). The CFPB is empowered to prevent unfair practices so long as it has "a reasonable basis to conclude" that the above criteria are met. *Id.* §§ 5531(a), (c)(1).

Discriminatory conduct clearly may meet all of the statutory criteria: it can substantially injure consumers by limiting their access to financial services on the basis of immutable or personal characteristics; consumers cannot reasonably avoid discrimination; and discrimination has no countervailing benefit to either consumers or competition.[55] Support for this application of the CFPB's unfairness definition is

---

[55] The district court's conclusion that "[t]he major-questions canon applies here," ROA.3098, is incorrect. *West Virginia v. EPA* does not counsel hesitation here because the CFPB's authority to combat unfair discrimination is neither an "unheralded" nor "transformative" claim of new authority. 597 U.S. 697, 724 (2022) (internal citation omitted). Even if it were, any "skepticism" would be overcome by "clear [C]ongressional authorization." *Id.* at 732 (internal citation omitted). As discussed in this Section, many discriminatory practices may fall within the statutory definition of unfairness.

found in the Federal Trade Commission's enforcement of its unfairness standard—which was the basis for that standard in the Dodd-Frank Act. *See* 15 U.S.C. § 45(n). The FTC recently obtained a stipulated settlement order after filing a complaint alleging that car sellers discriminated against Black and Latino customers under its functionally identical unfairness authority.[56]

### 1. *Discriminatory practices may impose substantial injury on consumers.*

Discrimination in financial services may harm consumers, communities, and the economy. A "substantial injury" is any injury that is more than merely "trivial or speculative." *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 913 (S.D. Ind. 2015) (cleaned up). "[E]ven a small harm may qualify if it affects a large number of people." *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945 (N.D. Ill. 2008). The injury caused by discriminatory practices can far exceed this threshold.

As discussed in Section I above, consumers navigate discrimination in the financial services market that may result in acceptance of predatory terms and fees or exclusion from the market altogether. Discrimination may deny consumers access to financial services, including the ability to cash a check or withdraw money from an account; imposes higher fees and interest rates on consumers; may deny otherwise

---

[56] Compl. at 18–19, *FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-TDC (D. Md. Oct. 18, 2022), ECF No. 1 (including claims of unfair discrimination in the provision of both credit and non-credit products); Stipulated Order, *FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-TDC (D. Md. Oct. 21, 2022), ECF No. 10.

credit-worthy individuals and businesses equal access to loans; and may lower the credit scores of consumers on account of factors irrelevant to their creditworthiness. The higher interest rates imposed on people of color for mortgage refinance loans alone result in an annual disparity of $250 million to $500 million.[57]

The injuries do not end there. Discriminatory practices may impose a variety of opportunity costs and other costs on individuals and families. Predatory loans, which disparately impact individuals and families of color, result in unnecessary foreclosures,[58] and may force borrowers to rely on high-cost, fringe financial products to get by.[59] Discriminatory practices impede wealth building and contribute to a significant racial wealth gap,[60] and harm consumers' physical and emotional well-being.[61]

Discriminatory practices also hurt the economy. "The foreclosure crisis depleted overall housing wealth and led to millions of job losses; predatory practices have been shown to diminish public trust and confidence in the financial system; and

---

[57] Lee et al., *supra* note 37, at 37.

[58] Wolff, *supra* note 23, at 6; *see also* Young & Suvanto, *supra* note 12.

[59] Wolff, *supra* note 23, at 5.

[60] *Id.* at 16–17; Cal. Reinvestment Coal. & S.F. Off. Fin. Empowerment, *Pre-Existing Conditions: Assessing the Financial Services Response to Racism, Inequality, and COVID-19*, at 6–8 (2020), https://sfgov.org/ofe/sites/default/files/2021-01/Pre-Existing%20Conditions%20Banking%20Report%20v3.pdf.

[61] *See* Dulce Gonzalez et al., Urb. Inst., *Perceptions of Unfair Treatment or Judgment Due to Race or Ethnicity in Five Settings* 1 (2021), https://urbn.is/3WkYYQ2; Young & Suvanto, *supra* note 12.

there is evidence that student debt is preventing economic growth, especially for young families."[62] Discriminatory financial practices have hurt the U.S. economy to the tune of $16 trillion since 2000.[63] Financial institutions could realize $2 billion additional revenue per year "if [B]lack Americans had the same access to financial products as white Americans."[64]

Courts have recognized the types of injuries detailed above as substantial. *See CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *29 (S.D. Fla. Sept. 5, 2019), *adhered to on denial of reconsideration*, No. 17-80495-CIV, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019) (late fees, incorrect credit reporting, foreclosure threats); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 563 (M.D. Pa. 2018), *aff'd*, 967 F.3d 273 (3d Cir. 2020) (misrepresentation of the suitability of loan repayment options); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 627 (5th Cir. 2022) (repeated withdrawal attempts resulting in fees). Financial service providers' practices that discriminate against consumers based on their race, ethnicity, gender, religion, or national origin may therefore cause substantial injury to consumers. Plaintiffs-Appellees have not disputed this.

---

[62] Wolff, *supra* note 23, at 6.

[63] Young & Suvanto, *supra* note 12.

[64] Aria Florant et al., McKinsey Inst. for Black Econ. Mobility, *The Case for Accelerating Financial Inclusion in Black Communities*, McKinsey & Co. (Feb. 25, 2020), https://mck.co/3BRnPmf.

### *2. Consumers cannot reasonably avoid all discriminatory practices.*

Consumers may not be able to reasonably avoid practices that discriminate on the basis of race, ethnicity, gender, or belief. To determine whether an injury is "reasonably avoidable," "courts generally look to whether the consumers had a free and informed choice." *Cmty. Fin. Servs. Ass'n of Am.*, 51 F.4th at 628 (internal quotation omitted). "An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Id.* (internal quotations omitted). Courts take a practical approach to determining whether an injury is reasonably avoidable, because "even diligent consumers c[an] be misled by bad actors." *CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016).

It is hard to imagine many scenarios in which discrimination can be avoided, as it penalizes certain consumers based on immutable characteristics or deeply held beliefs entirely irrelevant to the product or service at issue, often without any notice to the consumer. Consumers have neither a free nor an informed choice to avail themselves only of financial products and services that do not discriminate. As the CFPB correctly recognizes, discriminatory practices may "hinder[] a consumer's decision-making." Manual at 2.

Discriminatory practices are particularly unavoidable where consumers cannot practically identify them as such. Consumers of color, for example, are not told when the terms of loans provided to them are worse than the terms offered to white consumers with similar qualifications. Bank employees who refuse to allow Black customers to cash checks do not typically tell those customers that they would permit a white customer to cash a check under functionally identical circumstances.

Where discrimination results from the use of a biased algorithm, consumers may not even be aware an algorithm was used at all. Even if they are aware of the use of algorithms generally, "few consumers understand how algorithmic lending works and how to protect themselves."[65] Moreover, "data used by companies' proprietary algorithms is protected from disclosure by intellectual property law,"[66] limiting consumers' ability to learn whether discriminatory factors led to the algorithm's output. A lender himself "might not even know the criteria used by an artificial intelligence, designed to search for patterns in a great mass of data, or how it weighed them in reaching a conclusion about the appropriate terms of credit."[67]

Courts have upheld CFPB determinations that practices that are theoretically but not practicably avoidable by consumers are unfair. For example, in *Community*

---

[65] Bruckner, *supra* note 42, at 44.

[66] Lorena Rodriguez, *All Data Is Not Credit Data: Closing the Gap between the Fair Housing Act and Algorithmic Decisionmaking in the Lending Industry*, 120 Colum. L. Rev. 1843, 1858 (2020).

[67] Glater, *supra* note 21, at 572.

*Financial Services Association of America*, the court agreed that payday loan consumers could not reasonably avoid fees resulting from repeated withdrawal attempts, despite the lender's contention that consumers could avoid the injuries through various means. 51 F.4th at 628–29, *rev'd on other grounds*, 601 U.S. 416 (2024); *see also D & D Mktg.*, 2016 WL 8849698, at *10 (finding that back-end disclosures were insufficient to allow consumers to avoid predatory lending products sold under conflicting prior disclosures). Discriminatory practices—which are often not even theoretically avoidable—therefore may satisfy this prong of the "unfairness" definition. Plaintiffs-Appellees do not dispute that discriminatory practices are not always reasonably avoidable.

The district court reasoned that Congress did not intend for any discriminatory practices to constitute "unfair" practices in part because ECOA, over which the CFPB also has authority, already prohibits some forms of discrimination in financial services. *See* ROA.3100-01. The court's reasoning is flawed for two reasons. First, Congress included no provision in ECOA that it is an exclusive source of remedy for discrimination in lending. Second, some of the discriminatory practices discussed in Section I above do not fall within the reach of ECOA, which applies only to "credit transaction[s]." *See* 15 U.S.C. § 1691(a). And should a bank refuse to permit certain customers to open bank accounts, for example, on the basis of their national origin or religion, ECOA would not reach that discriminatory conduct. If this Court excepts

discriminatory practices from the statutory definition of unfairness, then the CFPB would not be able to prevent unfair discrimination in transactions without a credit component, such as opening a bank account that has no credit component, attempting to cash a check, or penalties applied to a PayPal account.

Congress empowered the CFPB to prevent discrimination in such transactions if the CFPB has "a reasonable basis to conclude" that they are "unfair." *See* 12 U.S.C. § 5531(c)(1); *see also* Manual at 10 ("A discriminatory act or practice is not shielded from the possibility of being unfair, deceptive or abusive even when fair lending laws do not apply to the conduct."). The absence of any regulatory enforcement mechanism means that certain discriminatory practices will, left thus unchecked, likely proliferate, leaving consumers with even fewer avenues of potentially avoiding those practices than might otherwise be available.

### 3.    *Discriminatory practices may not be outweighed by countervailing benefits.*

The injury caused by discriminatory practices is generally not outweighed by countervailing benefits to consumers or to competition. Indeed, injury caused by discrimination on account of race, ethnicity, gender, or other immutable factors can never be outweighed by countervailing benefits, because invidious discrimination is immoral and a violation of public policy.[68] Discrimination has a net negative impact

---

[68] *See* 12 U.S.C. § 5531(c)(2) ("In determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence.").

on the economy by impeding economic activity and wealth generation, as discussed in Section II(A)(1) above. To amici*'s* knowledge, no financial services provider has articulated an argument that the harms inflicted by discriminatory practices are outweighed by any countervailing benefits. Nor have Plaintiffs-Appellees contended that discriminatory practices are outweighed by countervailing benefits.

**B.    The district court erred by subjugating the statutory definition of an "unfair" practice to extra-textual considerations.**

"[S]tatutory interpretation must begin with, and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (cleaned up) (internal citation omitted). And all statutory text must be read in context. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). As shown above, in the context at issue here, the Court need look no further than the statutory definition of "unfairness" to conclude that practices that are unfair because they are discriminatory fall within the authority Congress intended to grant to the CFPB. *See* 12 U.S.C. § 5531(c)(1).

The district court acknowledged the "facial breadth of [the unfairness definition's] language." ROA.3101; *see also* ROA.3103 ("[T]he 'unfairness' language in the Dodd-Frank Act . . . might be viewed broadly to embody protection against discrimination. . . ."). Yet the court dismissed the most relevant source of meaning—the text—in favor of collateral considerations. First, that "discrimination" does not appear in the statutory definition of "unfairness," and the two concepts are distinct, ROA.3100-01, precluded the court from recognizing that the two terms are

neither coextensive nor mutually exclusive. Yet the adjective "unfair" may accurately characterize a broad variety of practices, including discrimination.[69]

Second, the district court reasoned that, because other statutes give the CFPB authority to enforce against discrimination, Congress must not have intended for Section 5531's definition of "unfair" practices to include discriminatory practices that otherwise meet that definition. ROA.3100-01. Not so. Congress may consider it prudent to specify that certain enforcement powers combat discrimination; but in doing so, Congress does not impliedly except discriminatory practices from definitions in other statutory provisions. Congress too listed "unfair," "deceptive," and "abusive" practices separately in Section 5531, and yet it is incontestable that, though each of those terms has distinct criteria, "abusive acts also may be unfair or deceptive," and vice versa. Manual at 9. It has been long settled that "[a]n unfair . . . practice may also violate other federal or state laws," including of course ECOA or other laws that regulate lending practices or that prohibit discrimination. Mot.

---

[69] Acknowledging that discrimination may be a kind of unfair practice is not a novel idea in the law. Courts have recognized that certain discriminatory conduct is unfair in other legal contexts. For example, in amending the Americans with Disabilities Act of 1990, Congress recognized the "continuing existence of *unfair . . . discrimination*." 42 U.S.C. § 12101(a)(8) (emphasis added). *See also, e.g.*, *United Packinghouse v. NLRB*, 416 F.2d 1126, 1134 (D.C. Cir. 1969) (National Labor Relations Board concluded that racial discrimination by a labor union was an "unfair labor practice" under the Taft-Hartley Act.); *Pagan v. Calderon*, 448 F.3d 16, 34 (1st Cir. 2006) (explaining that "invidious discrimination" is a form of "fundamental procedural unfairness"); *Morris v. BNSF Ry. Co.*, 429 F. Supp. 3d 545, 562 (N.D. Ill. 2019), *aff'd*, 969 F.3d 753 (7th Cir. 2020) ("Reasonable jurors could believe . . . that racial discrimination in employment *is* a type of unfairness.").

Summ. J. Ex. L, at 10, ECF No. 17-12. Recognizing that discriminatory practices may violate ECOA and may also be "unfair" is therefore consistent with the statutory context.

According to the district court's reasoning, if Congress uses a term that by definition may encompass acts of discrimination, but Congress does not use the word "discrimination" itself, then "discrimination" is automatically excluded from the broader term. Such an interpretation of the "unfairness" definition violates the principle that "general words . . . are to be accorded their full and fair scope"—not "arbitrarily limited." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (discussing the General-Terms canon). If the principle of construction Plaintiffs-Appellees proposed below were accepted, Congress would be hamstrung by the need to expressly state every concept it intends to include within a definition, so long as the concept is dealt with in other statutory provisions.

Third, the district court incorrectly presumed that, because the CFPB's 2012 manual did not specify that discriminatory practices may be unfair, the statute is therefore vague. ROA.3101-02. But whether the CFPB has in its manuals consistently included all practices that might fall within the definition of "unfairness" is immaterial to the statutory meaning; the CFPB's manuals cannot alter the definitions of either term. And clarifying that discriminatory practices may

be encompassed within the "broad" universe of unfair practices, *see Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 624, is consistent with the statutory text, as discussed above.

As shown above, the language of the statute and its context reaffirm the possibility that discriminatory practices may meet the statutory definition of "unfair."

## CONCLUSION

The Court should reverse the decision of the district court.

Dated: August 14, 2024                    Respectfully submitted,

*/s/ Rachel L. Fried*
Rachel L. Fried (D.C. Bar No. 1029538)
Orlando Economos
Victoria Nugent
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rfried@democracyforward.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,497 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Civil Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 MSO Version 2406 in Times New Roman 14-point font typeface.

*/s/ Rachel L. Fried*
Rachel L. Fried

## CERTIFICATE OF SERVICE

I, Rachel L. Fried, counsel for Proposed Amici, certify that on August 14, 2024, I caused a copy of the foregoing brief to be filed electronically through the appellate CM/ECF system with the Clerk of the Court, which provides electronic notice to all attorneys who have entered an appearance.

I further certify that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1: and (3) the document has been scanned for viruses and has been found to be free of viruses.

 */s/ Rachel L. Fried*
Rachel L. Fried

August 14, 2024