No. 23-40650

# In the United States Court of Appeals for the Fifth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS
ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT
BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF
BUSINESS; TEXAS BANKERS ASSOCIATION,

*Plaintiffs-Appellees,*

v.

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT CHOPRA,

*Defendants-Appellants.*

*On Appeal from the United States District Court
for the Eastern District of Texas*

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS
*AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Jess Zalph
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation. In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: August 14, 2024           */s/ Brianne J. Gorod*
                                      Brianne J. Gorod

                                      *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

Page

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.................. i

CORPORATE DISCLOSURE STATEMENT ................................................. ii

TABLE OF CONTENTS.................................................................................... iii

TABLE OF AUTHORITIES .............................................................................. iv

INTEREST OF *AMICUS CURIAE* ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT .......................................................................................................

I.     The Major Questions Doctrine Is Reserved for "Extraordinary" Cases Involving Breathtaking New Power that Congress Did Not Intend .................................................................................................. 6

II.    The CFPB's Update to Its Examination Manual Is Far from "Extraordinary" ........................................................................................ 13

     A.    Economic and Political Significance ........................................ 13

     B.    Adherence to Congressional Intent .......................................... 16

III.    Stretching the Major Questions Doctrine Beyond the Most Extraordinary Cases Would Undermine Statutory Interpretation and Constitutional Principles.............................................................. 22

     A.    Textualism..................................................................................... 22

     B.    Original Meaning ....................................................................... 24

     C.    Separation of Powers.................................................................. 27

CONCLUSION .................................................................................................... 30

CERTIFICATE OF SERVICE ........................................................................... 1A

CERTIFICATE OF COMPLIANCE.................................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021)............................................................ 3, 10, 11, 14

*Biden v. Missouri*,
  595 U.S. 87 (2022).............................................................. *passim*

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)........................................................ *passim*

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)............................................................ 22, 24

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024)............................................................ 27

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)............................................................ 7

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)............................................................ *passim*

*Gamble v. United States*,
  587 U.S. 678 (2019)............................................................ 23

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)............................................................ 10, 21

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980)............................................................ 7

*King v. Burwell*,
  576 U.S. 473 (2015)............................................................ 10, 20

*Little Sisters of the Poor v. Pennsylvania*,
  591 U.S. 657 (2020)............................................................ 24

iv

*The Margaretta*,
16 F. Cas. 719 (C.C.D. Mass. 1815) .................................................. 26

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................................ 9

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994) ................................................................ 7, 8, 15, 19

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022) .................................................... 11, 15, 17, 21

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) ............................................................................ 28

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ................................................................... *passim*

*West Virginia v. EPA*,
597 U.S. 697 (2022) .................................................................. *passim*

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ................................................................. 8, 9, 16

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ............................................................................ 22

## STATUTES

Act of Apr. 10, 1790, ch. 7, 1 Stat. 109 ................................................. 26

Act of May 26, 1790, ch. 12, 1 Stat. 122 ................................................ 26

Act of July 22, 1790, ch. 33, 1 Stat. 137 ................................................ 25

Act of Aug. 4, 1790, ch. 34, 1 Stat. 138 ................................................. 26

# TABLE OF AUTHORITIES – cont'd

Page(s)

5 U.S.C. § 801 ..................................... 29

5 U.S.C. § 804 ..................................... 29

12 U.S.C. § 5493(c) ................................ 21

12 U.S.C. § 5494(a) ................................ 21

12 U.S.C. § 5494(b) ................................ 21

12 U.S.C. § 5511(b) ................................ 4, 18, 19, 20

12 U.S.C. § 5514(b)(1) ............................. 4, 17

12 U.S.C. § 5515(b)(1) ............................. 4, 17

12 U.S.C. § 5531(a) ................................ 20

12 U.S.C. § 5531(b) ................................ 4, 17

12 U.S.C. § 5531(c) ................................ 4, 17, 18

12 U.S.C. § 5536(a)(1)(B) .......................... 1


## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I ................................. 27


## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96
   Notre Dame L. Rev. 243 (2021) ................... 26

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81 (2021)................................................. 26

Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379 (2021) ............................................................................................... 28

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118 (2016) ........................................................................................ 28, 29

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021)........................................ 25, 26

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288 (2021) ............................................................................................... 26

Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174 (2022)...... 27

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997) ...................................................................................... 22

Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262 (2022)........................................................................................... 27

Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022)..................................................................................... 29

vii

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to the progressive promise of the Constitution's text and history. CAC has studied the development and scope of the major questions doctrine along with its implications for the separation of powers. CAC accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The major questions doctrine does not apply to the Consumer Financial Protection Bureau's update of its Supervision and Examination Manual, which clarifies that discrimination can qualify as an "unfair . . . practice" prohibited by federal law. 12 U.S.C. § 5536(a)(1)(B). The Supreme Court has made clear that this doctrine applies extremely rarely—when agencies belatedly assert "breathtaking," "staggering," or "extraordinary" regulatory power and, on top of that, a slew of factors reveal that Congress did not intend to grant such startling authority. Stretching the major questions doctrine beyond that limited context would not only defy precedent but would also be at odds with textualism, the original understanding of the Constitution, and the separation of powers.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. All parties have consented to the filing of this brief.

In a series of cases beginning in the late twentieth century, the Supreme Court concluded that agencies were claiming enormous and surprising new authority despite indications that Congress did not mean to grant that authority. Taking stock of this case law, *West Virginia v. EPA* explicitly recognized a "major questions doctrine," explaining that "there are 'extraordinary cases' that call for a different approach" from "routine statutory interpretation." 597 U.S. 697, 721-24 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).

In these "extraordinary" cases, courts take an extraordinary approach. Rather than simply determine the original public meaning of a statute's text, courts instead weigh various factors outside of the text—including legislative history, political controversy, economic implications, and prior agency interpretations—to help decide whether a "major question" is implicated. If so, courts require "clear congressional authorization" for the agency's action. *Id.* at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The major questions doctrine thus differs sharply from "the ordinary tools of statutory interpretation." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). Accordingly, the Supreme Court has limited its application to "extraordinary" claims of authority, *id.* at 2374, that amount to a "fundamental revision of the

statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind," *id.* at 2373 (quoting *West Virginia*, 597 U.S. at 728).

In other words, the doctrine has two separate and highly demanding requirements.  First, an agency must be claiming "breathtaking" new powers, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam), with "staggering" economic and political significance, *Nebraska*, 143 S. Ct. at 2373. Second, the agency's claim must represent a "transformative expansion in [its] regulatory authority," *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324), reaching "beyond what Congress could reasonably be understood to have granted," *id.*

The second requirement is satisfied when agencies assert "unheralded" new power by twisting the "vague language" of "ancillary" provisions to "make a radical or fundamental change to a statutory scheme," *id.* at 723-24 (quotation marks omitted), particularly where the agency "has no comparative expertise" in the area it seeks to regulate, *id.* at 748 (quotation marks omitted), and where Congress has "conspicuously and repeatedly declined" to confer that same power on the agency, *id.* at 724.  The agency's action must be more than "unprecedented."  *Id.* at 728.  It must transform the statute "from one sort of scheme of . . . regulation into an entirely different kind."  *Id.* (brackets and quotation marks omitted); *accord Nebraska*, 143 S. Ct. at 2373.

Here, however, the CFPB has not exploited an "obscure, never-used section of the law" to assert a new type of power outside its "comparative expertise." *West Virginia*, 597 U.S. at 711, 729 (quotation marks omitted). The Bureau's update to its examination manual is a routine exercise of one of its core authorities— identifying consumer finance practices that can qualify as "unfair" under the Dodd-Frank Wall Street Reform and Consumer Protection Act, *see* 12 U.S.C. § 5531(b), (c), and ensuring compliance with those standards by examining financial institutions, *id.* §§ 5514(b)(1), 5515(b)(1). All of this serves the Bureau's statutorily designated "[o]bjectives" by "ensuring that, with respect to consumer financial products and services . . . consumers are protected from unfair, deceptive, or abusive acts and practices and from discrimination." *Id.* § 5511(b). In short, the examination manual updates reflect no "change to [the] statutory scheme" at all, much less a "radical or fundamental change." *West Virginia*, 597 U.S. at 723.

Extending the major questions doctrine to cases like this would not only conflict with Supreme Court precedent but would also undermine textualism. Unlike "the ordinary tools of statutory interpretation," *Nebraska*, 143 S. Ct. at 2375, the doctrine emphasizes factors outside of a statute's text and structure, including the subjective expectations of the legislators who passed it and the consequences of agency action. *See id.* at 2372-76. Some of these factors require judges to venture beyond their expertise into non-legal evaluations of politics or

economics, and many of these factors have no bearing on a statute's original public meaning because they focus on post-enactment events.

The major questions doctrine should also be applied sparingly because it is in tension with the original understanding of the Constitution. The doctrine presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 723 (quotation marks omitted). But Congress has tasked the executive branch with resolving major policy decisions since the Founding, when it routinely granted the executive vast discretion over some of the nation's most pressing challenges. Nothing in the Constitution forecloses that choice, and history does not suggest that Congress must speak in any particularly clear manner to exercise it. On the contrary, the major questions doctrine is the modern innovation.

Finally, an overly permissive use of the major questions doctrine would erode critical limits on the judiciary's role. The doctrine aims to promote "separation of powers principles" by preventing agencies from exceeding Congress's intent. *Id.* at 723. But in the process, the doctrine constrains Congress, too—blocking it from authorizing agency action whenever courts decide that a major question is implicated, unless Congress used language that courts deem sufficiently clear. The doctrine thus tells Congress how it must draft certain types of laws, based on new concepts devised by the one branch of government not

directly accountable to the people. And this risk of judicial aggrandizement is further exacerbated by the subjective and political nature of several of the factors that trigger the doctrine.

These tensions make clear why the Supreme Court has confined the doctrine to the most extraordinary cases. When an agency claims stunning new powers that appear incongruous with the relevant statutory scheme, the history of its implementation, the agency's own expertise, and Congress's conspicuous withholding of such power from the agency, then "a practical understanding of legislative intent" may call for hesitation. *Id.* But when radical and dubious innovation of that sort is absent, artificially narrowing the meaning of a statute's text would undermine, not vindicate, Congress's authority.

## ARGUMENT

### I. The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Power that Congress Did Not Intend.

What is now called the "major questions doctrine" began as a general rule of thumb in traditional statutory interpretation before becoming a requirement of "clear congressional authorization" in "certain extraordinary cases." *West Virginia*, 597 U.S. at 723 (quotation marks omitted). Throughout this evolution, economic and political significance alone has never been enough to trigger the doctrine. Instead, the ultimate focus is legislative intent. The issue is not whether agencies are asserting "highly consequential power" but rather "highly

6

consequential power *beyond what Congress could reasonably be understood to have granted*." *Id.* at 724 (emphasis added). Only when an agency seeks "a radical or fundamental change to a statutory scheme" by claiming "an unheralded power representing a transformative expansion in [its] regulatory authority," *id.* at 723-24 (quotation marks omitted), does the doctrine apply.

The Supreme Court first invoked the idea that Congress "speak[s] clearly" when assigning major questions to agencies only to bolster conclusions reached through ordinary statutory interpretation. *Id.* at 716. The opinion with the earliest glimmers of the doctrine relied on normal statutory construction before observing that the statute should not be read as implicitly granting an "unprecedented power over American industry." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion).

After *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court began using major questions analysis to buttress determinations that a statute's plain meaning precluded agency deference. Essentially, the Court began asking whether an agency was overhauling the nature of its authority. For example, in *MCI Telecommunications Corp. v. American Telephone and Telegraph Co.*, 512 U.S. 218, 223-24 (1994), the Court rejected an agency's claim that its power to "modify" certain statutory requirements allowed it to waive them entirely for a large swath of industry. The agency could not use an

ancillary provision to effect such a "fundamental revision of the statute." *Id.* at 231.

Similar concerns animated a key case in the doctrine's development, *FDA v. Brown & Williamson Tobacco Corp.* After claiming for decades that it lacked authority to regulate tobacco, the FDA reversed course. 529 U.S. at 125. The Court concluded that the FDA could not regulate tobacco because doing so would be inconsistent with the statutory scheme "as a whole." *Id.* at 142. Only then did the Court turn to major questions considerations. In "extraordinary cases," it wrote, "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 159. The Court emphasized the novelty of the FDA's assertion of jurisdiction over an entire industry, the implausibility of the agency's interpretation, the existence of "a distinct regulatory scheme for tobacco products," and congressional actions meant to preclude agency policymaking on tobacco. *Id.* at 159-60. "Given this history and the breadth of the authority that the FDA has asserted," in sum, "Congress could not have intended to delegate a decision of such economic and political significance" in "so cryptic a fashion." *Id.* at 160.

The same focus on congressional intent appeared in *Whitman v. American Trucking Associations*, 531 U.S. 457, 471 (2001), where the Court held that a statute "unambiguously" barred the EPA from considering compliance costs when

setting air quality standards. Certain "modest words" in the statute did not authorize that broad result, because Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Id.* at 468. Again, the focus was on preventing dubious transformations of regulatory regimes, not on the breadth of an agency's power in isolation.

The Court confirmed that point in *Massachusetts v. EPA*, 549 U.S. 497 (2007). The EPA sought to avoid regulating vehicle greenhouse gas emissions by claiming that such action "would have even greater economic and political repercussions than regulating tobacco." *Id.* at 512. But while it was "unlikely that Congress meant to ban tobacco products," the Court explained, there was "nothing counterintuitive" about the EPA regulating greenhouse gas emissions. *Id.* at 530-31. Absent conflict with the agency's "pre-existing mandate," the Court would not "read ambiguity into a clear statute" simply because implementing that statute would have enormous repercussions. *Id.*

In *Utility Air*, the Court again focused on whether an agency sought to transform its authority though a dubious "discover[y]" of an "unheralded power" in a "long-extant statute." 573 U.S. at 324. The EPA adopted a novel statutory interpretation that, if fully implemented, would "overthrow" the statute's "structure and design." *Id.* at 321-22. In short, the agency was "seizing expansive power that

it admit[ted] the statute [was] not designed to grant," making its interpretation "an enormous and transformative expansion in EPA's regulatory authority." *Id.* at 324.

In other major questions cases, the Court has refused to defer to agency interpretations that were "beyond [the agency's] expertise and incongruous with the statutory purposes and design." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). When the Attorney General barred the provision of drugs for assisted suicide, the Court highlighted the statute's "unwillingness to cede medical judgments to an executive official who lacks medical expertise." *Id.* at 266. Similarly, the Court cited the IRS's lack of "expertise in crafting health insurance policy" in refusing to defer to its interpretation of health-insurance tax credits. *King v. Burwell*, 576 U.S. 473, 485-86 (2015). But the Court nonetheless upheld the IRS's rule—which had vast economic and political significance—as reflecting the statute's best reading. *Id.* at 490-98.

The Court's pandemic-era cases again underscored that more is required for a major question than economic and political significance. The Court first ruled against an eviction moratorium because the relevant statute focused on measures more directly tied to the spread of disease. *Realtors*, 594 U.S. at 764. And "[e]ven if the text were ambiguous, the sheer scope of the CDC's claimed authority . . . would counsel against the Government's interpretation." *Id.* Notably, that

assessment of "scope" emphasized the moratorium's "unprecedented" nature and the agency's identification of virtually "no limit" to its power. *Id.* at 765.

Likewise, when applying the doctrine to a vaccination-or-testing mandate for large employers, the Court relied on more than the mandate's "significant encroachment into the lives—and health—of a vast number of employees." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). It also cited the conspicuous novelty of the mandate, the poor fit between OSHA's workplace expertise and its effort to promulgate "a general public health measure," and signs that Congress believed OSHA lacked this power. *Id.* at 118-19. The mandate was "simply not part of what the agency was built for." *Id.* at 119 (quotation marks omitted).

Significantly, however, the Court did not apply the major questions doctrine to a different vaccination requirement falling more squarely within the agency's mandate. *See Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam) (upholding HHS rule governing medical facilities). Dissenting Justices highlighted the rule's economic and political significance, "put[ting] more than 10 million healthcare workers to the choice of their jobs or an irreversible medical treatment." *Id.* at 108 (Alito, J., dissenting). But that was not enough. Given the agency's "longstanding practice," the mandate was not "surprising" and was like the "routinely impose[d]" funding conditions relating to healthcare workers. *Id.* at 94-95. There was no

mismatch with agency expertise, because "addressing infection problems in Medicare and Medicaid facilities is what [the HHS Secretary] does." *Id.* at 95. The lesson: the major questions doctrine does not constrain a statute's "seemingly broad language" when agency action "fits neatly within the language of the statute." *Id.* at 93-94.

In *West Virginia*, the Court explicitly adopted the "major questions doctrine" and discussed its parameters. In particular, the Court focused on the doctrine's second requirement—departure from congressional intent. In the Court's view, the EPA was attempting a "transformative expansion in [its] regulatory authority" by asserting an "unheralded" power that changed the statutory scheme "into an entirely different kind." 597 U.S. at 724, 728 (quotation marks omitted). According to the Court, this "newfound power" was based on "the vague language of an ancillary provision[]," required expertise not traditionally held by the EPA, and was an approach that Congress "conspicuously and repeatedly declined to enact itself." *Id.* at 724 (quotation marks omitted).

*Biden v. Nebraska* confirmed this focus on congressional intent, explaining that the doctrine applies only when the "indicators from our previous major questions cases are present." 143 S. Ct. at 2374 (quotation marks omitted). And "economic and political significance" is only part of this equation. Notably, the Court *first* concluded that the administration was asserting a new authority that

Congress likely did not intend: The debt relief program was, the Court said, completely unlike prior uses of the statute, and the agency was claiming "virtually unlimited power to rewrite the Education Act." *Id*. at 2373. This was "a fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind." *Id*. (quoting *West Virginia*, 597 U.S. at 728). Only *after* reaching that conclusion did the Court address the program's "staggering" economic and political significance. *Id*. The Court has thus made clear that unless both criteria are met, the major questions doctrine does not apply.

## II. The CFPB's Update to Its Examination Manual Is Far from "Extraordinary."

As explained above, the major questions doctrine requires a "radical or fundamental change to a statutory scheme" going beyond "what Congress could reasonably be understood to have granted," *West Virginia*, 597 U.S. at 723-24 (quotation marks omitted), in cases with vast "economic and political significance," *id.* at 721. Here, however, both parts of that equation are missing. The examination manual update does not approach the magnitude of economic and political significance required by Supreme Court precedent. Nor does it transform the authority Congress conferred on the CFPB in the Dodd-Frank Act.

### A. Economic and Political Significance

Much executive branch action is economically and politically significant— particularly in the realm of finance. To implicate the major questions doctrine, the

13

scope of an agency's claimed authority must be "staggering," *Nebraska*, 143 S. Ct. 2373, "[e]xtraordinary," *West Virginia*, 597 U.S. at 723, or "breathtaking," *Realtors*, 594 U.S. at 764. According to the district court, however, all that is necessary to show the requisite economic significance is that a policy has "large implications for the financial-services industry," as shown by "millions of dollars per year spent by companies attempting to comply." ROA.3098.

It is far from clear that the district court's "millions of dollars" figure corresponds with reality.[2] But regardless, these costs are nowhere close to the level of economic impact in the Supreme Court's major questions cases. They are far below the "nearly $50 billion," in costs imposed by the eviction moratorium, *Realtors*, 594 U.S. at 764, not to mention the much higher price ("between $469 billion and $519 billion") of the student debt program, *Nebraska*, 143 S. Ct. at 2373 (quotation marks omitted). The Bureau's updated guidance on the meaning of "unfair" with respect to consumer financial products is likewise a far cry from the "unprecedented power over American industry" asserted by the EPA's climate plan, *West Virginia*, 597 U.S. at 729, and from OSHA's "broad public health

---

[2] Among other things, neither the district court opinion nor the declarations it cites makes clear whether this figure reflects *new* compliance costs attributable to the changes to the examination manual, or whether it simply represents the overall costs of compliance "with the UDAAP rule at issue here." ROA.3098.

measure[]" that "ordered 84 million Americans" to receive a COVID vaccine or test weekly, *NFIB*, 595 U.S. at 117.

Notably, too, when assessing economic and political significance, the Supreme Court focuses more on the range of entities newly swept into regulatory schemes, *e.g.*, *Brown & Williamson*, 529 U.S. at 159; *MCI*, 512 U.S. at 231, than on new costs for "entities already subject to [an agency's] regulation," *Util. Air*, 573 U.S. at 332. There is no newly regulated entity here. The CFPB was created to regulate financial institutions, and the manual revision does not expand that scope. It simply clarifies that discrimination can satisfy the statutory definition of unfairness and guides examiners in applying that standard to the institutions the Bureau already supervises.

In finding this case *politically* significant, the district court relied on its impression of what Congress usually does when authorizing disparate-impact liability—from which the court inferred that Congress must not have authorized the CFPB to regard unintentional discrimination as "unfair" under any circumstances. ROA.3099-100. That is not how the Supreme Court has ever reached a finding of economic and political significance.

Worse, the district court found this case politically significant merely because states have their own authority to "guard against discrimination, protect consumers, and regulate financial-services companies." *Id.* at 3099. But if the

major question doctrine were triggered whenever the federal government regulated an area that states may also regulate, it would cease to be a rule for "certain extraordinary cases" and would largely displace "normal statutory interpretation." *West Virginia*, 597 U.S. at 723.

**B. Adherence to Congressional Intent**

The major questions doctrine does not look for elephants—it looks for elephants hidden in mouseholes. *See Whitman*, 531 U.S. at 468. No matter how great the economic and political significance of an agency action, it does not trigger the doctrine unless it transforms the agency's authority in a way that Congress is "very unlikely" to have intended. *West Virginia*, 597 U.S. at 723; *e.g.*, *Nebraska*, 143 S. Ct. at 2374 (asking whether Congress had "such power in mind"). To identify such dubious transformations, the Supreme Court looks for eyebrow-raising novelty, conflict with the statutory scheme, reliance on cryptic or ancillary provisions, mismatch with agency expertise, and congressional activity suggesting the agency lacks the authority it asserts. Those telltale signs are absent here.

*1. Belated Assertions of Novel Authority*

The major questions doctrine is skeptical of "unprecedented" claims of "unheralded power" newly discovered in "a long-extant statute." *West Virginia,* 597 U.S. at 728, 724 (quotation marks omitted). It is not enough, however, that

agency actions merely go "further than what [the agency] has done in the past." *Missouri*, 595 U.S. at 95 (declining to apply the doctrine).  Because the Court considers novelty at a high level of generality, the agency's newly claimed authority must be "strikingly unlike" its past efforts.  *NFIB*, 595 U.S. at 118.

That is not the case here.  Under its updated manual, the Bureau is exercising the same power it has always exercised under Dodd-Frank—the authority to identify specific types of conduct in the consumer financial services industry as potentially meeting the Act's three-pronged definition of "unfair," 12 U.S.C. § 5531(b), (c), and the authority to apply those standards when examining the institutions the Bureau supervises, *id.* §§ 5514(b)(1), 5515(b)(1).  The manual update simply makes clear, if it was not clear already, that a company's record of discriminatory practices and an absence of procedures to prevent discrimination should be considered when determining whether that company's practices qualify as "unfair."

### 2.  *Incongruence with statutory scheme*

An assertion of authority that fits poorly within a statute's overall structure signals a "fundamental revision of the statute" that supports applying the doctrine. *West Virginia*, 597 U.S. at 728 (quotation marks omitted).  But the modified manual does not transform the CFPB's authority "into an entirely different kind," *Nebraska*, 143 S. Ct. at 2373 (quotation marks omitted), or plausibly "render the

statute unrecognizable to the Congress that designed it," *Util. Air*, 573 U.S. at 324 (quotation marks omitted).

Congress gave the CFPB flexible authority to classify acts or practices as "unfair" if the Bureau concludes that they are "likely to cause substantial injury to consumers" that "is not reasonably avoidable by consumers" and "not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). The point of this framework is to give the Bureau the discretion to identify practices that may meet these statutory criteria—like discrimination—that have not previously been identified as such.

It should be equally evident that shielding consumers from discriminatory conduct "fits neatly within the language of the statute." *Missouri*, 595 U.S. at 94; *see* CFPB Br. 43-45. Indeed, Dodd-Frank adopted the Federal Trade Commission Act's standard for unfair and deceptive conduct, which was already understood to cover certain forms of discrimination. *See id.* at 47-49.

Moreover, the Bureau is expressly charged with "ensuring that, with respect to consumer financial products and services . . . consumers are protected . . . from discrimination." 12 U.S.C. § 5511(b). Although the district court emphasized that "[t]he 'unfairness' section [of Dodd-Frank] appears separately from other, explicit discrimination authorities," ROA.3101, that does not create an incongruity, much less the kind of incongruity that triggers the doctrine. Congress's choice to give

express antidiscrimination directives in specific areas that Congress knew were especially problematic does not mean it categorically excluded discrimination from the meaning of "unfair" in 12 U.S.C. § 5531. Indeed, that result would perversely give discrimination a unique exemption from being considered unfair under § 5531 precisely because Congress was concerned enough about discrimination to include standalone provisions targeting particular forms of it elsewhere in the statute.

Nor does Dodd-Frank's enumeration of "discrimination" separately from "unfair, deceptive, or abusive acts and practices" in 12 U.S.C. § 5511(b)(2) suggest that discrimination is excluded from those three concepts. In Dodd-Frank, as in many statutes, Congress utilized broad, overlapping terms to ensure comprehensiveness. For instance, the same section of the Act directs the Bureau to eliminate "outdated, unnecessary, or unduly burdensome regulations." *Id.* § 5511(b)(3). No one would claim that an "outdated" regulation cannot be considered "unnecessary" under Dodd-Frank simply because the statute uses both words.

### 3. *Reliance on obscure and ancillary provisions*

The Supreme Court has been wary of newly claimed authority that rests on an outsized use of "'subtle device[s]'" or "cryptic" delegations. *Brown & Williamson*, 529 U.S. at 160 (quoting *MCI*, 512 U.S. at 231). *West Virginia*, for instance, emphasized the EPA's use of an "obscure," "ancillary," "little-used

backwater" of the statute for its new policy.  597 U.S. at 711, 724, 730 (quotation marks omitted).

Here, the CFPB did not resort to a "little-used backwater" to claim a sweeping new power, but rather applied one of its core authorities under Dodd-Frank: preventing consumer financial services providers from "engaging in an unfair, deceptive, or abusive act or practice under Federal law."  12 U.S.C. § 5531(a); *see id.* § 5511(b) (listing second of the Bureau's five "[o]bjectives" the authority to protect financial-product consumers "from unfair, deceptive, or abusive acts and practices and from discrimination").  And there is nothing cryptic about the broad mandate conferred in 12 U.S.C. § 5511 and § 5531, which expressly authorizes the CFPB to protect consumers from unfair practices and discrimination.

### 4.  *Mismatch between asserted power and agency expertise*

The scope of an agency's expertise sheds significant light on whether it is claiming a new type of power that Congress is unlikely to have intended.  *See West Virginia*, 597 U.S. at 729 ("when [an] agency has no comparative expertise in making certain policy judgments . . . Congress presumably would not task it with doing so" (quotation marks omitted)); *accord King*, 576 U.S. at 486.

When discriminatory acts or practices in consumer finance qualify as "unfair" under Dodd-Frank, they are squarely within the CFPB's expertise.

Indeed, there are multiple contexts in which the CFPB polices discrimination by financial institutions. For example, the CFPB enforces federal lending laws like the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act, specifically scrutinizing lenders' actions for discrimination. 12 U.S.C. § 5493(c)(2)(A). And, as required by Dodd-Frank, the Bureau contains an Office of Fair Lending and Equal Opportunity that specializes in overseeing nondiscriminatory access to credit. *Id.* § 5493(c). Dodd-Frank also required the CFPB to establish a Consumer Advisory Board "to advise and consult with the Bureau in the exercise of its functions under the Federal consumer financial laws," and instructed the Director to assemble experts in "fair lending and civil rights" as part of that Board. *Id.* § 5494(a), (b).

It does not "raise[] an eyebrow," *West Virginia*, 597 U.S. at 730, therefore, that the CFPB would be tasked with evaluating lending practices for unfair discrimination. *Cf. Gonzales*, 546 U.S. at 266 (an official "who lacks medical expertise" making "medical judgments"); *NFIB*, 595 U.S. at 118 (agency with workplace expertise trying to "address[] public health more generally").

### 5. *Subsequent legislative activity*

The Supreme Court has sometimes considered congressional activity occurring after a statute's enactment, such as failed bills addressing related topics, as part of its major questions analysis. *E.g.*, *West Virginia*, 597 U.S. at 731-32.

But other cases have downplayed such evidence.  *E.g.*, *Brown & Williamson*, 529 U.S. at 155-56 (disclaiming reliance "on Congress' failure to act").

In any event, neither the plaintiffs nor the court below have pointed to any action Congress has taken to limit the CFPB's ability to examine financial institutions for discriminatory practices, let alone evidence of "Congress' consistent judgment to deny [the CFPB] this power," *id.* at 160.

## III. Stretching the Major Questions Doctrine Beyond the Most Extraordinary Cases Would Undermine Statutory Interpretation and Constitutional Principles.

As shown above, the Supreme Court has limited the major questions doctrine to "extraordinary" cases in which a rigorous two-part standard is met. Following that precedent helps ameliorate serious tensions between the doctrine and textualism, the Constitution's original meaning, and the separation of powers.

### A. Textualism

"The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020).  Courts should therefore "interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute."  *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quotation marks omitted); *cf.* Antonin Scalia, *A Matter of Interpretation:*

*Federal Courts and the Law* 22-23, 29-30 (1997) (discounting legislative history, pragmatic concerns, and Congress's perceived goals).

Departing from these principles, however, the major questions doctrine emphasizes factors outside of a statute's text and structure. Many of these factors necessarily post-date the statute's enactment and are therefore incapable of affecting its original public meaning. And because the doctrine requires sifting through various extratextual considerations with undetermined relative weights, it resembles the type of multi-factor balancing test that textualists typically disparage. *E.g.*, *Gamble v. United States*, 587 U.S. 678, 724 (2019) (Thomas, J., concurring).

Accordingly, Justices across the ideological spectrum have recognized that the major questions doctrine poses problems for textualists. *See Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring) ("[S]ome articulations of the major questions doctrine on offer . . . should give a textualist pause."); *West Virginia,* 597 U.S. at 751 (Kagan, J., dissenting) (calling the doctrine a "get-out-of-text free card[]"). The Court itself has acknowledged that the doctrine is "distinct" from "routine statutory interpretation." *Id.* at 724 (majority opinion).

All of this is well illustrated here. According to the court below, the CFPB's power should be curtailed because of the "large implications for the financial-services industry." ROA.3098. But when a statute's text gives agencies broadly

worded authority, "imposing limits on an agency's discretion" based on extratextual considerations is to "alter, rather than to interpret," the statute. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020). Statutory language should not be artificially constrained due to "undesirable policy consequences," *Bostock*, 590 U.S. at 680, or because a policy "goes further than what the [agency] has done in the past," *Missouri*, 595 U.S. at 95.

Precisely because the major questions doctrine departs from "the ordinary tools of statutory interpretation," *Nebraska*, 143 S. Ct. at 2375, the doctrine is reserved for "extraordinary" cases in which an agency tries to transform one kind of statute "into an entirely different kind," *id.* at 2373 (quoting *West Virginia*, 597 U.S. at 728). That is not remotely the case here.

### B. Original Meaning

Imposing a heightened clarity requirement on Congress when it wants to authorize economically and politically significant agency actions is also in tension with the Constitution's original meaning.

No detailed justification for the major questions doctrine has been endorsed by a majority of the Supreme Court, which has only gestured at "separation of powers principles and a practical understanding of legislative intent." *West*

*Virginia*, 597 U.S. at 723.[3]  But the Court has referenced a presumption that "Congress intends to make major policy decisions itself, not leave those decisions to agencies."  *Id.*

Contrary to this presumption, the Constitution as originally understood embodied no skepticism toward agency resolution of major policy decisions. Indeed, the earliest Congresses repeatedly used broad language to grant the executive branch vast discretion over some of the era's most pressing economic and political choices.  The Founders had no qualms about legislation authorizing the executive branch to resolve critically important policy questions, and they did not require Congress to speak in any particular manner to confer such authority.

For example, because trade with Indian tribes was financially vital but politically fraught at the Founding, the First Congress required a license for such trading.  But far from making the major policy decisions itself, Congress gave the President total discretion over the licensing scheme's "rules, regulations, and restrictions."  Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137, 137; *see* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 341 (2021).

---

[3] Justices who have offered more detailed explanations for the doctrine disagree about its basis.  *Compare West Virginia*, 597 U.S. at 735-39 (Gorsuch, J., concurring), *with Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring).

The First Congress granted similarly broad authority to address "arguably the greatest problem facing our fledgling Republic: a potentially insurmountable national debt." Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81, 81 (2021). Legislation authorized the President to borrow about $1.3 trillion in new loans (in today's dollars) and to make other contracts to refinance the debt "as shall be found for the interest of the [United] States." Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 139; *see* Chabot, *supra*, at 123-24. The statute left the implementation of this broad mandate largely to the President's discretion. *See id.*; Mortenson & Bagley, *supra*, at 344-45.

These statutes were not unusual. To cite just three more examples, Congress granted the Treasury Secretary "authority to effectively rewrite the statutory penalties for customs violations," Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96 Notre Dame L. Rev. 243, 306 (2021); *see* Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122-23, which Joseph Story called "one of the most important and extensive powers" of the government, *The Margaretta*, 16 F. Cas. 719, 721 (C.C.D. Mass. 1815). Congress authorized an executive board to grant exclusive patents if it deemed inventions or discoveries "sufficiently useful and important," denying all other Americans the "right and liberty" of offering the same products. Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, 110. And Congress gave federal commissioners nearly unguided power over the politically charged

question of how to appraise property values across the nation for the first direct tax.  *See* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1391-1401 (2021).

Nothing in the Constitution's text or history prohibits Congress from using its "legislative Powers," U.S. Const. art. I, § 1, to assign specific policy questions to agencies, which helps explain why Congress tasked the executive branch with resolving major policy questions from the start.  *Cf. CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (early legislation "provides contemporaneous and weighty evidence of the Constitution's meaning" (quotation marks omitted)).  Simply put, the premise underlying the major questions doctrine was not shared by the Founders—yet another reason to reserve the doctrine for "extraordinary" cases in which agencies go "beyond what Congress could reasonably be understood to have granted," *West Virginia*, 597 U.S. at 724.

### C.  Separation of Powers

The major questions doctrine is meant to promote "separation of powers principles."  *Id.* at 723.  But an aggressively applied doctrine would raise its own separation-of-powers concerns, shifting authority from the elected branches to the courts.  Because the doctrine is a judicial creation that "directs how Congress must draft statutes," Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262,

276 (2022), it risks becoming "a license for judicial aggrandizement," Nathan

Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions*

*Canon*, 108 Va. L. Rev. Online 174, 175, 200 (2022).

At bottom, the major questions doctrine disallows plausible readings of a

statute's text based on concerns about the real-world implications of an agency's

reading and how the legislators who enacted the statute might have regarded that

reading. *E.g.*, *Nebraska*, 143 S. Ct. at 2374 ("Congress did not unanimously pass

the HEROES Act with such power in mind"). But distorting a statute's original

public meaning because of cost, political controversy, or other post-enactment

developments risks "amending legislation outside the single, finely wrought and

exhaustively considered, procedure the Constitution commands." *New Prime Inc.*

*v. Oliveira*, 586 U.S. 105, 113 (2019) (quotation marks omitted). In other words,

"[w]hen courts apply doctrines that allow them to rewrite the laws (in effect), they

are encroaching on the legislature's Article I power." Brett M. Kavanaugh, *Fixing*

*Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2120 (2016).

This potential for encroachment on congressional authority underscores the

need to employ the doctrine only in truly extraordinary cases, not whenever an

agency makes a costly or controversial decision. If the judiciary "starts to reject

Congress's legislation on important matters precisely because it is important," it

risks eroding the courts' status as non-political arbiters of the law.  Lisa
Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379, 391 (2021).

Far from reflecting "a practical understanding of legislative intent," *West
Virginia*, 597 U.S. at 723, applying the doctrine too broadly would also be at odds
with Congress's explicit choice to allow agencies to make decisions with
significant economic consequences.  Under the Congressional Review Act,
agencies must identify "major" rules (defined by economic impact, *see* 5 U.S.C.
§ 804) when reporting new regulations to Congress—and these major rules "shall
take effect" unless Congress acts to disapprove them, *id.* § 801.  Applying the
major questions doctrine to all economically and politically significant actions
would invert this statute, making such actions presumptively invalid instead of
valid.  *See* Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty
(Sept. 6, 2022), https://lawliberty.org/major-problems-with-major-questions/.

These concerns are not alleviated by Congress's ability to pass new
legislation, because "in our separation of powers scheme . . . it is very difficult for
Congress to correct a mistaken statutory decision."  Kavanaugh, *supra*, at 2133-34.

In sum, stretching the major questions doctrine beyond "extraordinary"
cases in which an agency seeks a "transformative expansion" of the power
Congress meant to assign it, *West Virginia*, 597 U.S. at 724, does not serve the
separation of powers but instead severely undermines it.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

Dated: August 14, 2024

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Jess Zalph
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on August 14, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 14th day of August, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 14th day of August, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*