No. 23-40650

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

———————————————

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS ASSOCIATION OF BUSINESS; TEXAS BANKERS ASSOCIATION,

*Plaintiffs-Respondents,*

— v. —

CONSUMER FINANCIAL PROTECTION AGENCY, ROHIT CHOPRA

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the Eastern District of Texas
Case No. 1:22-cv-00381-JCB

———————————————

## BRIEF OF AMICI CURIAE PROFESSORS OF CONSUMER LAW IN SUPPORT OF APPELLANTS

———————————————

Seth E. Mermin
David S. Nahmias
CENTER FOR CONSUMER LAW &
ECONOMIC JUSTICE
305 Berkeley Law
Berkeley, CA 94720-7200
tmermin@law.berkeley.edu
dnahmias@law.berkeley.edu
(510) 643-3519

*Counsel for Amici Curiae*

No. 23-40650, *Chamber of Commerce of the United States v. CFPB*

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel further states that amici curiae have no parent corporations, and no publicly held corporation has a 10% or greater ownership interest in amici curiae.

- Respondent Chamber of Commerce of the United States of America;
- Respondent Longview Chamber of Commerce;
- Respondent American Bankers Association;
- Respondent Consumer Bankers Association;
- Respondent Independent Bankers Association of Texas;
- Respondent Texas Association of Business;
- Respondent Texas Bankers Association;
- Respondent Texas Automobile Dealers Association.
- Counsel for respondents Consovoy McCarthy, PLLC, Cameron Thomas Norris and Bryan K. Weir;
- Counsel for respondents U.S. Chamber Litigation Center, Jennifer B. Dickey and Jordan Landrum Von Bokern;
- Counsel for respondents Ward, Smith & Hill, PLLC, Brue Alan Smith;
- Counsel for respondents David Pommerehn;
- Amicus curiae Professor Luke Herrine;
- Amicus curiae Professor Kate Sablosky Elengold;
- Amicus curiae Professor Andrew Selbst;
- Amicus curiae Professor Jeff Sovern;
- Amicus curiae Professor David Vladeck;
- Counsel for amici curiae Center for Consumer Law and Economic Justice, Seth E. Mermin and David S. Nahmias.

Respectfully submitted,

/s/ Seth E. Mermin
Seth E. Mermin

*Counsel of Record for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES .................................................................. v

INTERESTS OF AMICI CURIAE ........................................................ 1

ARGUMENT .............................................................................. 5

   I.    THE CFPA USES "UNFAIR" TO MEAN DISCRIMINATORY. ............................................. 5

        A.    In Ordinary Usage, Discrimination Is "Unfair." ............................ 5

        B.    The CFPA Adopts The Widespread Practice Of Using "Fair" To Mean "Non-Discriminatory." ......................................... 7

   II.   BEFORE THE ORIGINAL PROHIBITION ON "UNFAIR PRACTICES" IN THE FTC ACT, THE LAW FREQUENTLY USED "UNFAIR" TO REFER TO DISCRIMINATORY CONDUCT. ............................................. 9

        A.    At Common Law, "Unfair" Referred To Wrongfully Discriminatory Conduct. ............................................... 9

        B.    The Meaning Of "Unfair Methods Of Competition" In The FTC Act Was Clearly Understood To Prohibit At Least Price Discrimination. .................................. 13

   III.   "UNFAIR PRACTICES" IN THE FTC ACT PROHIBITS DISCRIMINATION. ...................................................... 15

        A.    The Wheeler-Lea Act Incorporated Preexisting Overlap Between "Unfair" And "Discriminatory" While Remaining Open To Further Overlap. ....................... 15

        B.    Since 1938, UDAP Has Repeatedly Been Used To Regulate Discriminatory Conduct. ............................... 17

C.     Outside The FTC Act, The Concepts Of "Unfair"
       And "Discriminatory" Became Even More
       Intertwined Over The Course Of The 20th Century. ................... 22

IV.    THE TEXT AND STRUCTURE OF THE CFPA CLEARLY
       INDICATE THAT "UNFAIR" AND "DISCRIMINATORY"
       ARE OVERLAPPING CONCEPTS. ....................................................... 24

CONCLUSION ................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................ 27

CERTIFICATE OF COMPLIANCE ................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*Am. Airlines v. N. Am. Airlines,*
   351 U.S. 79 (1956) ........................................................................ 19

*Am. Fin. Servs. Ass'n v. FTC,*
   767 F.2d 957 (D.C. Cir. 1985) ............................................. 16, 19

*Bolling v. Sharpe,*
   347 U.S. 497 (1954) ...................................................................... 24

*Bus. Elec. Corp. v. Sharp Elec. Corp.,*
   485 U.S. 717 (1988) ...................................................................... 16

*Chamber of Commerce of the United States v. CFPB,*
   691 F. Supp. 3d 730 (E.D. Tex. 2023) ...................................... 7, 8

*City of Mobile v. Bienville Water Supply Co.,*
   30 So. 445 (Ala. 1901) ................................................................. 13

*Fairman v. Schaumberg Toyota, Inc.,*
   1996 WL 392224 (N.D. Ill. July 10, 1996) ................................. 22

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ...................................................................... 25

*FTC v. Accusearch Inc.,*
   570 F.3d 1187 (10th Cir. 2009) ..................................................... 4

*FTC v. Cement Inst.,*
   333 U.S. 683 (1948) ...................................................................... 14

*FTC v. Floatme Corp.,*
   No. 5:24-cv-00001 (W.D. Tx. filed Jan 22, 2024)....................... 18

*FTC v. Ind. Fed'n of Dentists,*
   476 U.S. 447 (1986) ...................................................................... 13

*FTC v. Kochava, Inc.*,
    2024 WL 449363 (D. Idaho, Feb. 3, 2024) ................................................ 17

*FTC v. Passport Auto. Grp., Inc.*,
    No. 8:22-cv-02670-GLS (D. Md. Oct. 18, 2022) ....................................... 18

*FTC v. Rhinelander Auto Ctr.*,
    No. 3:23-cv-737 (W.D. Wis. filed Oct. 24, 2023) ....................................... 18

*FTC v. Standard Educ. Soc'y*,
    86 F.2d 692 (2d Cir. 1936) ......................................................................... 16

*FTC v. Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015) .................................................................... 4, 17

*Harry & Bryant Co. v. FTC*,
    726 F.2d 993 (4th Cir. 1984) ...................................................................... 16

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) .................................................................................... 12

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017) ....................................................................................... 5

*Interstate Comm. Comm'n v. Balt. & Ohio R.R. Co.*,
    145 U.S. 263 (1892) .............................................................................. 10, 11

*Interstate Comm. Comm'n v. Union Pac. Ry. Co.*,
    222 U.S. 541 (1912) .................................................................................... 11

*Keogh v. Chi. N.W. Ry. Co.*,
    260 U.S. 156 (1922) .................................................................................... 11

*LabMD v. FTC*,
    894 F.3d 1221 (11th Cir. 2018) .................................................................... 3

*Louisville & N. R. Co. v. United States*,
    282 U.S. 740 (1931) .................................................................................... 10

*Mitchell v. United States*,
> 313 U.S. 80 (1941) ...................................................................................... 12

*Morissette v. United States*,
> 342 U.S. 246 (1952) .................................................................................... 25

*New York v. United States*,
> 331 U.S. 284 (1947) .................................................................................... 11

*Orkin Exterminating Co., Inc. v. FTC*,
> 849 F.2d 1354 (11th Cir. 1988) ............................................................... 4, 16

*Pettiford v. Branded Mgmt. Grp.*,
> 104 Mass. App. Ct. 287 (2024) .................................................................. 22

*Standard Oil Co. of New Jersey v. United States*,
> 221 U.S. 1 (1911) ........................................................................................ 13

*State v. Kimber*,
> 3 Ohio Dec. Reprint 197 (Ct. C.P. 1859) ................................................... 12

*Texas Dept. of Hous. & Comm. Affairs v. Inclusive Comms. Project, Inc.*,
> 576 U.S. 519 (2015) .................................................................................... 25

*Utility Air Regulatory Group v. EPA*,
> 573 U.S. 302 (2014) .................................................................................... 25

## STATUTES

12 U.S.C. § 1818(b)(1) ......................................................................................... 22
>  § 1818(e)(1) ................................................................................... 22
>  § 1818(i)(2) .................................................................................... 22
>  § 2801 ............................................................................................... 8
>  § 5481(a)(12) .................................................................................. 8
>  § 5481(a)(13) .................................................................................. 7
>  § 5493(2)(A) ................................................................................... 7
>  § 5493(c)(1) .................................................................................... 7

15 U.S.C. § 13 ..................................................................................................... 14

§ 1691 ................................................................... 8

§ 45(a)(1) ............................................................. 6

§ 12182 ............................................................... 12

42 U.S.C. § 3601 ................................................ 23

§ 3602(f) ............................................................. 23

Federal Trade Commission Act Amendments,
Ch. 49, 52 Stat. 111 (1938) ............................ 5

Clayton Antitrust Act,
Pub. L. 63-212, 38 Stat. 730 (1914) ............... 14

Federal Trade Commission Act of 1914,
Pub. L. 63-203, 38 Stat. 717 (1914) ............... 13

Housing and Community Development Act of 1992,
Pub. L. No. 102-550, § 905(a), 106 Stat. 3672 (1992)................ 23

Interstate Commerce Act of 1887,
Pub. L. 49-104, 24 Stat. 379 (1887) ............... 11

Transportation Act,
§ 418, 41 Stat. 474 (1920) .............................. 11

## Legislative Materials

83 Cong. Rec. 3255 (1938)................................... 15

83 Cong. Rec. 393 (1938)..................................... 15

S. Rep. No. 1705 (1936) ....................................... 15

## Regulations

Exec. Order No. 8,802 (Jun. 25, 1941)................... 23

## Rules

Fed. R. App. P. 29(a)............................................ 1

## Administrative Adjudications

*Am. Airlines, Inc.*, Docket No. OST-2003-15046-18,
    2003 WL 23097500 (Dep't of Transp. Aug. 21, 2003)............................... 20

*Atl. Se. Airlines, Inc.*, Docket No. OST-2012-0002,
    Order No. 2012-5-2 (Dep't of Transp. May 2, 2012).................................. 20

*Continental Airlines, Inc.*, Docket No. OST 2004-16943,
    Order 2004-4-4, 2004 WL 720318
    (Dep't of Transp. Apr. 2, 2004)................................................... 20

*Delta Air Lines, Inc.*, Docket No. OST 2004-16943,
    Order No. 2004-6-13, 2004 WL 1380520
    (Dep't of Transp. June 21, 2004) ................................................ 20

*Dept. of Pub. Serv. v. Pac. Tel. & Tel. Co.*,
    8 F.C.C. 342 (1941)............................................................ 11

*In re Am. Airlines, Inc.*, Docket No. OST-2003-15046
    (Dep't of Transp. Feb. 27, 2004)................................................ 21

*In re Atl. Se. Airlines*, Docket OST-2011-0003,
    Order 2011-7-4 (Dep't of Transp. July 11, 2011) ................................. 21

*In re Compania Mexicana De Aviacion, S.A. De C.V.*,
    Docket No. OST 2008-0031, Order No. 2008-4-6-3,
    2008 WL 5505456 (Dep't of Transp. Apr. 2, 2008) ................................ 21

*In re Delta Air Lines, Inc.*, Docket No. OST-2011-0003,
    Order 2011-2-10 (Dep't of Transp. Feb. 17, 2011)................................. 21

*In re Delta Air Lines, Inc., Miscellaneous Economic Orders*,
    78 C.A.B. 860, 886 (1978) ..................................................... 19

*In re First Buckingham Cmty., Inc*,
    73 F.T.C. 938 (1968) .......................................................... 18

*In re Pfizer*,
    81 F.T.C. 23 (1972)............................................................. 1

*In re US Airways, Inc. Violations of 14 CFR Part 382 and*
    *49 U.S.C. §§ 41310, 41702, 41705 and 41712,*
    Docket No. 14194, 2003 DOT Av. LEXIS 178
    (Dep't of Transp. Mar. 26, 2003) ................................................................ 21

*In re Virgin America Inc.*, Docket No. OST 2012-0002,
    Order No. 2012-5-22 (Dep't of Transp. May 24, 2012).............................. 21

*Keys v. Carolina Coach Co.*,
    64 M.C.C. 769 (1955) .................................................................................. 12

*Nw. Airlines, Inc.*, Docket No. OST-01-10598-15,
    2002 WL 32340945 (Dep't of Transp. Feb. 11, 2002).................................. 21

*United Air Lines, Inc.*, Docket No. OST-2003-14194,
    Order No. 2003-11-13, 2003 WL 25425041
    (Dep't of Transp. Nov. 19, 2003) .............................................................. 20

*United Air Lines*, Inc., Docket No. OST-2011-0003,
    Order No. 2011-11-2 (Dep't of Transp. Nov. 1, 2011) ................................ 20

*United Airlines Violations of Order 94-1-19, 49 U.S.C. § 41712,*
    *and 49 U.S.C. § 41705*, Order No. 98-9-22,
    1998 DOT Av. LEXIS 402(Dep't of Transp. June 1998) ............................ 21

## Other Authorities

*About Civil Rights Department (CRD)*, Cal. Civil Rights Dept. (2024) ................ 23

Andrew D. Selbst & Solon Borocas,
    *Unfair Artificial Intelligence: How FTC Intervention Can*
    *Overcome the Limitations of Discrimination Law*,
    171 U. Pa. L. Rev. 1023 (2023)....................................................................... 2

Antonin Scalia & Bryan A. Garner,
    *Reading Law: the Interpretation of Legal Texts* (2012) ....................... 5, 6, 25

Bd. of Governors of the Fed. Res. Sys. & FDIC,
    *Unfair or Deceptive Acts or Practices by State-Chartered*
    *Banks*, Fin. Inst. Letters (Mar. 11, 2004 )..................................................... 22

Black's Law Dictionary (12th ed. 2024) ................................... 5

*Civil Rights Division*, Texas Workforce Commission (2024)............................... 23

*College Standard Dictionary of the English Language* (1943) ............................. 6

Ethan J. Leib & James J. Brudney,
   *The Belt-and-Suspenders Canon*, 105 Iowa L. Rev. 735 (2020)............... 3, 8

Felix Frankfurter,
   *Some Reflections on the Reading of Statutes*,
   47 Colum. L. Rev. 527 (1947)..................................................... 24

Ganesh Sitaraman & Morgan Ricks,
   *Tech Platforms and the Common Law of Carriers*,
   73 Duke L.J. 1037 (2024)............................................................ 10

Henry Campbell Black,
   *Black's Law Dictionary* (10th ed. 1990)...................................... 7

Henry Campbell Black,
   *Black's Law Dictionary* (3d ed. 1933)......................................... 6

Isaac K. Funk, *Funk & Wagnalls New Standard Dictionary
   of the English Language* (1943) ................................................ 6

J. Howard Beales, *The FTC's Use of Unfairness Authority:
   Its Rise, Fall, and Resurrection*,
   The Marketing & Public Policy Conference (2003) ...................................... 4

James Gordley,
   *Equality in Exchange*, 69 Cal. L. Rev. 1587 (1981)..................................... 10

Jeff Sovern,
   *Is Discrimination Unfair*, -- Ga. St. U. L. Rev. --
   (forthcoming 2025)................................................................... 2, 7

Joseph Singer, *No Right to Exclude: Public Accommodations and
   Private Property*, 90 Nw. L. Rev. 1283 (1996) ............................................. 12

Kate Sablosky Elengold, *Consumer Remedies for Civil Rights*,
99 B.U. L. Rev. 587 (2019) ............................................................. 2

Louis C. Kesselman,
*The Fair Employment Practice Commission Movement in*
*Perspective*, 31 J. Negro Hist. 30 (1946) ..................................... 23

Luke Herrine,
*The Folklore of Unfairness*, 96 N.Y.U. L. Rev. 431 (2021) ................... 2, 15

Marc Winerman,
*The Origins of the FTC: Concentration, Control,*
*and Competition*, 71 Antitrust L.J. 1 (2003)................................. 14

Mary Gardiner Jones,
*The Federal Trade Commission in 1968: Times of Turmoil*
*and Response*, 7 J. Pub. Pol'y & Mktg. 1 (1988) ......................... 17

Merriam-Webster.com Dictionary ............................................... 5

Patrick Atiyah,
*The Rise and Fall of Freedom of Contract* (1979) ...................... 10

Samuel Evan Milner,
*Defining Unfair Methods of Competition in the*
*Federal Trade Commission Act*, 2023 Wisc. L. Rev. 110 (2023)................ 13

*The American Heritage Dictionary of the English Language*
(3d ed. 1986).................................................................. 6

William Alan Neilson,
*Webster's New International Dictionary of the*
*English Language* (1934) .................................................. 6

William Boyd,
*Just Price, Public Utility, and the Long History of*
*Economic Regulation in America*, 35 Yale J. Reg. 721 (2018) ...................... 9

<u>**INTERESTS OF AMICI CURIAE**</u>[1]

Amici curiae are five law professors and scholars of consumer protection law with expertise in unfair and deceptive acts and practices laws and their intersections with anti-discrimination law. Professor Luke Herrine is an Assistant Professor of Law at the University of Alabama School of Law.[2] Professor Kate Sablosky Elengold is an Assistant Professor of Law and Director of the Economic Justice Clinic at the University of North Carolina School of Law. Professor Andrew Selbst is a Professor of Law at the University of California, Los Angeles School of Law. Professor Jeff Sovern is the Michael Millemann Professor of Consumer Protection Law at the University of Maryland Francis King Carey School of Law. Professor David Vladeck is the A.B. Chettle, Jr., Professor of Law at the Georgetown University Law Center.

Amici have a strong interest in resolving questions of law that go to the core of their professional expertise and scholarship, namely, the scope of the prohibition on "unfair practices" contained in the Consumer Financial Protection Act of 2010 (CFPA). Their expertise derives in part from their scholarly writings, including

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a). All parties have consented to the filing of this brief.

[2] Amici join in their individual capacities; institutional affiliations are provided for identification purposes only.

Kate Sablosky Elengold, *Consumer Remedies for Civil Rights*, 99 B.U. L. Rev. 587 (2019); Luke Herrine, *The Folklore of Unfairness*, 96 N.Y.U. L. Rev. 431 (2021); Andrew D. Selbst & Solon Borocas, *Unfair Artificial Intelligence: How FTC Intervention Can Overcome the Limitations of Discrimination Law*, 171 U. Pa. L. Rev. 1023 (2023), and Jeff Sovern, *Is Discrimination Unfair*, -- Ga. St. U. L. Rev. -- (forthcoming 2025), *available at* SSRN, https://perma.cc/F8QJ-Z4DC. Their interest in this proceeding draws in part from their research embodied in those works.

Based on years of experience studying, teaching, and writing about the CFPA and similar legal authorities, amici curiae believe that it is entirely lawful and appropriate for the Consumer Financial Protection Bureau (CFPB) to use its authority over unfair practices in its efforts to combat discriminatory conduct.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For hundreds of years, the concepts of discrimination and unfairness—and related concepts like unjustness and unreasonableness—have evolved together in everyday and technical legal usage. This overlap was well established in several areas of law when Congress first gave the Federal Trade Commission authority over "unfair or deceptive acts or practices" (UDAP) in 1938. It became more deeply established over the course of the twentieth century, as anti-discrimination law developed and as the FTC and other enforcers of the prohibition on unfair

practices used that authority to supplement more specialized anti-discrimination laws. By the time Congress gave the CFPB authority over "unfair, deceptive, and abusive acts and practices" (UDAAP), multiple agencies with unfair practices authority had used it to police discriminatory conduct, and it was intuitive to both specialists and the general public to call wrongfully discriminatory conduct "unfair."

Without taking into account this history, the court below announced a radical new principle: discrimination can never violate the prohibition on unfair practices. This principle contradicts the text, structure, and history of the CFPA.

It is true, as the court below observed, that the CFPA separately prohibits unfair and discriminatory practices. But Congress often creates overlapping prohibitions out of an abundance of caution.[3] Further, it is an elementary principle of consumer law that the prohibition on unfair practices overlaps with—indeed, gains much of its content from—wrongs also prohibited by more specific sources of law. *See, e.g.*, *LabMD v. FTC*, 894 F.3d 1221, 1230-31 (11th Cir. 2018) (looking for sources of "clear and well-established public policies" to determine the scope of unfair practices); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1194-95

---

[3] *See generally* Ethan J. Leib & James J. Brudney, *The Belt-and-Suspenders Canon*, 105 Iowa L. Rev. 735 (2020) (identifying the frequency of this practice of legislative drafting and the interpretive techniques courts have used to make sense of it).

(10th Cir. 2009) (same); *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988). In fact, it is well established that even *deceptive* conduct is unfair even though UDAAP (like UDAP) separately prohibits it. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245 (3d Cir. 2015); J. Howard Beales, *The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection*, The Marketing & Public Policy Conference (2003), https://perma.cc/D7E5-L69M ("deception and unfairness . . . . have sometimes been viewed as mutually exclusive legal theories, [but] Commission precedent incorporated in the [1994] statutory codification makes clear that deception is properly viewed as a subset of unfairness.").

For these and related reasons, experts in consumer law agree that discriminatory conduct can be unfair. That is not necessarily to say that *all* discriminatory conduct is unfair, nor is it to say anything about which protected classes should be included, how to establish discrimination, or which defenses are cognizable. But the Court is not presented with these questions. Rather, this is a facial challenge to the CFPB's statement that it will consider at least some discriminatory practices unfair. Therefore, the minimal conclusion that discrimination can be unfair is all that is required to dispose of this case. The Court should do so and reverse.

<u>**ARGUMENT**</u>

**I. THE CFPA USES "UNFAIR" TO MEAN DISCRIMINATORY.**

It is entirely commonplace for English speakers to use "unfair" to refer to unjustified differential treatment. This sense of "unfair" is so elementary that schoolchildren make use of it (all too) frequently. More to the point, this common usage is reflected in dictionaries and in the CFPA's text and structure.

**A. In Ordinary Usage, Discrimination Is "Unfair."**

Dictionaries confirm that "unfair" can be used to refer to inequitable treatment.[4] Lawyers use the term in this sense as well.[5] This is not a novel development in our language: the first written record of this sense of "unfair" dates back to 1700.[6] Dictionaries have consistently reflected this usage, including in 1938, when the original prohibition on "unfair or deceptive acts or practices" was passed. Federal Trade Commission Act Amendments, Ch. 49, 52 Stat. 111 (1938),

---

[4] *See Unfair*, Merriam-Webster.com Dictionary, https://perma.cc/TB4C-JJTR ("market by injustice, partiality, or deception" and "not equitable in business dealings"); Antonin Scalia & Bryan A. Garner, *Reading Law: the Interpretation of Legal Texts* 69 (2012) ("Words are to be understood in their ordinary, everyday meanings—unless their context indicates that they bear a technical sense."); see also *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) (using dictionaries to determine ordinary meaning of words in a consumer protection statute).

[5] *See* Black's Law Dictionary 744 (12th ed. 2024) (including in its definitions "not…impartial" and "inequitable in business dealings").

[6] *See* Merriam-Webster.com, *supra*.

*codified at* 15 U.S.C. § 45(a)(1)).

The 1943 edition of the New Standard Dictionary of the English Language—the "most useful and authoritative for the English language generally and for law"[7]—defined "unfairness" to include "showing partiality or prejudice."[8] Another contemporary dictionary defined unfair as "not equal."[9] The leading legal dictionary, Black's Law Dictionary, described fair as being "even-handed" in its 1933 edition.[10] Relatedly, dictionaries of the time defined discrimination as a "distinction, as in treatment; esp[ecially] an unfair or injurious distinction,"[11] and defined discriminate as "[t]o make a distinction; treat unequally or unfairly."[12]

Dictionaries between then and now have also reflected this sense. The 1986 American Heritage Dictionary defined fair as "not just or evenhanded."[13] The 1990 edition of Black's defined "fair" as, among other things, "having the qualities of

---

[7] Scalia & Garner, *supra*, at 419.

[8] Isaac K. Funk, *Funk & Wagnalls New Standard Dictionary of the English Language* 2607 (1943).

[9] See William Alan Neilson, *Webster's New International Dictionary of the English Language* 2773 (1934).

[10] *See* Henry Campbell Black, *Black's Law Dictionary* 744 (3d ed. 1933). It did not separately define "unfair." *See id.*

[11] Neilson, *supra*, at 745.

[12] *See College Standard Dictionary of the English Language* (1943).

[13] *The American Heritage Dictionary of the English Language* 1,950 (3d ed. 1986).

impartiality," "free from prejudice, favoritism, and self interest," "just, equitable, even-handed."[14]

## B. The CFPA Adopts The Widespread Practice Of Using "Fair" To Mean "Non-Discriminatory."

This ordinary usage of the term "unfair" to include certain discriminatory acts is reflected in the CFPA.[15] As is true with several other laws, the CFPA frequently uses "fair" to mean "non-discriminatory." The CFPA's definition section defines "fair lending" as "fair, equitable, and *nondiscriminatory* access to credit for consumers." *See* 12 U.S.C. § 5481(a)(13) (emphasis added). Similarly, the CFPA mandates that the Bureau establish an Office of Fair Lending and Equal Opportunity whose functions include "ensur[ing] the fair, equitable, and *nondiscriminatory* access to credit." *See* 12 U.S.C. § 5493(c)(1), (2)(A) (emphasis added).

In addition to providing prima facie support for the CFPB's position, the fact that Congress frequently uses "fair" to mean "nondiscriminatory," both in the

---

[14] Henry Campbell Black, *Black's Law Dictionary* 595 (10th ed. 1990). *See also* Sovern, *Is Discrimination Unfair*, *supra* (cataloging numerous relevant dictionary definitions).

[15] Amici entirely agree with the Bureau's argument that the discriminatory conduct will frequently satisfy the three-part substantial injury test. App. Br. at 43-44. The district court apparently did so as well. *Chamber of Commerce of the United States v. CFPB*, 691 F. Supp. 3d 730, 742 (E.D. Tex. 2023) (noting that the argument that discrimination causes injury in the relevant sense "has a certain appeal given the facial breadth of that section's language.").

CFPA and elsewhere, undermines the district court's reasoning that the separation of these two prohibitions indicates a congressional understanding that they do not overlap. *Chamber of Commerce v. CFPB*, 691 F. Supp. 3d at 741. Here, as elsewhere, Congress used broad language to cover as much ground as possible. In such a circumstance, the canon of *ex abundanti cautela* is appropriately applied.[16]

The court below offered inadequate reasons to explain its contrary position. It argued that Congress's creation of "a CFPB office to provide oversight and enforcement of federal laws 'intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau'" provided an "illustrat[ion] that Congress knew how to clearly add nondiscrimination to the CFPB's portfolio when it meant to do so." *Chamber of Commerce v. CFPB*, 691 F. Supp. 3d at 742. However, as discussed below, Congress has sometimes used "fair" without qualifier when it meant to prohibit wrongful discrimination, and has been inconsistent in whether it separately prohibits "unfair" and "discriminatory" conduct in consumer protection statutes. Thus, the fact that Congress "knew" how to say "unfair or discriminatory" does not itself say much about whether those concepts overlap.[17]

---

[16] *See* Leib & Brudney, *supra*.

[17] Further, the name of the office in question, the Office of Fair Lending *and Equal Opportunity* seems to imply a power beyond just the traditional "fair lending" statutes, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., and the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq*. *See* 12 U.S.C. § 5481(a)(12)

## II. BEFORE THE ORIGINAL PROHIBITION ON "UNFAIR" PRACTICES" IN THE FTC ACT, THE LAW FREQUENTLY USED "UNFAIR" TO REFER TO DISCRIMINATORY CONDUCT.

The textual analysis above, showing that the unfairness prohibition in the CFPA may include some acts of discrimination, is supported by a long jurisprudential history associating prohibitions on unfair and discriminatory conduct.

### A. At Common Law, "Unfair" Referred To Wrongfully Discriminatory Conduct.

At common law, fairness was often understood to require (roughly) equal treatment, which included, among other things, non-discrimination. The notion of "fair price" or "just price" (both of which translate the Latin *justum pretium*) was predicated on two ideas: first, in exchanges, the benefit and burden were to be equally balanced between parties, and, second, the prices charged to any given party should reflect equitable treatment (with some reasonable relationship to cost) rather than favoritism or discrimination.[18] The first notion of fairness-in-exchange motivated the early development of the doctrines of consideration, usury,

---

(enumerating statutes the CFPB enforces). This indicates that Congress meant the Bureau to use additional powers—including UDAAP—to bring about equal opportunity.

[18] *See* William Boyd, *Just Price, Public Utility, and the Long History of Economic Regulation in America*, 35 Yale J. Reg. 721 (2018).

unconscionability, and quasi-contract, among others.[19] It is the second notion of

fairness-across-exchanges that is more relevant to us here. It played its most

prominent role in the law of common callings and unfair competition.

In the law of common callings, which became the law of "public utilities"

and "regulated industries," the duty to charge a "just and reasonable price"

included both the fairness-in-exchange duty to not overcharge anybody and the

fairness-across-exchange duty to charge similarly situated parties the same rate.

*See Interstate Comm. Comm'n v. Balt. & Ohio R.R. Co.*, 145 U.S. 263, 276 (1892)

(holding that, in the common law of common carriers, "the weight of authority in

this country was in favor of an equality of charge to all persons for similar

services" though some courts ruled otherwise).[20] When Congress began codifying

common carrier regulation, it sought to make unambiguous the fact that

discrimination should be prohibited. *Louisville & N. R. Co. v. United States*, 282

U.S. 740, 749 (1931) ("The legislative history of the Interstate Commerce Act

shows clearly that the evil of discrimination was the principal thing aimed at."). To

that end, Congress both created a separate prohibition on "discriminat[ion] in rates

and charges" (and other "undue preferences") and codified the prohibition on

---

[19] *See* Patrick Atiyah, *The Rise and Fall of Freedom of Contract*, 61-67, 146-54
(1979); James Gordley, *Equality in Exchange*, 69 Cal. L. Rev. 1587 (1981).

[20] *See also* Ganesh Sitaraman & Morgan Ricks, *Tech Platforms and the Common
Law of Carriers*, 73 Duke L.J. 1037, 1054-56 (2024).

"unjust and unreasonable charge[s]." *See* Interstate Commerce Act of 1887, Pub.

L. 49-104, 24 Stat. 379, 379-80 (1887); *see also*, *e.g.*, *Dept. of Pub. Serv. v. Pac.*

*Tel. & Tel. Co.*, 8 F.C.C. 342, 359-60 (1941) (discussing similar provisions in the

Federal Communications Act and their relationship to the ICA). In creating distinct

grounds for liability, however, Congress did not create entirely separate spheres of

wrongdoing. The ICC and reviewing courts continued to evaluate how a rate

structure allocated burdens across shippers in determining the justness of a rate.

*See Keogh v. Chi. N.W. Ry. Co.*, 260 U.S. 156, 163 (1922) (discussing how an

otherwise reasonable rate might be unfair because of its effect on other shippers);

*see also Interstate Comm. Comm'n v. Union Pac. Ry. Co.*, 222 U.S. 541 (1912)

(discussing how multiple effects, including differential treatment of different

routes, can be considered in determining the reasonableness of a rate). And

different rates for different shippers continued to be outlawed only if that

difference was deemed unfair. *Balt. & Oh.*, 145 U.S. at 276 ("it [was] not all

discriminations or preferences that fall within the inhibition of the statute,—only

such as [were] unjust or unreasonable.").[21]

---

[21] Congress's amendments declaring that rates that were too *low* could be unjust illustrates this dynamic. Transportation Act, § 418, 41 Stat. 474, 485 (1920). If fairness of a rate were only a matter of preventing carriers from using their power to gouge shippers, the amendment would make no sense. The reason for prohibiting rates that were too low was to prevent unfairness across shippers—that is, discrimination. *See New York v. United States*, 331 U.S. 284 (1947) (discussing

Although the prohibition on discrimination in the common carrier context was primarily focused on differential treatment by region or population size or willingness to make special deals, it was also sometimes used to police discrimination against what we would now call "protected classes." Courts as far back as 1859 held that discrimination based on race was "unreasonable discrimination" in violation of the common law duties of common carriers. *State v. Kimber*, 3 Ohio Dec. Reprint 197, 198 (Ct. C.P. 1859).[22] Such reasoning later formed the basis for the modern law of public accommodations under the Civil Rights Act of 1964. *See* Singer, *supra*; *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 245-49 (1964); *see also* 42 U.S.C. § 12182 (prohibiting discrimination in public accommodations based on disability). Even before that, the ICC used its authority over "undue preferences" and "unjust discrimination" to prohibit racial discrimination in interstate travel. *Mitchell v. United States*, 313 U.S. 80 (1941); *see also Keys v. Carolina Coach Co.*, 64 M.C.C. 769 (1955) (administrative ruling affirming and applying this principle to bus service).

In the law of "unfair competition" businesses could face liability for discriminatory practices such as targeting price cuts in some regions but not others

---

a finding that rates were too low in the northeast on the grounds that these rates reflected regional discrimination).

[22] Joseph Singer, *No Right to Exclude: Public Accommodations and Private Property*, 90 Nw. L. Rev. 1283 (1996).

to fend off competitors or refusing to provide a service to a competitor that was otherwise generally available. *See, e.g.*, *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 42-43 (1911); *City of Mobile v. Bienville Water Supply Co.*, 30 So. 445, 448-49 (Ala. 1901).[23]

**B.    The Meaning Of "Unfair Methods Of Competition" In The FTC Act Was Clearly Understood To Prohibit At Least Price Discrimination.**

In prohibiting "unfair methods of competition" in the Federal Trade Commission Act of 1914 (FTCA), Congress expanded on the case law described above. Pub. L. 63-203, 38 Stat. 717 (1914). "Unfair" was used precisely because of its capaciousness—it was meant to "encompass[] not only practices that violate the Sherman Act and the other antitrust laws, but also practices that the Commission determines are against public policy for other reasons." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986). The term "unfair *method* of competition" was explicitly meant to be *broader* than the common law concept of "unfair competition"—which, as set forth above, condemned price and non-price discrimination that harmed competition. *See supra* Section II.A. And Congress

---

[23] See also Samuel Evan Milner, *Defining Unfair Methods of Competition in the Federal Trade Commission Act*, 2023 Wisc. L. Rev. 110, 116-35 (2023) (explaining that the law of unfair competition derived from a series of business torts that began to congeal over the course of the nineteenth century).

explicitly endorsed the notion that discrimination could form the basis of a competition harm in the same debates that gave rise to the FTCA.[24]

As a result of these debates, just weeks after passing the FTCA, Congress explicitly endorsed non-discrimination as part of the duty to compete fairly. In Section 2 of the Clayton Antitrust Act, Pub. L. 63-212, 38 Stat. 730 (1914), *codified as amended at* 15 U.S.C. § 13, Congress stated that "[i]t shall be unlawful for any person engaged in commerce…to discriminate in price between different purchasers of commodities…where the effect of such discrimination may be to substantially lessen competition." Since it has always been taken for granted that every violation of the Sherman or Clayton Antitrust Act is a violation of the prohibition of unfair methods of competition in Section 5 of the FTC Act, (at least one variety of) discrimination is unambiguously an unfair method of competition. *FTC v. Cement Inst.*, 333 U.S. 683, 693, 725-26 (1948).

---

[24] *See* Marc Winerman, *The Origins of the FTC: Concentration, Control, and Competition*, 71 Antitrust L.J. 1 (2003) (explaining how the Clayton and FTC Acts emerged out of the same set of legislative debates).

## III.   "UNFAIR PRACTICES" IN THE FTC ACT PROHIBITS DISCRIMINATION.

### A.   The Wheeler-Lea Act Incorporated Preexisting Overlap Between "Unfair" And "Discriminatory" While Remaining Open To Further Overlap.

Congress added the prohibition of "unfair or deceptive acts or practices" (UDAP) to the FTC Act via the Wheeler-Lea Act of 1938. It was this UDAP authority that Congress later expanded upon in giving the CFPB its UDAAP authority. The UDAP authority itself expanded upon the meaning of "unfair methods of competition" and other uses of "unfair" at common law.[25] Legislators agreed that UDAP was "a more or less procedural amendment," 83 Cong. Rec. 393 (1938) (statement of Rep. Carl Mapes), to "make[] the consumer who may be injured by an unfair trade practice of equal concern before the law with the merchant injured by the unfair methods of a dishonest competitor." 83 Cong. Rec. 3255 (1938) (statement of Sen. Burton Wheeler). Thus, it brought the earlier associations between unfairness and discrimination along with it.

Further, the record makes clear that, as in 1914, Congress chose the term "unfair" because of its polysemy, its ability to take on more associations over time. S. Rep. No. 1705, at 2 (1936) (discussing the impossibility of enumerating practices to be condemned, given market evolution). As Judge Learned Hand put it

---

[25] *See* Luke Herrine, *The Folklore of Unfairness*, 96 N.Y.U. L. Rev. 431 (2021).

in an influential opinion that came down just before the Wheeler-Lea Act passed, the word "unfair" invites the FTC to "discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop." *FTC v. Standard Educ. Soc'y*, 86 F.2d 692, 696 (2d Cir. 1936), *rev'd on other grounds*, 302 U.S. 112 (1937). Like the Sherman Act's prohibition of "restraints of trade," the prohibition on UDAP "invokes the common law itself, and not merely the static content that the common law had assigned to the term at the time of enactment." *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 732 (1988) (Scalia, J.).

Because of its in-built flexibility, the prohibition on "unfair practices" has served a gap-filling function. It has borrowed meaning from other laws and extended their scope when consistent with their spirit. Historically, its most common gap-filling function has been to expand duties of honesty beyond what the strict letter of anti-deception law might require. *See, e.g.*, *Harry & Bryant Co. v. FTC*, 726 F.2d 993 (4th Cir. 1984) (disclosures in funeral services). But the unfair practices authority has also been used to expand creditors' duties to debtors beyond both common law and statutory baselines, *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 (D.C. Cir. 1985), to prevent bad faith breaches of contract, *Orkin Exterminating*, 849 F.2d 1354, and to build a whole law of data security and data privacy from the traces of constitutional, common, and statutory law. *See, e.g.*,

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015); *FTC v. Kochava, Inc.*, 2024 WL 449363 (D. Idaho, Feb. 3, 2024).

Thus, even if Congress had not already understood "unfair" to include discrimination in 1938, as discussed *supra*, "unfair" would have taken on that meaning because anti-discrimination became a sufficiently entrenched norm in consumer markets after 1938.

**B.    Since 1938, UDAP Has Repeatedly Been Used To Regulate Discriminatory Conduct.**

The practice of the FTC and other agencies with UDAP authority has illustrated this entrenchment. They have repeatedly used the prohibition on "unfair practices" to enforce against discriminatory practices. By the time of the CFPA's passage in 2010, this practice was well established.

Even before equal protection laws had extended into consumer credit, the FTC used its UDAP authority to indirectly root out invidious discrimination. After the Watts Riots of 1965 put the issue of retail and lending practices in segregated inner-city neighborhoods at the center of public debate, the FTC undertook several initiatives to root out these practices.[26] Because this initiative began before the passage of ECOA or the Fair Housing Act, the FTC often used its UDAP authority.

---

[26] *See* Mary Gardiner Jones, *The Federal Trade Commission in 1968: Times of Turmoil and Response*, 7 J. Pub. Pol'y & Mktg. 1 (1988).

One notable case, *In re First Buckingham Cmty., Inc*, 73 F.T.C. 938 (1968), involved a landlord who refused to rent to people because of their race—a practice that today would be a clear violation of the Fair Housing Act. Without that law to rely on but with an increasingly clear federal norm against discriminatory conduct, the Commission's complaint charged the landlord with both unfair and deceptive acts. Though the agency dismissed the case after the chastened landlord abandoned its discriminatory practices, the FTC opinion explained that "[a]n advertiser's failure to disclose material facts in circumstances where the effect of nondisclosure is to deceive a substantial segment of the public is as much deception as if it were accomplished through affirmative misrepresentations."[27] *Id*. at 946.

The FTC engaged in a more systematic effort to regulate consumer credit markets, including discriminatory acts, in its decade-long credit practices rulemaking. Mostly relying on its unfair practices authority, the agency prohibited a number of collection practices, many of which were most common in poor and segregated neighborhoods. Its reasoning—and the D.C. Circuit's reasoning on

---

[27] In a later case, *In re Pfizer*, 81 F.T.C. 23, 60 n.5 (1972), the Commission called *Buckingham* an unfairness case. In other words, the FTC also asserted that its unfairness power reached discrimination. More recently, and consistently with its past practice, the FTC has brought several cases charging unfair discrimination in violation of the FTC Act. *See FTC v. Passport Auto. Grp., Inc.*, No. 8:22-cv-02670-GLS (D. Md. Oct. 18, 2022); *FTC v. Rhinelander Auto Ctr.*, No. 3:23-cv-737 (W.D. Wis. filed Oct. 24, 2023); *FTC v. Floatme Corp.*, No. 5:24-cv-00001 (W.D. Tx. filed Jan 22, 2024).

review—discussed the harm of these practices in terms of their disparate impact on low-income consumers. *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d at 982 n.29 ("The Commission has identified a market failure with respect to a particular category of credit transactions which is being exploited by the creditors involved to the detriment of the consumers involved, and thus the dissent's argument that higher-income, more creditworthy consumers can obtain credit on better terms from banks is unavailing."); *id.* at 983 ("the Commission's exercise of its unfairness authority…[in this case] can be fairly viewed as falling within the Commission's authority to take into consideration principles of equity and public policy").

An even more direct and consistent practice of using UDAP to police discrimination against protected classes developed a decade later among aviation regulators, first the Civil Aeronautics Board (CAB) and later the Department of Transportation (DOT), which absorbed the CAB's relevant responsibilities.[28] In a 1978 case, for example, Delta Airlines had imposed additional requirements on customers whose addresses were in certain communities of color. *See In re Delta Air Lines, Inc., Miscellaneous Economic Orders*, 78 C.A.B. 860, 886 (1978) (Enforcement re Ticket-by-Mail, order 78–8–101). The CAB determined that the conduct violated the UDAP and the Equal Credit Opportunity Act. *Id.* at 889. After

---

[28] CAB's UDAP statute "was modeled closely after § 5 of the Federal Trade Commission Act." *Am. Airlines v. N. Am. Airlines*, 351 U.S. 79, 82 (1956).

the Department of Transportation assumed the CAB's role in such matters, the

DOT brought several discrimination cases under its UDAP authority. *See, e.g.*,

*Continental Airlines, Inc.*, Docket No. OST 2004-16943, Order 2004-4-4, 2004

WL 720318 (Dep't of Transp. Apr. 2, 2004) ("§ 41712 prohibits unfair and

deceptive practices by air carriers. Each of these provisions has been interpreted to

prohibit air carriers from discriminating on the basis of race, color, national origin,

religion, sex, or ancestry"); *Atl. Se. Airlines, Inc.*, Docket No. OST-2012-0002,

Order No. 2012-5-2 (Dep't of Transp. May 2, 2012); *United Air Lines*, Inc.,

Docket No. OST-2011-0003, Order No. 2011-11-2 (Dep't of Transp. Nov. 1,

2011); *Delta Air Lines, Inc.*, Docket No. OST 2004-16943, Order No. 2004-6-13,

2004 WL 1380520 (Dep't of Transp. June 21, 2004); *United Air Lines, Inc.*,

Docket No. OST-2003-14194, Order No. 2003-11-13, 2003 WL 25425041 (Dep't

of Transp. Nov. 19, 2003) (consent order).

In one such case, when the airline challenged the DOT position that § 41712

barred discrimination, an administrative law judge rebuffed the airline's claim,

writing that "section 41712 may be invoked in a matter in which discrimination is

charged on the basis of perceived race, religion, national origin or ancestry." *See*

*Am. Airlines, Inc.*, Docket No. OST-2003-15046-18, 2003 WL 23097500, at 3

(Dep't of Transp. Aug. 21, 2003). The airline later agreed to a consent order. *See*

*In re Am. Airlines, Inc.*, Docket No. OST-2003-15046 (Dep't of Transp. Feb. 27,

2004). Other DOT proceedings similarly found discrimination by reason of disability to be unfair under § 41712 or predecessor statutes. *See, e.g.*, *In re Compania Mexicana De Aviacion, S.A. De C.V.*, Docket No. OST 2008-0031, Order No. 2008-4-6-3, 2008 WL 5505456 (Dep't of Transp. Apr. 2, 2008) (consent order stating that "unreasonable discrimination in foreign air transportation . . . also constitute[s] unfair and deceptive trade practices in violation of 49 U.S.C. § 41712"); *In re Virgin America Inc.*, Docket No. OST 2012-0002, Order No. 2012-5-22 (Dep't of Transp. May 24, 2012); *In re Delta Air Lines, Inc.*, Docket No. OST-2011-0003, Order 2011-2-10 (Dep't of Transp. Feb. 17, 2011); *In re Atl. Se. Airlines*, Docket OST-2011-0003, Order 2011-7-4 (Dep't of Transp. July 11, 2011); *In re US Airways, Inc. Violations of 14 CFR Part 382 and 49 U.S.C. §§ 41310, 41702, 41705 and 41712*, Docket No. 14194, 2003 DOT Av. LEXIS 178 (Dep't of Transp. Mar. 26, 2003) (consent order); *Nw. Airlines, Inc.*, Docket No. OST-01-10598-15, 2002 WL 32340945 (Dep't of Transp. Feb. 11, 2002); *United Airlines Violations of Order 94-1-19, 49 U.S.C. § 41712, and 49 U.S.C. § 41705*, Order No. 98-9-22, 1998 DOT Av. LEXIS 402 (Dep't of Transp. June 1998).

More recently, but still before the passage of the CFPA, the practice of using UDAP authority to root out discrimination extended to consumer lending. In 2004, the Federal Deposit Insurance Corporation and Board of Governors of the Federal Reserve System wrote that "[u]nfair or deceptive practices that target or have a

disparate impact on consumers who are members of these protected classes may violate the ECOA or the FHA, as well as the FTC Act."[29] That comment is particularly significant because those agencies enforce the FTC Act against certain financial institutions. *See* 12 U.S.C. § 1818(b)(1), (e)(1), (i)(2). Thus, they were opining about the very law upon which the CFPA was based.

## C. Outside The FTC Act, The Concepts Of "Unfair" And "Discriminatory" Became Even More Intertwined Over The Course Of The 20th Century.

The FTCA was not the only place in which legislative, judicial, and administrative practice intermingled the concepts of unfairness and discrimination. Over decades, it has become clear that all three branches of government freely associate the concepts of unfairness and discrimination, unable or unwilling to draw sharp lines of distinction.

Amici provide only a few salient examples. In 1941—only three years after passage of the Wheeler-Lea Act—President Roosevelt created a "Committee on Fair Employment Practices" and "Fair Employment Practice Commissions"

---

[29] See Bd. of Governors of the Fed. Res. Sys. & FDIC, *Unfair or Deceptive Acts or Practices by State-Chartered Banks*, Fin. Inst. Letters (Mar. 11, 2004 ) (emphasis added), https://perma.cc/7BUJ-QKNW. *Cf. Fairman v. Schaumberg Toyota, Inc.*, 1996 WL 392224 (N.D. Ill. July 10, 1996) (denying a motion to dismiss under the Illinois Consumer Fraud Act, which prohibits unfair practices, for targeting African-Americans and Hispanic Americans for auto loans with higher interest rates); *Pettiford v. Branded Mgmt. Grp.*, 104 Mass. App. Ct. 287 (2024) (finding that racial harassment is unfair within the meaning of the Massachusetts UDAP law).

(FEPCs) in an executive order barring racial discrimination in the defense industry. Exec. Order No. 8,802 (Jun. 25, 1941).[30] FEPCs were often the predecessors for states' civil rights enforcement agencies, many of which enforce states' "fair employment" statutes.[31]

When Congress sought to prohibit discrimination in housing a quarter century later, it passed the Fair Housing Act of 1968 ("FHA"). *See* 42 U.S.C. § 3601 *et seq.* Neither the FHA nor the Fair Housing Amendments Act of 1988 explicitly define "fair." The FHA as amended does, however, define "discriminatory housing practice"—the core prohibition in the FHA—to mean "an act that is unlawful under section 804, 805, 806, or 818 of this title." 42 U.S.C. § 3602(f); *see also* Housing and Community Development Act of 1992, Pub. L. No. 102-550, § 905(a), 106 Stat. 3672, 3868 (1992) ("The congress finds that–(1) in the past half decade, there have been major legislative and administrative changes in Federal fair housing and fair lending laws and substantial improvements in the Nation's understanding of discrimination in the housing markets.").

---

[30] *See* Louis C. Kesselman, *The Fair Employment Practice Commission Movement in Perspective*, 31 J. Negro Hist. 30 (1946).

[31] *See, e.g.*, *Civil Rights Division*, Texas Workforce Commission (2024), https://perma.cc/NJ9W-RRKY; *About Civil Rights Department (CRD)*, Cal. Civil Rights Dept. (2024), https://perma.cc/B55B-R6YN.

The Supreme Court has likewise equated unfairness with discrimination. As it famously explained in *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954):

> [T]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process.

## IV. THE TEXT AND STRUCTURE OF THE CFPA CLEARLY INDICATE THAT "UNFAIR" AND "DISCRIMINATORY" ARE OVERLAPPING CONCEPTS.

By the time that the CFPA was passed in 2010, anti-discrimination had become a sufficiently entrenched norm in consumer markets and the legal concepts of unfairness and discrimination had become so intertwined that such that it would be impossible to draw clear lines between them.[32] It is not coincidence that the text and structure of the CFPA exude that entanglement.

Under the prior interpretation canon, when Congress enacts a statute and uses phrases drawn from other statutes, it is presumed to adopt as well as the interpretations of those statutes unless it says otherwise. *Morissette v. United*

---

[32] *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947) ("Words of art bring their art with them. . . . [I]if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it").

*States*, 342 U.S. 246, 263 (1952).[33] Not only do multiple agencies prominent in the consumer financial regulation area—including the FTC, the Federal Deposit Insurance Corporation, and the Board of Governors of the Federal Reserve System—use their unfairness powers to bar objectionable discrimination, but Congress also did nothing to reject those interpretations when it enacted the CFPA. *Cf. Texas Dept. of Hous. & Comm. Affairs v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536-37 (2015) (holding that the fact that Congress has amended a law but not changed a well-established judicial interpretation of that law "is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings" that had interpreted the law that way).

Finally, it bears noting that the precedents discussed in the previous section would present a serious problem for the application of the major questions doctrine here. One trigger for the doctrine is when "an agency claims to discover in a long-extant statute an unheralded power." *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). But as the above discussion demonstrates, the power here is not unheralded; indeed, it is older than the very statute under which the CFPB is proceeding.

---

[33] *See also* Scalia & Garner, *supra*, at 322, 325 (administrative usage is included in this presumption).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Dated: August 14, 2024                         Respectfully submitted,


                                                /s/ Seth E. Mermin
                                                Seth E. Mermin
                                                David S. Nahmias
                                                CENTER FOR CONSUMER LAW &
                                                ECONOMIC JUSTICE
                                                305 Berkeley Law
                                                Berkeley, CA 94720-7200
                                                tmermin@law.berkeley.edu
                                                dnahmias@law.berkeley.edu
                                                (510) 643-3519

                                                *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*

# **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.

*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*