**No. 23-40650**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION;
CONSUMER BANKERS ASSOCIATION; INDEPENDENT BANKERS ASSOCIATION OF TEXAS;
TEXAS ASSOCIATION OF BUSINESS; TEXAS BANKERS ASSOCIATION,
*Plaintiffs-Appellees,*

v.

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT CHOPRA,
*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Texas, No. 6:22-cv-381 (Barker, J.)

## APPELLEES' BRIEF

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
jdickey@uschamber.com

Cameron T. Norris
David L. Rosenthal
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

Thomas Pinder
Andrew R. Doersam
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Ave. NW
Washington, DC 20036
(202) 663-5035
tpinder@aba.com

Dated: October 7, 2024

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE REGARDING INTERESTED PERSONS

Per Circuit Rule 28.2.1, the following have an interest in the outcome of this case. These representations are made so that this Court's judges can evaluate possible disqualification or recusal:

1. Plaintiffs-Appellees
   a. Chamber of Commerce of the U.S.A.
   b. Longview Chamber of Commerce
   c. American Bankers Association
   d. Consumer Bankers Association
   e. Independent Bankers Association of Texas
   f. Texas Association of Business
   g. Texas Bankers Association

2. Counsel for Plaintiffs-Appellees
   a. Cameron T. Norris, Consovoy McCarthy PLLC
   b. Bryan K. Weir, Consovoy McCarthy PLLC
   c. David L. Rosenthal, Consovoy McCarthy PLLC
   d. Jennifer B. Dickey, Chamber of Commerce of the U.S.A.
   e. Jordan L. Von Bokern, Chamber of Commerce of the U.S.A.
   f. Bruce A. Smith, Ward, Smith & Hill, PLLC
   g. David R. Pommerehn, Consumer Bankers Association
   h. Thomas Pinder, American Bankers Association
   i. Andrew R. Doersam, American Bankers Association

3. Defendants-Appellants
   a. Consumer Financial Protection Bureau
   b. Rohit Chopra, in his official capacity as Director of the CFPB

4. Counsel for Defendants-Appellants

    a. Justin Michael Sandberg, CFPB

    b. Ryan Cooper, CFPB

*/s/ Cameron T. Norris*
Counsel for Plaintiffs-Appellees
Dated: October 7, 2024

# STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees agree with Defendants-Appellants that oral argument is appropriate.

# TABLE OF CONTENTS

Certificate Regarding Interested Persons..............................................................i

Statement Regarding Oral Argument................................................................iii

Table of Authorities .........................................................................................v

Introduction ......................................................................................................1

Statement of the Issues.....................................................................................3

Statement of the Case ......................................................................................4

I.     Congress grants the CFPB discrete statutory authority over "unfair" practices.................................................................................................4

II.    The CFPB issues a manual update that claims an unprecedented expansion of its unfairness authority to cover discrimination, including potential disparate impacts. ...................................................................5

III.   The manual update directly harms regulated entities like Plaintiffs' members. ...................................................................................................7

IV.   Plaintiffs sue and win at summary judgment.......................................9

Summary of Argument ...................................................................................14

Standards of Review.......................................................................................15

Argument ........................................................................................................15

I.     The district court correctly found standing and venue.................. 16

A.    Plaintiffs' use of pseudonyms did not violate *Summers*, a case involving no pseudonyms. ..................................................... 16

B.    The CFPB's new objections to Plaintiffs' evidence are forfeited and meritless. ............................................................. 25

C.    Venue was proper in the Eastern District of Texas. ........................... 30

II.    The CFPB violated the APA................................................................. 34

A.    The CFPB exceeded its statutory authority by reading its power over "unfair" practices to encompass a new power over disparate impacts. .............................................................. 34

B.    The CFPB also violated the APA's procedural rules.......................... 43

III.   The district court's remedy was appropriate. .................................. 45

Conclusion....................................................................................................... 49

Certificate of Service ...................................................................................... 51

Certificate of Compliance .............................................................................. 51

# TABLE OF AUTHORITIES

## Cases

*AAER v. Fearless Fund Mgmt.*,
103 F.4th 765 (11th Cir. 2024) ...................................................... *passim*

*Abrams Shell v. Shell Oil Co.*,
343 F.3d 482 (5th Cir. 2003) ...................................................... 31

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) ............................................ 17, 23, 26

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ...................................................... 41

*Allentown Mack Sales & Serv. v. NLRB*,
522 U.S. 359 (1998) ...................................................... 44

*Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*,
833 F. App'x 235 (11th Cir. 2020) .............................................. 33

*B.R. v. F.C.S.B.*,
17 F.4th 485 (4th Cir. 2021) ............................................ 23, 34

*Blanchard v. Bergeron*,
489 U.S. 87 (1989) ...................................................... 22

*Bldg. & Const. Trades Council v. Downtown Dev.*,
448 F.3d 138 (2d Cir. 2006) ............................................ 33, 34

*Book People v. Wong*,
91 F.4th 318 (5th Cir. 2024) ...................................................... 29

*Brown v. Cain*,
546 F. App'x 471 (5th Cir. 2013) .............................................. 25

*Brown v. Davenport*,
596 U.S. 118 (2022) ...................................................... 19

*Campbell v. Ackerman*,
903 F.3d 14 (1st Cir. 2018) ...................................................... 25

*Career Colls. & Schs. of Tex. v. DOE*,
98 F.4th 220 (5th Cir. 2024) ...................................................... 29

*CFPB v. Community Financial Services Ass'n*,
601 U.S. 416 (2024) ...................................................... 10

*Christian Emps. All. v. Azar,*
   2019 WL 2130142 (D.N.D. May 15) ............................... 47

*Church of Scientology v. Cazares,*
   638 F.2d 1272 (5th Cir. 1981) ..................................... 22

*Collins v. Yellen,*
   594 U.S. 220 (2021) ................................................... 29

*Community Financial Services Ass'n v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) ......................................... 9

*Cong. of Racial Equal. v. Douglas,*
   318 F.2d 95 (5th Cir. 1963) ......................................... 22

*Corner Post v. Bd. of Govs. of Fed. Rsrv. Sys.,*
   144 S.Ct. 2440 (2024) ................................................ 45

*Council of Ins. Agents & Brokers v. Juarbe-Jimenez,*
   443 F.3d 103 (1st Cir. 2006) ......................................... 26

*Courthouse News Serv. v. N.M. Admin. Off. of Cts.,*
   53 F.4th 1245 (10th Cir. 2022) ..................................... 21

*Crane v. Napolitano,*
   920 F. Supp. 2d 724 (N.D. Tex. 2013) ..................... 31, 32

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) ................................................... 29

*Dep't of Educ. v. Brown,*
   600 U.S. 551 (2023) ................................................... 19

*DHS v. Regents of the Univ. of Calif.,*
   591 U.S. 1 (2020) ..................................................... 44

*Do No Harm v. Pfizer,*
   96 F.4th 106 (2d Cir. 2024) ............................ 17, 24, 33

*Doe v. Mass. Inst. of Tech.,*
   46 F.4th 61 (1st Cir. 2022) ......................................... 19

*Doe v. Stincer,*
   175 F.3d 879 (11th Cir. 1999) ............................... 16, 22

*Duarte ex rel. Duarte v. City of Lewisville,*
   759 F.3d 514 (5th Cir. 2014) ....................................... 29

*Ensley v. Cody Res.,*
   171 F.3d 315 (5th Cir. 1999) ....................................... 25

*Exxon Corp. v. FTC,*
    588 F.2d 895 (3d Cir. 1978) ...................................................... 31, 32

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ...................................................................... 48

*Franciscan All. v. Becerra,*
    553 F. Supp. 3d (N.D. Tex. 2021) ............................................... 46

*FW/PBS Inc. v. Dallas,*
    493 U.S. 215 (1990) ...................................................................... 19

*Genesis Marine, LLC of Del. v. Hornbeck Offshore Servs.,*
    951 F.3d 629 (5th Cir. 2020) ....................................................... 10

*Golden v. Cox Furniture Mfg. Co.,*
    683 F.2d 115 (5th Cir. 1982) ....................................................... 31

*Guidry v. Int'l Union of Operating Engr's,*
    882 F.2d 929 (5th Cir. 1989) ....................................................... 48

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ...................................................................... 36

*Hancock Cnty. Bd. of Sup'rs v. Ruhr,*
    487 F. App'x 189 (5th Cir. 2012) ............................................. 22, 32

*Humane Soc'y v. USDA,*
    2021 WL 1593243 (C.D. Cal. Mar. 26) ...................................... 26

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ...................................................................... 16

*Kansas v. DOE,*
    2024 WL 3471331 (D. Kan. July 19) ........................................... 47

*Kars 4 Kids v. Am. Can!,*
    8 F.4th 209 (3d Cir. 2021) ........................................................... 15

*Kelly v. Syria Shell Petroleum Dev. B.V.,*
    213 F.3d 841 (5th Cir. 2000) ....................................................... 32

*La. ex rel. Murrill v. DOE,*
    2024 WL 3452887 (5th Cir. July 17) ........................................... 42

*Labrador v. Poe ex rel. Poe,*
    144 S.Ct. 921 (2024) .................................................................... 49

*Loper Bright Enters. v. Raimondo,*
    144 S.Ct. 2244 (2024) .................................................................. 38

*Love v. Reilly,*
924 F.2d 1492 (9th Cir. 1991) ............................................................ 21

*LSR Consulting, LLC v. Wells Fargo Bank, N.A.,*
835 F.3d 530 (5th Cir. 2016) ............................................................. 27

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ......................................................................... 32

*Lyles v. Medtronic Sofamor Danek, USA,*
871 F.3d 305 (5th Cir. 2017) ............................................................. 15

*Mock v. Garland,*
75 F.4th 563 (5th Cir. 2023) ............................................................. 43

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ......................................................................... 47

*NAACP v. Ala. ex rel. Patterson,*
357 U.S. 449 (1958) ..................................................................... 7, 20

*NAACP v. Trump,*
298 F. Supp. 3d 209 (D.D.C. 2018) ................................................. 17

*NAM v. SEC,*
631 F. Supp. 3d 423 (W.D. Tex. 2022) ............................................. 46

*Nat'l Council of La Raza v. Cegavske,*
800 F.3d 1032 (9th Cir. 2015) .................................................24, 33, 34

*Neirbo Co. v. Bethlehem Shipbuilding Corp.,*
308 U.S. 165 (1939) ......................................................................... 30

*NFIB v. OSHA,*
595 U.S. 109 (2022) ...................................................................41, 43

*Ohio v. EPA,*
144 S.Ct. 2040 (2024) ..................................................................... 42

*PDE v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
2024 WL 3992579 (S.D. Ohio Aug. 28) ........................................... 19

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,*
268 U.S. 510 (1925) ......................................................................... 47

*Playboy Enters. v. Pub. Serv. Comm'n of P.R.,*
906 F.2d 25 (1st Cir. 1990) ............................................................... 48

*R.A.V. v. St. Paul,*
505 U.S. 377 (1992) ......................................................................... 19

*R.J. Reynolds Vapor Co. v. FDA,*
   65 F.4th 182 (5th Cir. 2023) ................................................................. 31

*Reaching Souls Int'l v. Azar,*
   2018 WL 1352186 (W.D. Okla. Mar. 15) ....................................... 47

*Reifer v. Westport Ins. Corp.,*
   751 F.3d 129 (3d Cir. 2014) ............................................................... 31

*Religious Sisters of Mercy v. Becerra,*
   55 F.4th 583 (8th Cir. 2022) .............................................................. 20

*Reno v. Flores,*
   507 U.S. 292 (1993) ............................................................................ 41

*Retail Indus. Leaders Ass'n v. Fielder,*
   475 F.3d 180 (4th Cir. 2007) .............................................................. 48

*Rolls ex rel. A. R. v. Packaging Corp. of Am.,*
   34 F.4th 431 (5th Cir. 2022) .............................................................. 25

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) ........................................................................ 18, 20

*S.C. NAACP v. Alexander,*
   2022 WL 453533 (D.S.C. Feb. 14) ............................................. 24, 33

*Seila Law v. CFPB,*
   591 U.S. 197 (2020) .............................................................................. 1

*SFFA v. Harvard,*
   2023 WL 3126414 (D. Mass. Apr. 27) ............................................ 21

*SFFA v. Harvard,*
   600 U.S. 181 (2023) ............................................................................ 20

*SFFA v. U.S. Naval Acad.,*
   707 F. Supp. 3d 486 (D. Md. 2023) ............................................. 17, 21

*SFFA v. West Point,*
   709 F. Supp. 3d 118 (S.D.N.Y. 2024) .......................................... 17, 20

*Shell Offshore v. Babbitt,*
   61 F. Supp. 2d 520 (W.D. La. 1999) ................................................ 46

*Smilde v. Snow,*
   73 F. App'x 24 (5th Cir. 2003) .......................................................... 31

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp.,*
   509 F.3d 216 (5th Cir. 2007) ............................................................. 43

*Speech First v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ...................................................... 23, 26

*Speech First v. Shrum,*
  92 F.4th 947 (10th Cir. 2024) ..................................................... *passim*

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .................................................................. *passim*

*Superior MRI Servs. v. All. Healthcare Servs.,*
  778 F.3d 502 (5th Cir. 2015) .............................................................. 15

*Tenn. Republican Party v. SEC,*
  863 F.3d 507 (6th Cir. 2017) ............................................................. 20

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project,*
  576 U.S. 519 (2015) ...............................................................9, 40, 44

*Texas Bankers Ass'n v. OCC,*
  2024 WL 1349308 (N.D. Tex. Mar. 29) .............................17, 23

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) ............................................................. 43

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ............................................................. 42

*Texas v. United States,*
  50 F.4th 498 (2022)............................................................................ 46

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ............................................................. 43

*UAW v. Brock,*
  477 U.S. 274 (1986) ................................................................16, 26, 48

*United States v. Joseph,*
  102 F.4th 686 (5th Cir. 2024) ........................................................... 15

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
  570 U.S. 338 (2013) ............................................................................ 36

*Warth v. Seldin,*
  422 U.S. 490 (1975) ............................................................26, 32, 47, 48

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .....................................................................39, 41

*Williamson-Dickie Mfg. Co. v. M/V Heinrich J,*
  762 F. Supp. 2d 1023 (S.D. Tex. 2011).......................................... 31

*Workman v. UPS*,
    234 F.3d 998 (7th Cir. 2000) ......................................................... 25

## Statutes

5 U.S.C. §553 .................................................................................................7

5 U.S.C. §706(2) ..................................................................................... 39, 43

15 U.S.C. §45(n) ........................................................................................ 38

15 U.S.C. §1691 ..............................................................................................6

12 U.S.C. §5481(13) ............................................................................6, 36, 39

12 U.S.C. §5493 ..................................................................................6, 37, 39

12 U.S.C. §5511 ...................................................................................1, 6, 36

12 U.S.C. §5514 ........................................................................................ 1, 4

12 U.S.C. §5515 ........................................................................................ 1, 4

12 U.S.C. §5531 ....................................................................................4, 6, 36

12 U.S.C. §5536(a)(1)(B) .....................................................................1, 2, 4, 35

12 U.S.C. §5562 ..............................................................................................1

12 U.S.C. §5564 ..............................................................................................1

12 U.S.C. §5565(a)(2) .....................................................................................1

28 U.S.C. §1391(e)(1) ................................................................................. 30

42 U.S.C. §2000e-2 ..................................................................................... 37

49 U.S.C. §40127 ........................................................................................ 38

52 Stat. 111 (1938) ...................................................................................... 38

## Other Authorities

14D Wright & Miller, Fed. Prac. & Proc. Juris. (4th ed.) ................................ 31

*Business Directory*, Longview Chamber of Commerce, perma.cc/3CPT-VPLC (last
    visited Oct. 7, 2024) .................................................................................. 33

Pseudonym, *Black's Law Dictionary* (12th ed. 2024) ........................................ 19

## Rules

Fed. R. Civ. P. 56 .......................................................................................... 12

Fed. R. Evid. 807 ............................................................................... 27

## Regulations

29 C.F.R. §37.1 ................................................................................ 37

# INTRODUCTION

The Consumer Financial Protection Bureau wields "vast authority." *Seila Law v. CFPB*, 591 U.S. 197, 236 (2020). The Dodd-Frank Act created the CFPB to "implement and ... enforce Federal consumer financial law." 12 U.S.C. §5511(a). Among its responsibilities, Congress charged the agency with enforcing a prohibition on "any unfair, deceptive, or abusive act or practice"—or UDAAP. §5536(a)(1)(B). To carry out this UDAAP authority, the Act says the CFPB can "require reports," "conduct examinations," "asses[s] compliance," "obtai[n] information," "conduct investigations," "issue subpoenas and civil investigative demands," "initiate administrative adjudications," and "prosecute civil actions in federal court." §§5514-15; *Seila Law*, 591 U.S. at 206 (citing 12 U.S.C. §§5562, 5564(a), (f)). The Act further contemplates penalties like restitution, rescission of contracts, disgorgement, and injunctive relief. 12 U.S.C. §5565(a)(2).

But even broad regulatory authority has limits; and the CFPB's broad authority makes enforcing those limits more important, not less. As the district court recognized, the CFPB must stay within the four corners of its statutory authority, including its UDAAP authority. ROA.3097-104. Yet the CFPB's recent update to its examination manual arrogated to itself an open-ended and novel power: It reinterpreted its UDAAP authority, for the first time, to regulate discrimination as a UDAAP—and not just discrimination, but discrimination based on disparate *impacts* against an unidentified and potentially endless set of protected classes.

1

Plaintiffs and their members oppose discrimination; the problem is that the CFPB has gone beyond Congress's specifically crafted prohibitions on discrimination. Congress knows how to grant agencies the all-important power to regulate discrimination, how to specify the classes protected by that power, and how to create disparate-impact liability. Congress did not silently do all that with a reference to "unfairness." 12 U.S.C. §5536(a)(1)(B). The CFPB's contrary interpretation flouts everything about the text, history, and structure of the Dodd-Frank Act. The district court agreed, vacating the CFPB's March 2022 manual update as exceeding the agency's statutory authority and enjoining the agency from pursuing examinations or enforcement actions based on its unlawful interpretation. ROA.3109-10.

Tellingly, the CFPB waits until page 43 of its brief to contest the district court's decision on the merits. Instead, the CFPB primarily raises procedural objections. Though Plaintiffs' memberships include many entities that are directly regulated by the CFPB's new rule, the agency claims that not one has Article III standing. The CFPB first finds in the Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009)—a case involving no pseudonyms—a ban on associations referring to their members with pseudonyms. Then the agency repackages a final-agency-action argument that was rejected below as a reason why Plaintiffs' declarations were somehow insufficient. That argument is based on *evidentiary* objections that the CFPB never raised below and are thus forfeited. Even so, Plaintiffs submitted substantial and competent

evidence. The CFPB understands that its manual directs the behavior of agency personnel and regulated entities—that's the whole point of it—which in turn compels Plaintiffs' members to expand UDAAP compliance programs and systems, imposing heavy compliance costs.

The CFPB's remaining procedural arguments are no stronger. It challenges venue because the forum plaintiff, the Longview Chamber, supposedly lacks standing. But the agency's standing arguments all fail. The CFPB also criticizes the relief granted below, arguing that vacatur would have sufficed to remedy Plaintiffs' harms. But the district court provided sound reasons for each kind of relief, including an injunction that stops the CFPB from circumventing vacatur and inflicting irreparable harm on Plaintiffs' members.

This Court should affirm the well-reasoned decision below.

## STATEMENT OF THE ISSUES

**I.** Plaintiffs submitted declarations to establish their associational standing. Those declarations identified, by pseudonym, particular members with standing and detailed the harms that the CFPB's action imposed on them. The CFPB did not challenge any of those facts and waived its right to discovery. Should this Court now reverse for lack of standing or venue?

**II.** The CFPB's March 2022 manual update adopted a novel interpretation of the agency's UDAAP authority, discovering a new power to police regulated entities for

discrimination—even disparate impacts. It did so with no textual hook, without notice and comment, and without considering or imposing key limits on disparate-impact liability. Did the CFPB violate the APA?

**III.** After finding the manual update unlawful, the district court issued a final judgment declaring that the CFPB's action was illegal and vacating it. Did the district court abuse its discretion by also enjoining the CFPB from wielding its unlawful action against Plaintiffs' members?

# STATEMENT OF THE CASE

## I. Congress grants the CFPB discrete statutory authority over "unfair" practices.

Under the Dodd-Frank Act, the CFPB can prohibit covered entities—banks and other participants in the consumer-finance market—from engaging in an "unfair, deceptive, or abusive act or practice." 12 U.S.C. §5536(a)(1)(B). The agency can "prescribe rules" to identify UDAAPs and prevent them. §5531(b). It can also "require reports" and "conduct examinations" of covered entities to "asses[s] compliance," and it can "obtai[n] information" about their "activities and compliance systems or procedures." §§5514-15.

The CFPB's examination power over regulated entities is "far-reaching," as outlined in its multi-thousand-page Supervision and Examination Manual. ROA.3087. Per the CFPB, this manual "describes how we supervise and examine these companies and

gives our examiners direction on how to assess compliance with federal consumer financial laws." ROA.3087. The manual tells the CFPB's personnel how to examine whether a company has sufficient procedures in place to ensure compliance with the agency's rules, including the prohibition on UDAAPs. ROA.3088.

Given the CFPB's expansive authority to examine for UDAAPs, compliance is onerous. Examiners will "assess the quality of the regulated entity's compliance risk management systems, including internal controls and policies and procedures." ROA.20. Examiners have free rein "to obtain and review a company's training manuals, written policies, procedure manuals, internal-audit materials, agreements with affiliates, records regarding software development and algorithms, and customer-demographics information." ROA.3088. Supervisory findings have direct consequences for the examined entity. When CFPB examiners identify what they deem a potential violation *or* inadequate internal monitoring, the CFPB can pursue additional supervision and public enforcement actions against the entity. ROA.3088. Before the district court granted summary judgment here, the CFPB's enforcement actions had garnered nearly $1.7 billion dollars in restitution, underscoring the massive financial effect that its UDAAP authority has on the marketplace. ROA.188.

## II. The CFPB issues a manual update that claims an unprecedented expansion of its unfairness authority to cover discrimination, including potential disparate impacts.

In March 2022, the CFPB updated several portions of its manual to claim the power to examine entities, under its UDAAP authority, for discrimination. ROA.3088-

89. This update essentially gave examiners an entire new field to scrutinize. To cite just a few examples, the update requires a regulated entity to have "a process to prevent discrimination in relation to all aspects of consumer financial products or services the entity offers or provides." ROA.3088. This "compliance program" must include an "established process for periodic analysis and monitoring of all decision-making processes" and a process "to take corrective action to address any potential UDAAP concerns," "*including discrimination*." ROA.3089 (emphasis added). The update further requires that a regulated entity have "established policies and procedures to mitigate potential UDAAP concerns arising from the use of its decision-making processes, *including discrimination*." ROA.3089 (emphasis added). And regulated entities must take care that both employees and "third-party contractors and service providers" are not "engaging in practices that lead to ... *disproportionately adverse impacts* on a discriminatory basis." ROA.3089 (emphasis added).

This claim of antidiscrimination authority was novel. Since its first iteration in October 2012, the manual's section on UDAAPs made no mention of discrimination. ROA.3088. The manual consistently treated "unfairness" and "discrimination" as distinct concepts, ROA.3100, just as the CFPB's statutes do, *e.g.*, 12 U.S.C. §5511(b)(2); §5481(13); §5493(c)(2)(A); *cf.* §5531(c); 15 U.S.C. §1691.

Yet the CFPB did not hide the import of its decision. It proclaimed in a press release that "examiners *must now* 'require supervised companies to show their processes for assessing risks and discriminatory outcomes, including documentation of customer

demographics and the impact of products and fees on different demographic groups.'" ROA.3088 (emphasis added). Even worse, the agency introduced this new rule without using the Administrative Procedure Act's mandatory notice-and-comment procedures. 5 U.S.C. §553. So it acted without crucial feedback from consumers, industry, and States.

## III. The manual update directly harms regulated entities like Plaintiffs' members.

Plaintiffs are business organizations whose members include banks and other financial companies that are supervised by the CFPB. ROA.3089. These well-known associations—the U.S. Chamber of Commerce, American Bankers Association, Consumer Bankers Association, Longview Chamber of Commerce, Independent Bankers Association of Texas, Texas Association of Business, and Texas Bankers Association— represent a large swathe of the financial-services industry. The Longview Chamber, for example, "has as members depository institutions that are subject to CFPB supervision and examination." ROA.273. And 59 of the CBA's 70 corporate members are supervised by the CFPB. ROA.239, 261. These 59 members alone make up over one-third of the depository institutions supervised by the CFPB. ROA.239. Though most of these associations exercise their First Amendment right to keep their membership anonymous, *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958), some publicize their membership, *e.g.*, ROA.246-251 (CBA).

The CFPB's update puts Plaintiffs' members to a Hobson's choice: Either undertake the substantial expense of incorporating this unlawful action into their operations and compliance management systems. Or wait for the CFPB to make supervisory findings and ultimately bring an enforcement action for their failure to guard against these alleged violations. For highly regulated entities like Plaintiffs' members, this choice was no choice at all. They had to comply.

This coerced compliance inflicted significant harm on Plaintiffs' members through unrecoverable compliance costs and negative effects on their business operations. ROA.3095; *see* ROA.219-294 (declarations from each Plaintiff detailing their injuries). The update forced Plaintiffs' members to update their UDAAP compliance policies and programs. These changes partly reflect the reality that Congress's prohibitions on discrimination in the financial-services industry focus on *lending*, while UDAAP applies more broadly. For example, Member A—a pseudonymous member of the U.S. Chamber—"significantly modified its existing compliance management system to control and monitor for substantial additional risks" and "updated its processes for certain business approvals to more explicitly evaluate these risks in connection with nonlending products and services." ROA.225. Another Chamber member, Member C, "updated its UDAAP risk assessment to assess discrimination as a possible UDAAP risk." ROA.225-26. Yet another, "Member E," had to "inventory relevant data (including demographic data) that exists within the company but was previously outside the scope

of its fair lending program." ROA.226. All told, these forced changes cost "more than $1 million annually per member." ROA.226.

These compliance costs were magnified because the CFPB gave no instructions on what might constitute unfair discrimination or disparate impacts. It did not identify protected classes or characteristics, delineate what legal test it would use, identify safe-harbor activities, or explain to regulated entities how they are supposed to assess their activities or ensure compliance. Instead, the CFPB forced the industry to scale up compliance programs without clear guardrails or any accounting of the costs. ROA.3100. Nor did the agency consider the "serious constitutional questions" that arise when antidiscrimination mandates are "based solely on a showing of statistical disparity." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 540 (2015).

## IV.  Plaintiffs sue and win at summary judgment.

Plaintiffs challenged the CFPB's action in the Eastern District of Texas. They brought three claims under the APA: that the CFPB exceeded its statutory authority, acted arbitrarily and capriciously, and illegally bypassed notice and comment. ROA.3089-90. Plaintiffs also alleged one claim under the Constitution: that the CFPB's funding structure violates the Appropriations Clause, as this Court held in *Community Financial Services Association v. CFPB*, 51 F.4th 616, 635 (5th Cir. 2022). But understanding that the Supreme Court might review *Community Financial*, Plaintiffs asked the district court to rule against the CFPB under *both* the APA and the Constitution. ROA.3103-04. Either was sufficient to justify the relief that Plaintiffs sought, and ruling in the

alternative would avoid a pointless remand in case the Supreme Court reversed *Community Financial.*

The district court mostly agreed. After rejecting the CFPB's procedural arguments, it ruled for Plaintiffs on their constitutional claim. And it ruled for Plaintiffs, in the alternative, on their first APA claim. ROA.3097-104.[1]

The district court first rejected the CFPB's then-leading argument: that the manual update is not "final agency action." ROA.3093. Per the district court, the CFPB did "not dispute" that the update "marks the consummation of the agency's decisionmaking process and was issued to 'guide [its] supervision of covered financial institutions.'" ROA.3093. The update also "obligates agency personnel to act on a particular understanding of an 'unfair act or practice' in examining and supervising companies." ROA.3093 (cleaned up). Because the update changed "the way in which examiners will look for [UDAAP] violations," the court found that it "limits examiner discretion and interprets a legal norm." ROA.3093-94. As the district court found, the CFPB's adoption of "a new 'legal position' on the breadth of the UDAAP prohibition, binding

---

[1] Now that the Supreme Court has reversed *Community Financial, see* 601 U.S. 416 (2024), Plaintiffs do not ask this Court to affirm on that ground. It should affirm the district court's alternative statutory ruling, which is sufficient to support its judgment and all its relief. *E.g., Genesis Marine, LLC of Del. v. Hornbeck Offshore Servs.,* 951 F.3d 629, 632 (5th Cir. 2020) ("Because we affirm on [one] basis, we do not consider the district court's alternative rationale."). This Court could also decide the other statutory grounds that the parties fully briefed below. *Infra* II.B. If this Court disagrees with all those statutory claims, then it could vacate and remand for further briefing and consideration of Plaintiffs' constitutional claim, which Plaintiffs could amend or reframe in light of the Supreme Court's opinion.

agency officials to that position in deciding how to examine companies," is final agency action. ROA.3094.

The district court next rejected the CFPB's challenges to standing and venue. To prove standing, Plaintiffs submitted "declarations establishing that their members are incurring costs to comply with the manual's new UDAAP provisions." ROA.3095. The CFPB did "not dispute that these costs count as injury in fact, that defendants caused them, or that the relief sought would remedy them." ROA.3095. Instead, the CFPB made "only one argument about standing"—that "some plaintiffs have used pseudonyms or common nouns to describe [their injured] members." ROA.3095. The district court rejected this argument because "plaintiffs' declarations establish that multiple members of each association, right now, are regulated by the CFPB and are spending money because of the agency's new examination directives." ROA.3096. It did not matter that Plaintiffs referred to some members by pseudonym because their names were irrelevant to their standing, because the law allows anonymity, and because the CBA's membership is public anyway. ROA.3095. Because all Plaintiffs have standing—including the Longview Chamber, who resides in the Eastern District of Texas—venue was proper too. ROA.3097.

Importantly, the district court stressed how the CFPB's own litigation conduct fatally undermined its standing argument. The parties agreed that the district court could resolve this case without discovery, on cross-motions for summary judgment. ROA.3086. "If defendants wanted to dispute the veracity of [Plaintiffs'] declarations,"

the court explained, then "defendants needed to either submit controverting evidence or give specific reasons why they could not marshal such evidence." ROA.3096 (citing Fed. R. Civ. P. 56(c)-(d)). The CFPB did neither, thus leaving Plaintiffs' standing evidence "uncontested." ROA.3096.

On the merits, the district court agreed that the manual update exceeded the CFPB's statutory UDAAP authority. It started by recognizing that the question whether Congress gave the CFPB authority to regulate discrimination—including "for lack of introspection about statistical disparities concerning any such group"—is a "major" one. ROA.3098. Indeed, "such an authority would have large implications for the financial-services industry" based on "the millions of dollars per year spent by companies attempting to comply with the UDAAP rule at issue here." ROA.3098. And "such agency authority would have significant political implications as to both state and federal power." ROA.3099.

Congress never chose to give the CFPB this power. ROA.3100. Title X of the Dodd-Frank Act, establishing the CFPB, doesn't even "us[e] the words 'discrimination' or 'disparate impact.'" ROA.3100. It "treats discrimination and unfairness as distinct concepts." ROA.3100. And it lacks "any mention of protected classes" or "any mention of disparate-impact standards." ROA.3101. Congress "typically" doesn't enact federal nondiscrimination statutes without "defining what classes are protected, what outcomes or actions are prohibited, and defenses to liability." ROA.3099. And it "rarely" creates disparate-impact liability, and then "only in narrow circumstances, with limits that exist

to avoid 'serious constitutional questions.'" ROA.3099-100. So by claiming the power to regulate discrimination as a UDAAP, the CFPB exceeded its statutory authority. ROA.3103.

Turning to relief, the court determined that "the remedies of a declaration, an injunction, and vacatur are appropriate." ROA.3104. The CFPB "concede[d] that vacatur of the March 2022 revisions would be an appropriate remedy," so the court entered that relief. ROA.3107 (cleaned up). The CFPB also "concede[d] that 'declaratory relief would be an appropriate remedy,'" ROA.3104, so the court entered that relief too. The court declared that the CFPB's pursuit of any action against one of Plaintiffs' members "based on the CFPB's interpretation of its UDAAP authority announced in the March 2022 manual update" exceeded its statutory authority. ROA.3105. And it entered an injunction prohibiting the CFPB from taking such actions against Plaintiffs' members. After finding the traditional requirements for an injunction satisfied, ROA.3105, the district court also tailored its relief. The injunction protects only Plaintiffs' members and does "not restrict the [CFPB's] ability to pursue examination or supervision of acts or practices that qualify as 'unfair' independently of the position announced in the agency's March 2022 update." ROA.3106.

## SUMMARY OF ARGUMENT

The district court correctly found that Plaintiffs had standing, that venue was proper, and that Plaintiffs were entitled to summary judgment. The CFPB's novel expansion of its UDAAP authority—covering even disparate-*impact* liability—exceeds the power that Congress granted it. The CFPB's focus on procedure demonstrates the frailty of its statutory position, and the strength of the district court's decision.

On procedure, the CFPB again attacks Plaintiffs' use of pseudonyms—an argument that has now been rejected by multiple circuits. The agency then contests Plaintiffs' proof of standing based on evidentiary objections that it never raised below. These forfeited and failing arguments do not defeat standing. Even less so venue.

On the merits, nothing the CFPB adds on appeal unsettles the district court's sound reasoning. The manual update exceeds the agency's statutory authority. The text of the Dodd-Frank Act establishes that Congress never considered discrimination itself to be a UDAAP, and Dodd-Frank was not the first federal law to ban discrimination while identifying no protected classes or categories. The update also violated the APA's procedural rules requiring public participation and reasoned decisionmaking—arguments that were fully briefed below and are available to this Court on appeal.

The district court also acted well within its discretion when it awarded limited equitable relief to Plaintiffs' members. This Court should affirm.

# STANDARDS OF REVIEW

The CFPB largely states the right standards of review, Blue-Br.16-17, with two exceptions. While this Court reviews a district court's *legal* rulings on "standing" de novo, "[a] district court's factual findings, including those on which the court based its legal conclusions, are reviewed for clear error." *Superior MRI Servs. v. All. Healthcare Servs.*, 778 F.3d 502, 504 (5th Cir. 2015). And while this Court reviews a district court's summary judgment de novo, it "applies the manifest-error standard of review to the district court's evidentiary rulings." *Lyles v. Medtronic Sofamor Danek, USA*, 871 F.3d 305, 311 (5th Cir. 2017) (cleaned up); *see id.* ("'manifest error'" is "'plain and indisputable'" and "'amounts to a complete disregard of the controlling law'").

Much of what the CFPB says on appeal is also new—arguments that it could have made, but chose not to make, below. The district court's judgment that an argument was not presented, an issue was conceded, or a fact was uncontested is reviewed only for abuse of discretion. *Kars 4 Kids v. Am. Can!*, 8 F.4th 209, 219 n.9 (3d Cir. 2021). Arguments that are "'rais[ed] for the first time on appeal,'" "'[in]adequately brief[ed] on appeal,'" or "'merely intimat[ed]'" below are forfeited on appeal. *United States v. Joseph*, 102 F.4th 686, 691 (5th Cir. 2024).

# ARGUMENT

The district court did not err, clearly err, manifestly err, or abuse its discretion. The CFPB's standing and venue arguments are not a reason to reverse. The district

court's statutory ruling was correct and alone supports its summary judgment, and Plaintiffs' alternative APA arguments are also correct. The district court's relief, which was necessary to fully remedy Plaintiffs' injuries, was well within its discretion. This Court should affirm.

## I.     The district court correctly found standing and venue.

Associational standing is a "three-part test": The association has standing if one of its members "would otherwise have standing to sue" on its own, if the case is germane to its purpose, and if the lawsuit does not "'requir[e] the participation of individual members.'" *UAW v. Brock*, 477 U.S. 274, 282 (1986) (quoting *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)). There is no fourth part; "[t]hese are the sole requirements." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999).

Contra the CFPB, associations can satisfy *Hunt*'s first requirement without divulging the legal names of their members. The CFPB's belated evidentiary objections are forfeited and, regardless, prove no clear error on injury, causation, or redressability. Because there are no standing problems in Plaintiffs' complaint, the CFPB's only challenge to venue fails.

### A.     Plaintiffs' use of pseudonyms did not violate *Summers*, a case involving no pseudonyms.

The CFPB's "one argument" on standing, ROA.3095, relies almost exclusively on the premise that *Summers*—a case that involved no pseudonyms—bans associations from using pseudonyms. Blue-Br.18-24. Though this argument has become trendy, the

overwhelming majority of courts reject it. *E.g.*, *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022); *Speech First v. Shrum*, 92 F.4th 947, 949-52 (10th Cir. 2024); *AAER v. Fearless Fund Mgmt.*, 103 F.4th 765, 772-74 (11th Cir. 2024); *Texas Bankers Ass'n v. OCC*, 2024 WL 1349308, at *3-4 (N.D. Tex. Mar. 29); *SFFA v. West Point*, 709 F. Supp. 3d 118, 131-32 (S.D.N.Y. 2024); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018), *aff'd without questioning standing*, 591 U.S. 1 (2020). Only the Second Circuit disagrees, and a petition for rehearing en banc has been pending in that case since March 2024. *Do No Harm v. Pfizer*, 96 F.4th 106, 118-19 (2d Cir. 2024), *reh'g pet'n pending*, No. 23-15 (2d Cir.). This Court should make clear that it sides with the lopsided majority.

The CFPB's argument "significantly overreads the Supreme Court's decision in *Summers.*" *SFFA v. U.S. Naval Acad.*, 707 F. Supp. 3d 486, 501 (D. Md. 2023). *Summers* is a case about identifying specific members, not divulging their true identities. The associations there challenged regulations that allowed the Forest Service to undergo certain projects without first doing an environmental assessment. 555 U.S. at 490-91. A member would have standing only if a forest project was imminent, the project would affect an area that the member imminently planned to visit, and the project threatened the member's enjoyment of that area. *See id.* at 494. Yet even after a trial, the associations could not prove that they had *any* member who satisfied these criteria. *See id.* at 496-98. They instead argued that, given the sheer size of their membership, it was a "statistical probability" that they had at least one member with standing. *Id.* at 497. The Court

rejected this theory of "probabilistic standing"—the notion that an association can point to its membership *generally* and argue that someone in there *likely* has standing. *Id.* at 498-99. Instead, associations must "identify" or "name" a *specific* member and explain why that member *has* standing. *Id.* Because the associations in *Summers* did not identify any specific member, the Court could not know whether any member "will *ever* visit one of the small parcels at issue." *Id.* at 500.

Plaintiffs complied with *Summers*. Take the U.S. Chamber, for example. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) ("the presence of one party with standing is sufficient"). The Chamber submitted a declaration identifying five particular members (Members A, B, C, D, and E); detailed each member's compliance burdens; and explained why those burdens stem from the CFPB's unlawful action. ROA.225-26; *accord* ROA.233-34 (ABA declaration doing the same for its Members A and B). The CFPB did not challenge these allegations—let alone explain what relevant information would be communicated by changing "Member A" to the company's real name. ROA.3096. The district court, as the factfinder, concluded "that the Court itself does not need those members' names to find that the uncontradicted declarations credibly show that plaintiffs have identified members that are currently suffering cognizable harm from the agency action challenged here." ROA.3096. It was correct.

Rather than invoking *Summers*' actual holding, the CFPB plucks the words "identify" and "name" from the opinion and pretends that they create a ban on pseudonyms.

But *Summers* didn't have "anything to do with … pseudonymity" because the associations there didn't even use pseudonyms. *Fearless Fund*, 103 F.4th at 773; *Shrum*, 92 F.4th at 949, 952. They identified *no* specific member with standing, by pseudonym or otherwise. *See Dep't of Educ. v. Brown*, 600 U.S. 551, 566 n.3 (2023) (explaining that "no plaintiff in *Summers* had standing because none had alleged specific plans to observe nature in one of the areas at issue in the case"). It would be "contrary to all traditions of our jurisprudence" to read "broad language" in *Summers* to "conclusively resolv[e]" a question about pseudonymity that "was not presented or even envisioned." *R.A.V. v. St. Paul*, 505 U.S. 377, 385-86 n.5 (1992); *see also Brown v. Davenport*, 596 U.S. 118, 141 (2022). The words "identify" and "name" do not even suggest the CFPB's rule. Specific injured members can be "identif[ied]" as "'Member 1' just as well as by the name 'Samuel Clemens.'" *Shrum*, 92 F.4th at 952; *accord Fearless Fund*, 103 F.4th at 773. And pseudonyms are a type of "name." Pseudonym, *Black's Law Dictionary* (12th ed. 2024); *cf. Doe v. Mass. Inst. of Tech.*, 46 F.4th 61, 67 (1st Cir. 2022) (noting that the word "name" is ambiguous as to whether it means "true name" or also allows a "pseudonym").[2]

---

[2] *FW/PBS v. Dallas* provides even less support than *Summers* for a supposed ban on associations using pseudonyms. That case didn't involve an association, let alone one that referred to its members with pseudonyms. It doesn't even use the word "name." The Supreme Court found no standing because the key affidavit failed to identify any individual who had suffered an injury. *See* 493 U.S. 215, 235 (1990). It said licenses had been revoked but failed to identify whose licenses, so the Court couldn't determine whether the revocations involved "any [plaintiff] before th[e] Court." *Id.*; *see PDE v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 2024 WL 3992579, at *4 (S.D. Ohio Aug. 28) (similarly distinguishing *FW/PBS*).

The CFPB's other cases apply *Summers'* actual holding, Blue-Br.21 (citing *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017)), and are thus "easily distinguishable" for the same reason, *Shrum*, 92 F.4th at 951 (distinguishing *Religious Sisters*, *Tenn. Republican Party*, and other similar cases). In all those cases, the associations lacked standing not because of pseudonyms, but because they failed to identify a particular member with standing:

- In *Religious Sisters*, the association did not use pseudonyms; it stated generically that "'its membership includes … entities'" that receive federal funds. 55 F.4th at 601; *see* 2d Am. Compl. (Doc. 97) ¶¶55-56, No. 3:16-cv-386 (D.N.D. Nov. 23, 2020). The Eighth Circuit faulted the association for failing to identify a "'*specific*'" member with standing. *Religious Sisters*, 55 F.4th at 601-02.

- In *Tennessee Republican Party*, the associations "fail[ed] to identify any members," except four people who weren't injured. 863 F.3d at 521. No specific member with standing was identified, by pseudonyms or otherwise. *See* Pet'rs' App'x (CA6 Doc. 39) at 312-13, 316-19 No. 16-3360 (6th Cir. Nov. 16, 2016).

Again, none of these cases involved the fact pattern here: an association that identified a specific injured member but declined to divulge that member's real name.

Instead of following other cases, the CFPB's misreading of *Summers* would contradict "generations of precedent." *Shrum*, 92 F.4th at 952. Some of the most famous associational-standing cases involved associations whose members were anonymous, including *SFFA v. Harvard*, 600 U.S. 181 (2023); *Rumsfeld v. FAIR*, 547 U.S. 47; and the case that first recognized associational standing, *NAACP v. Alabama ex rel. Patterson*. *See West Point*, 709 F. Supp. 3d at 131-32 (discussing *Harvard*); *Shrum*, 92 F.4th at 950-

51 & n.2 (discussing *FAIR* and *NAACP*). That last case recognized a right to associational privacy grounded in the First Amendment; so the CFPB's suggestion that Article III bans anonymity "would be in tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous." *U.S. Naval Acad.*, 707 F. Supp. 3d at 501.[3]

Accepting the CFPB's position would also split with a recent decision from the Eleventh Circuit. In *Fearless Fund*, an association sought a preliminary injunction on behalf of pseudonymous members based on declarations that explained their harm. 103 F.4th at 772-73. The association did not reveal its members' real names, not even to the court. When the defendants there repeated the CFPB's misreading of *Summers*, the Eleventh Circuit rejected it. This argument "overread[s] *Summers*" and similar cases, which don't have "anything to do with anonymity or pseudonymity" and do not "purpor[t] to impose a naming requirement." *Id.*; *accord Shrum*, 92 F.4th at 952 ("*Summers* itself in no

---

[3] The CFPB's reference to the public's right to open judicial proceedings, *see* Blue-Br.34-36, is a distraction. That right is grounded in Rule 10(a) and the First Amendment, not Article III. *Fearless Fund*, 103 F.4th at 773 n.2. Rule 10(a) is not implicated here. *Id.* Neither is the public's right of access, since no sealed or redacted court document was filed below. *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1262 (10th Cir. 2022). Even if one had been, the members' First Amendment right to associational privacy would have trumped the public's right to know their identities. *SFFA v. Harvard*, 2023 WL 3126414, at *6 n.4 (D. Mass. Apr. 27). The public knows who Plaintiffs are; and contra the CFPB, Plaintiffs, not their members, are "the real parties in interest." Blue-Br.35; *see Love v. Reilly*, 924 F.2d 1492, 1494 (9th Cir. 1991) (rejecting the argument that, "because the members of the [association] received the benefits from the merits determination," the "members of the [association] are also the real parties in interest").

way involved the use of pseudonyms, so there was no reason for the Court to distinguish between legal names and pseudonyms."). Any argument to the contrary contradicts "the available precedent" and makes little "sense" as "a first-principles matter." *Fearless Fund*, 103 F.4th at 773. Even the *Fearless* dissent "agree[d] with the Majority" on anonymity. *Id.* at 786 n.3 (Rosenbaum, J., dissenting).[4]

The Eleventh Circuit is especially persuasive because it drew on *Stincer*, a summary-judgment case that in turn drew on former Fifth Circuit precedent. Following those "established" precedents, *Stincer* "decline[d] to create [a] requirement" that an association "must specifically name the individual on whose behalf the suit is brought." 175 F.3d at 884-85 (citing *Church of Scientology v. Cazares,* 638 F.2d 1272, 1279 (5th Cir. 1981), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); *Cong. of Racial Equal. v. Douglas,* 318 F.2d 95, 102 (5th Cir. 1963)). Panels of this Court have reaffirmed that principle even after *Summers. See, e.g., Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) (citing *Cazares*). The association in *Speech First v. Fenves*, for example, had standing to seek a preliminary injunction based on a declaration from its "president," which explained why the association's pseudonymous members ("Student

---

[4] *Fearless Fund* cannot be distinguished on the ground that it was decided at the "preliminary injunction" stage, as opposed to summary judgment. Blue-Br.22. The Eleventh Circuit held—as a matter of *law*—that *Summers* says nothing about pseudonyms and that pseudonymity has nothing to do with Article III standing. 103 F.4th at 773. What the CFPB calls "the best reading of *Summers*," Blue-Br.19-20, is what the Eleventh Circuit (and Tenth Circuit) call an incorrect reading of *Summers*, *see Fearless Fund*, 103 F.4th at 773; *Shrum*, 92 F.4th at 949, 951-52.

A" and the like) were injured. 979 F.3d 319, 326, 330-31, 335. "Fifth Circuit precedents" thus reject the CFPB's view. *Texas Bankers Ass'n*, 2024 WL 1349308, at *4 (citing *Hancock County* and *Fenves*).

If more were needed, the CFPB's position would also split with the D.C. Circuit. Its decision in *Highway Safety* could not be closer to the facts here: It involved an administrative-law challenge, under the summary-judgment standard, brought by an association, who submitted survey responses from "specific" members without revealing their real "names," over the government's *Summers*-based objection. 41 F.4th at 592-94. The D.C. Circuit held that, when an association identifies "specific" members in this way, the members' "anonymity is no barrier to standing." *Id.* at 593-94 (distinguishing *Summers*). *Summers* was irrelevant because the association "did not offer only unsubstantiated generalizations about … its membership"; it "identif[ied] specific members" with standing. *Id.* at 593-94. Though it did not divulge their real "names," the act of "'[n]aming … members adds no essential information bearing on'" standing. *Id.* at 594.[5]

Indeed, anonymity "in no way detracts" from the "components of what constitutes an Article III case or controversy." *B.R. v. F.C.S.B.*, 17 F.4th 485, 494 (4th Cir. 2021) (discussing *Summers*); *accord Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032,

---

[5] That the survey responses were submitted as part of the "administrative record" was irrelevant to the D.C. Circuit's analysis of *Summers*. *Cf.* Blue-Br.23 n.3. The association also could have "submit[ted] an affidavit" to shore up "standing," the D.C. Circuit explained; in fact, submitting affidavits (as Plaintiffs did here) would have been "advisable." *Highway Safety*, 41 F.4th at 593.

1041 (9th Cir. 2015) (similar). Pseudonyms are "not evidence that the [association] *lacks* the alleged members" with standing; "they merely suggest the [association] has reservations about revealing those member names to Defendants." *S.C. NAACP v. Alexander*, 2022 WL 453533, at *3 (D.S.C. Feb. 14) (citing *Hancock County*). Whether Defendants have a right to those names, and in what form they'd be produced, is "[a]t bottom" a "discovery dispute" that "can and should be handled using the ordinary mechanisms for resolving such disputes." *Id.* Yet the CFPB waived its right to discovery below, ROA.171, and the district court said it didn't need any member's legal name to assess Plaintiffs' unchallenged testimony on standing. ROA.3096.[6]

The CFPB was not "denied the opportunity" to discover the identities of Plaintiffs' members. Blue-Br.34. It stipulated that "no discovery is needed prior to this Court's resolution of the parties' respective dispositive motions." ROA.171 ¶6. And after receiving Plaintiffs' declarations, it "reserve[d] the right to seek jurisdictional discovery" only "[i]f Plaintiffs provide further evidence on standing." ROA.1555 n.5. Plaintiffs provided no further evidence. In its reply, the CFPB cursorily suggested that, "if the Court disagrees" with the CFPB's arguments, then "jurisdictional discovery may be warranted." ROA.1809. But the district court did not abuse its discretion when it

---

[6] This case is thus distinguishable even from the Second Circuit's decision in *Do No Harm*. That decision did not decide whether an association could use pseudonyms when *the district court* agreed that it didn't need the members' real names to assess standing. *See* 96 F.4th at 111. Had the district court needed that information below, Plaintiffs would have provided it "in camera"—an option that the Second Circuit flagged in *Do No Harm*. *See* 96 F.4th at 118, 111 n.3, 118.

deemed this conditional, cursory suggestion insufficient under the rules. ROA.3096; *see Brown v. Cain*, 546 F. App'x 471, 476 (5th Cir. 2013).

## B. The CFPB's new objections to Plaintiffs' evidence are forfeited and meritless.

The CFPB now challenges, for the first time on appeal, other aspects of Plaintiffs' standing declarations. The district court found that "plaintiffs' standing is uncontested" because the CFPB did not "dispute the veracity of [their] declarations." ROA.3096. Yet the CFPB spends *eight pages* attacking those declarations, raising evidentiary and factual objections that were all forfeited below. *See* Blue-Br.25-33.

These forfeited arguments should not be entertained. While standing is of course jurisdictional, factual disputes underlying standing can be forfeited and waived. *Workman v. UPS*, 234 F.3d 998, 999-1000 (7th Cir. 2000). So can evidentiary points that were never raised below. *Ensley v. Cody Res.*, 171 F.3d 315, 319 (5th Cir. 1999); *see also Rolls ex rel. A. R. v. Packaging Corp. of Am.*, 34 F.4th 431, 437 (5th Cir. 2022). The district court did not abuse its discretion, manifestly err, or even clearly err when it deemed Plaintiffs' factual allegations uncontested, let alone when it never credited evidentiary objections that the CFPB never raised. *See Campbell v. Ackerman*, 903 F.3d 14, 18 (1st Cir. 2018) ("Our jurisprudence simply does not allow a litigant to switch horses in midstream").

The CFPB's "hearsay" argument is meritless anyway. Blue-Br.25-27. Associations, who act as "representative[s]" of their members, can speak to their members'

injuries. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). A premise of associational standing, after all, is that the litigation will not "'requir[e] the participation of individual members.'" *UAW*, 477 U.S. at 282. Courts thus rely on associations' testimony about their members all the time, without requiring those statements to fall within a hearsay exception. *E.g.*, *Fenves*, 979 F.3d at 326, 331 (crediting a declaration from the association's president about its members' injuries); *Highway Safety*, 41 F.4th at 592-94 (crediting a survey produced by an association that quoted its members); *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 110-11 & n.10 (1st Cir. 2006) (crediting a declaration from the association's president "regarding its members' injuries," something within his "personal knowledge" as president); *Humane Soc'y v. USDA*, 2021 WL 1593243, at *3 (C.D. Cal. Mar. 26) (crediting associations' statements about "specific (albeit unnamed) members").

The CFPB again overreads *Summers*. Blue-Br.25. The Supreme Court discussed "individual affidavits" in *Summers* because those associations were trying to prove standing, even after the case had been tried, based on unproven allegations in their *complaint*. *See* 555 U.S. at 497 ("in its pleadings"); *id.* at 499 (again quoting the complaint). Though *Summers* is right that standing must be proved with evidence at later stages of litigation, *Summers* does not suggest that the evidence needs to come from individual *members*, as opposed to individual officers of the association. *Id.* at 499. In fact, *Summers* reiterates that an association "need only 'make specific allegations' based on 'specific facts ... that

one or more of [its] members would be directly affected.'" *Fearless Fund*, 103 F.4th at

773 (quoting *Summers*, 555 U.S. at 498).

In all events, the CFPB's hearsay objection is immaterial because summary-judg-

ment evidence need only be "capable" of being presented in admissible form at trial.

*LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016). An

association's statements about its members' injuries should, at a minimum, fall under

the residual exception to the hearsay rule, Fed. R. Evid. 807—which the district court

might have explained, had the CFPB raised hearsay below. If the CFPB had raised hear-

say, Plaintiffs also could have responded by submitting the same information in pseu-

donymous declarations from the injured members themselves. *E.g.*, *Fearless Fund*, 103

F.4th at 774. Such facts also could have been testified to at trial (in a closed courtroom,

to preserve anonymity). But, of course, the CFPB had no interest in going to trial be-

cause it knows APA cases like this one are decided on cross-motions for summary

judgment, "'based solely on the administrative record.'" ROA.3090. The agency's sud-

den concern with the rules of evidence is not well taken.

Also not well taken is the CFPB's newfound criticism of Plaintiffs' compliance

costs. *See* Blue-Br.28-32. The district court found that Plaintiffs' "declarations estab-

lish[ed] that their members are incurring costs to comply with the manual's new

UDAAP provisions." ROA.3095. And it found that they were "currently" suffering that

harm "from the agency action challenged here." ROA.3096. It also ruled that the CFPB

did "*not dispute* that these costs count as injury in fact, that defendants caused them, or

that the relief sought would remedy them." ROA.3095 (emphasis added). The agency never "dispute[d] the veracity of those declarations" and did not "submit controverting evidence." ROA.3096. The CFPB does not explain how the district court's factual findings were clearly erroneous, or how its forfeiture rulings were an abuse of discretion.

Plaintiffs' declarations were plenty detailed. The U.S. Chamber identified five specific members and explained how, in direct response to the agency's new rule, they were incurring specific costs:

- Member A "significantly modified its existing compliance management system."
- Member B "updated its policies, controls, and training materials" to apply to non-credit products.
- Member C "updated its UDAAP risk assessment to assess discrimination as a possible UDAAP risk."
- Member D "performed a breakdown of consumer demographics for its deposit products."
- And Member E began inventorying new data that "was previously outside the scope of its fair lending program." ROA.226.

The ABA did the same. *See* ROA.233-34 ("Member A paid a consultant $50,000 to review its UDAAP prevention program," and "Member B initiated its regulatory change control process" for products not previously subject to it). These specific, detailed allegations draw clear lines between the CFPB's action and the members' injuries. The CFPB understood these allegations below. *See* ROA.3092 ("Defendants do not dispute that plaintiffs are adversely affected and aggrieved by the agency action here. The court

agrees that they are."). Its supposed questions about them now, *see* Blue-Br.28-32, are too late and too speculative to warrant reversal.

If the CFPB had proceeded through a notice-and-comment rulemaking (as the law required) rather than a manual update, the agency wouldn't be making these standing arguments. Standing would be simple because Plaintiffs' members are the "object" of the CFPB's UDAAP authority and the regulations enforcing that authority. *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 517-18 (5th Cir. 2014). And federal regulations "'almost *always*'" impose "'compliance costs'" on regulated entities, a prototypical injury that counts for purposes of standing even if "*some* of the compliance costs borne by [the] members have already been realized." *Career Colls. & Schs. of Tex. v. DOE*, 98 F.4th 220, 237-38 (5th Cir. 2024); *accord Collins v. Yellen*, 594 U.S. 220, 243 (2021). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017). So is having "to divert time and resources away" from "regular business." *Book People v. Wong*, 91 F.4th 318, 331 (5th Cir. 2024) (cleaned up).

But the answer should be the same here, where the district court found—and the CFPB no longer contests—that the manual update was "final agency action." ROA.3094. The district court correctly found that the CFPB did "not dispute" that the manual update "marks the consummation of the agency's decisionmaking process and was issued to 'guide [its] supervision of covered financial institutions.'" ROA.3093. The update triggers legal consequences because it "obligates agency personnel to act on a

particular understanding of an 'unfair act or practice' in examining and supervising companies." ROA.3093 (cleaned up). By the CFPB's own admission, this shift changed "the way in which examiners will look for [UDAAP] violations." ROA.3093-94. Regulated entities must react accordingly to avoid scrutiny and consequences, thus requiring new compliance systems that cost millions. ROA.3088. In short, the CFPB's action had the same legal effect as a notice-and-comment rule, and so it predictably injured Plaintiffs' members in the same ways that notice-and-comment rules do.[7]

### C.    Venue was proper in the Eastern District of Texas.

The CFPB argues that venue is improper because the Longview Chamber of Commerce—the plaintiff who "resides" in the Eastern District, 28 U.S.C. §1391(e)(1)—supposedly lacks standing. The CFPB then largely rehashes its attacks on Plaintiffs' declarations. *See* Blue-Br.37-39. Those arguments are unpersuasive, as explained above. And for purposes of venue, they don't even ask the right questions.

Contrary to the CFPB's assumption, venue and standing are distinct. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) (stressing the "basic difference" between subject-matter jurisdiction and venue). For example, in *R.J. Reynolds Vapor Co. v. FDA*, this Court held that venue was proper because one petitioner resided in the district, even though it found Article III standing based on some other petitioner.

---

[7] In one line of one footnote, the CFPB asserts that Plaintiffs' claims were "not ripe" for the same reasons they lack standing. Blue-Br.27 n.4. But for the same reasons those standing arguments fail, Plaintiffs' claims were ripe. Ripeness is yet another argument that the CFPB did not argue below (and one that it fails to adequately brief here).

65 F.4th 182, 188 (5th Cir. 2023). Because the CFPB cannot defeat *every* Plaintiffs' standing here, *supra* I.A-B, it cannot divest the Eastern District of venue.

The CFPB does not claim the exception to this rule, where the venue-creating plaintiff was "improperly and collusively joined." 14D Wright & Miller, Fed. Prac. & Proc. Juris. §3815 (4th ed. 2024). It couldn't, unless the Longview Chamber's standing is "frivolous." *Crane v. Napolitano*, 920 F. Supp. 2d 724, 747 (N.D. Tex. 2013). The CFPB cannot meet that high burden, particularly under the abuse-of-discretion standard that governs venue. *Abrams Shell v. Shell Oil Co.*, 343 F.3d 482, 486 (5th Cir. 2003); *see, e.g.*, *Crane*, 920 F. Supp. 2d at 747 (deeming the forum plaintiff "not improperly or collusively joined" because "Plaintiffs have pleaded sufficient facts to support [that plaintiff's] standing").

At most, the question is whether Plaintiffs plausibly alleged the Longview Chamber's standing in their complaint, not whether the Longview Chamber's declaration was sufficient to win standing at summary judgment. "[V]enue" is "determined at the outset of litigation"—*i.e.*, at the pleading stage. *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003) (citing *Exxon Corp. v. FTC*, 588 F.2d 895, 899 (3d Cir. 1978), *overruled on other grounds by Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 138 (3d Cir. 2014)); *Williamson-Dickie Mfg. Co. v. M/V Heinrich J*, 762 F. Supp. 2d 1023, 1027 (S.D. Tex. 2011) (citing *Golden v. Cox Furniture Mfg. Co.*, 683 F.2d 115, 118 (5th Cir. 1982)); 14D Fed. Prac. & Proc. Juris. §3826 (collecting cases). It cannot be lost based on "subsequent events," *Smilde*, 73 F. App'x at 26, including the dismissal of the venue-creating plaintiff, *Exxon*, 588

F.2d at 899. The opposite rule would be unworkable. It would force courts to dismiss cases for lack of venue even after discovery or trial, should the venue-creating plaintiff fail to carry its burden of proving standing at a later stage. Because venue must be decided at the outset, the question must be whether "Plaintiffs have pleaded sufficient facts to support [the venue-creating plaintiff's] standing" in their complaint. *Crane*, 920 F. Supp. 2d at 747.

The CFPB does not argue that the Longview Chamber lacked standing at the pleading stage. All its arguments target Longview's "declaration," Blue-Br. 37-39, not the allegations in Plaintiffs' complaint. There, Plaintiffs more than plausibly alleged that "Plaintiffs each have members" who are subject to the CFPB's supervisory jurisdiction over UDAAPs, ROA.18, ¶30, ¶29, ¶27; ROA.26-27 ¶60, and that those members are injured by the manual update and the authority invoked there, ROA.26-27, ¶¶58-60; ROA.32, ¶79. No more specificity was required at the pleading stage, where courts "'presume'" that "'general factual allegations'" about standing "'embrace those specific facts that are necessary.'" *Hancock Cnty.*, 487 F. App'x at 195 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The CFPB's new germaneness argument, *see* Blue-Br.37-38, is not even cognizable at the pleading stage. It ignores that courts must accept the complaint's factual allegations as true and construe everything in the plaintiff's favor. *Warth*, 422 U.S. at 501; *see also Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000) (courts also credit "the facts contained in the [Plaintiffs'] affidavits and other documentation").

Regardless, the CFPB's theory that the *Longview* Chamber of Commerce is no longer interested in Longview because maybe it's been overrun by non-Longview businesses "who joined … to facilitate this suit," Blue-Br.38, is insulting and ridiculous. No wonder the CFPB forfeited this issue below. *See* ROA.3095 (noting that germaneness is "apparent and undisputed"). Had the CFPB raised it, Plaintiffs would have pointed out that the CFPB can see the Longview Chamber's membership for itself on its *public* directory. *See Business Directory*, Longview Chamber of Commerce, perma.cc/3CPT-VPLC (last visited Oct. 7, 2024).

The "one argument about standing" that the CFPB did raise below—*Summers'* supposed ban on pseudonyms—is not relevant to the pleading stage, as the CFPB itself concedes. Blue-Br.21-22. *Summers* was decided after trial. 555 U.S. at 500. Per this Court in *Hancock County*, there is "no authority for the proposition that an [association] must identify a particular [standing] member *at the pleading stage*." 487 F. App'x at 198. Every circuit agrees that *Summers* does not apply to complaints. *E.g.*, *Shrum*, 92 F.4th at 950 n.1; *La Raza*, 800 F.3d at 1041; *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020). Even the Second Circuit agrees. *See Bldg. & Const. Trades Council v. Downtown Dev.*, 448 F.3d 138, 145 (2d Cir. 2006); *Do No Harm*, 96 F.4th at 115 & n.5 (explaining that it was not deciding whether associations can use pseudonyms "at the *pleading* stage"). These courts are correct. At the pleading stage, general allegations are allowed, facts must be accepted as true, and omissions cannot be construed against the plaintiff. *S.C. NAACP*, 2022 WL 453533, at *3; *B.R.*,

17 F.4th at 495; *Bldg. & Const.*, 448 F.3d at 145. *Summers'* concern with "verifying the facts" simply does not apply. 555 U.S. at 499.

Plus, the CBA's membership list is publicly available. ROA.246-251. The CFPB knows the 59 CBA members that it regulates; it is "relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected" by its action; and the CFPB "need not know the identity of a particular member to understand and respond to [the CBA's] injury." *La Raza*, 800 F.3d at 1041. So Plaintiffs had standing even under the CFPB's view that *Summers* bans anonymity. ROA.3095.

## II.    The CFPB violated the APA.

The district court was also right on the merits. The CFPB exceeded its statutory authority. The CFPB also violated the APA for other reasons that the court didn't reach, and those arguments are available as additional or alternative grounds to affirm.

### A.    The CFPB exceeded its statutory authority by reading its power over "unfair" practices to encompass a new power over disparate impacts.

As the district court correctly ruled, the CFPB lacks statutory authority to reinterpret its UDAAP power to consider discrimination itself to be a UDAAP. ROA.3107. The CFPB contends that its UDAAP authority reaches not only discrimination itself, but also disparate-impact theories. And it claims that authority even though neither the Dodd-Frank Act nor the CFPB's manual outlines any protected classes or categories. Congress has never done that. And it certainly didn't do that for the CFPB—silently, for the first time, tucked within a provision about unfair practices.

Because the CFPB has no real defense of its statutory interpretation, it resorts to a strawman, falsely characterizing Plaintiffs' position as an attempt to insulate conduct that meets the statutory definition of a UDAAP but that also *happens to be* discriminatory. *See* Blue-Br.55. But the agency did not spend so much time and energy drafting and promoting the update just to tell examiners and regulated entities that UDAAP means UDAAP. The update announces the agency's view that discrimination is a UDAAP— that examiners must look for discrimination itself. Regulated entities must set up compliance programs keyed to discrimination itself (in new contexts not covered by existing nondiscrimination statutes under the CFPB's jurisdiction). And discrimination itself, under the CFPB's update, satisfies the statutory elements of a UDAAP. Not just discrimination. Disparate impacts against an unidentified and potentially endless set of protected classes. *That* grossly exceeds the CFPB's statutory authority.

### 1. The text of the Dodd-Frank Act evidences that Congress does not consider discrimination part of UDAAP.

The Dodd-Frank Act empowered the CFPB to prohibit "unfair" acts or practices. 12 U.S.C. §5536(a)(1)(B). It also gave the CFPB authority over two discrete antidiscrimination laws. But it did not provide further authority to the CFPB in this space. ROA.3100.

In the Dodd-Frank Act, Congress expressly articulated "unfair" acts and "discrimination" as two distinct concepts. ROA.3100. The Act "authorized" the CFPB "to exercise its authorities under Federal consumer financial law" to ensure "consumers are

protected from unfair, deceptive or abusive acts and practices *and* from discrimination." 12 U.S.C. §5511(b) (emphasis added). Congress's word choice is significant. It did not authorize the CFPB to protect consumers from unfair acts or practices "including" or "such as" discrimination, as it would if Congress had meant for discrimination to be viewed as a type of unfairness. Its use of "and" treated them as separate concepts. Nor did Congress give the CFPB editorial authority to redefine and prohibit "unfair, deceptive, *discriminatory*, or abusive acts or practices." *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope"). As the district court recognized, the section that defines "unfairness" does not mention discrimination or anything like it. ROA.3101 (citing 12 U.S.C. §5531(c)).

The CFPB's novel position is likewise unsupported by the structure of the Act. *See Nassar*, 570 U.S. at 353 ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices."). The statute shows that "Congress knew how to clearly add nondiscrimination to the CFPB's portfolio when it meant to do so." ROA.3101. In §1002(13) of the Act, Congress defined "fair lending" as "fair, equitable, and nondiscriminatory access to credit for consumers." 12 U.S.C. §5481(13). If Congress's use of "fair" included "nondiscriminatory," it wouldn't have needed to include nondiscriminatory in its definition. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."). This distinction is again apparent in the Act's creation of the CFPB's Office of Fair

Lending and Equal Opportunity. There, Congress said the office could oversee and enforce federal laws designed to ensure "fair, equitable, and nondiscriminatory access to credit." 12 U.S.C. §5493(c)(2)(A). The Equal Credit Opportunity Act and the Home Mortgage Disclosure Act are listed as examples of laws the office could enforce, but not the CFPB's unfairness authority. §5493(c)(2)(A).

The broader statutory context confirms these points. In the many statutes where Congress addresses discrimination, it defines "what classes are protected, what outcomes or actions are prohibited, and defenses to liability." ROA.3099; *e.g.*, 42 U.S.C. §2000e-2 (Title VII); 29 C.F.R. §37.1 (implementing the "nondiscrimination … provisions of the Workforce Investment Act of 1998," which cover, among other classes, "age, disability, [and] political affiliation or belief"). For every case that the CFPB cites as purportedly applying an unfairness provision to discrimination, Congress laid out the protected classes. *See* Blue-Br.48 (collecting cases). Not so here. And "the CFPB's claimed authority to prohibit disparate-impact discrimination," in particular, is "something that Congress rarely authorizes" and then "only in narrow circumstances, with limits that exist to avoid serious constitutional questions." ROA.3099-100.

History also weighs against the CFPB. Before 2022, the CFPB had never interpreted its UDAAP authority to include the power to regulate discriminatory conduct. Since its first iteration in October 2012, the agency's manual made no mention of discrimination in the UDAAP section (just like the Dodd-Frank Act). ROA.3101. To the contrary, the manual repeatedly treated UDAAP and discrimination separately (just like

the Act). ROA.3101. And when Congress passed Dodd-Frank, no relevant legal authority had conflated "unfairness" and "discrimination." ROA.3101. Recent attempts by other federal agencies to target discrimination under the guise of unfairness only introduce "ambiguity." ROA.3103; *see* ROA.3102 (finding that "legal views on the FTC Act's 'unfairness' definition have changed over the decades"). Though Congress empowered the Federal Trade Commission to protect consumers from "unfair or deceptive" practices, 52 Stat. 111 (1938), it has never endorsed reading that language to cover discrimination. It has only *curtailed* that power, stressing that the FTC must focus on consumer protection and not use its unfairness authority for broader "public policy" purposes. 15 U.S.C. §45(n).[8]

The CFPB's amici do not help its cause. Contra the professors, statutory text is not "flexib[le]." Profs.-Br.16-17. It is "fixed." *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2266 (2024). And contra the nonprofits, the question is not whether Congress carved out "discriminatory practices from the statutory definition of unfairness." Nonprofits-Br.23-24. The question is whether the statutory definition of unfairness contains a separate concept that Congress consistently treated separately (and the answer is no). Amici do no better by arguing that *other* terms of art that do not appear in the UDAAP

---

[8] The CFPB's consent orders from the Department of Transportation are likewise unilluminating. Blue-Br.48. The allegations of discrimination there were investigated under the agency's UDAAP authority *and* a federal discrimination statute (49 U.S.C. §40127(a)). The private actors who settled never contested whether the agency's UDAAP authority extended to discrimination. And no court has approved that assertion.

provision, like "fair lending," can cover discrimination. Profs.-Br.7-8 (citing 12 U.S.C. §§5481(13), 5493(c)). Tellingly, their examples of laws that cover discrimination apply to identified "protected classes," a hallmark of antidiscrimination laws that is missing here. Profs.-Br.9-12.

All this might explain why the CFPB did not make these arguments itself. On the CFPB's arguments (and the amici's, for that matter), the district court was correct to reject the manual update as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C).

### 2. The expansion of disparate-impact liability throughout the financial-services industry presents a major question.

If doubts remained, the substantial "economic and political significance" of the CFPB's rule should give this Court "reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). Though the district court could have reached the same result without the major-questions doctrine, it was not wrong to apply that doctrine. Without "a clear statement for Congress to authorize a version of discrimination liability that even explicit nondiscrimination statutes usually do not cover," the CFPB would turn Dodd-Frank's UDAAP provision into "sweeping antidiscrimination authority." ROA.3100. To do so without even a whisper of "the words 'discrimination' or 'disparate impact'" is contrary to law. ROA.3100.

The CFPB's assertion that its UDAAP authority contemplates disparate-impact liability is deeply problematic. ROA.3099. Statutes authorize disparate-impact liability only within narrow confines, according to the Supreme Court, and the Act's provision about UDAAPs has none of them. A nondiscrimination law would at least define protected classes and specify exemptions. *Inclusive Cmtys.*, 576 U.S. at 540. The Act does neither, and the CFPB has not tried to (and cannot) fill that void. Yet those limits exist to "avoid serious constitutional questions" posed by disparate-impact liability. *Id.* at 521. According to the CFPB, then, Congress not only hid the elephant of discrimination in the mousehole of UDAAP, but it hid a version of discrimination liability that *explicit* nondiscrimination statutes usually do not (and constitutionally, cannot) cover. And Congress apparently did so without giving any guidance on how to determine whether outcomes are discriminatory, or defining which classes are protected.

Such a rule would have widespread effects. It would have a tremendous economic effect—to the tune of millions of dollars per year—on Plaintiffs' members and the rest of the financial-services industry. ROA.3098. And it has a significant political effect on the balance of state-federal power. ROA.3099. The CFPB's decision to overstep statutory bounds intrudes on state prerogatives and interests by asserting new federal authority over the fields of antidiscrimination and consumer protection, where States exercise their own authority. ROA.3099. As the district court found, "States can and do guard against discrimination, protect consumers, and regulate financial-services companies." ROA.3099 (collecting authorities). They "make meaningful choices about

40

what classes are protected or not, what conduct is prohibited or allowed, and what defenses and remedies are available or not." ROA.3099. Yet the CFPB's position allows it to upset those balances. ROA.3099.

The CFPB's claimed authority would be a seismic shift in how Congress has always authorized disparate-impact liability, not a "routine" update. CAC-Br.4, 15. Because the CFPB's assertion "significantly alter[s] the balance between federal and state power" and has "vast economic and political significance," this Court should "'hesitate before concluding that Congress' meant to confer such authority." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); *accord NFIB v. OSHA*, 595 U.S. 109, 117 (2022); *West Virginia*, 597 U.S. at 721. Congress conferred nothing like the CFPB's claimed authority here.

Sensing this, the CFPB makes a brand-new argument on appeal: that under *Reno v. Flores*, 507 U.S. 292 (1993), Plaintiffs must satisfy the test for a "facial challenge" and thus must prove that *every* application of the UDAAP provision to *any* definition of discrimination presents a major question. Blue-Br.55-56, 63-64. This argument is forfeited. This Court will search the CFPB's district-court briefs in vain to find where they made this point, cited *Reno*, or even used the word "facial." Nor did the CFPB discuss— let alone put in the record—the proxy statements from major banks, letters from elected officials, and other extrarecord sources it now mentions in its appellate brief. *See, e.g.*, Blue-Br.59-61.

Federal agencies, with their "ample resources and voluminous briefing," are not exempt from the rule that appellate courts "normally declin[e] to entertain arguments forfeited" below. *Ohio v. EPA*, 144 S.Ct. 2040, 2057 (2024). That rule alone should dispose of this new line of attack. *See, e.g.*, *La. ex rel. Murrill v. DOE*, 2024 WL 3452887, at *1 (5th Cir. July 17) (per curiam) (agency forfeited "overbreadth" argument because its "vague" and "conclusory" allusions below had not "adequately identified" the issue for the district court); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (EPA "waived any argument about the scope of the stay" by failing to adequately brief it).

Even if the CFPB had raised its *Reno* argument below, that argument would not change anything. The CFPB uses *Reno* to suggest that, unless every application of a regulation raises a major question, then the major-questions doctrine cannot apply. Blue-Br.55-56. Even if this principle could be found in *Reno* (a massive stretch), it has no relevance here. The question whether the Act's UDAAP provision covers disparate-impact liability, as the CFPB seems to appreciate, is a major one. But so is the question whether the UDAAP provision covers discrimination itself. If it does, then it bans discrimination without identifying protected classes, safe harbors and defenses, or a legal standard. That, too, would have major ramifications for the financial-services industry and States' power to regulate discrimination. ROA.3099-3101. And, importantly, it is a distinct question from whether, for example, a practice that is unlawful under existing nondiscrimination laws can also be proven a UDAAP under the traditional UDAAP analysis.

At bottom, the major-questions doctrine stops courts from reading seemingly expansive statutes to reach—by implication and in unpredictable ways—areas that Congress usually regulates expressly. *See NFIB*, 595 U.S. at 117; *id.* at 125 (Gorsuch, J., concurring). That is this case in a nutshell.

## B.    The CFPB also violated the APA's procedural rules.

The arguments above also show why Plaintiffs' other APA claims were correct. This Court can affirm on these grounds as well, in addition to the statutory argument, because they are pure questions of law that were fully briefed below. *Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp.*, 509 F.3d 216, 221 (5th Cir. 2007); *see, e.g., Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) (affirming the APA ground reached by the district court and reaching "an alternate and additional ground" under the APA "for affirming the injunction," which "was fully briefed in the district court").

Start with notice and comment. The CFPB no longer contests final agency action. *Infra* I.B. But the reasons it lost that argument are the same reasons why its manual update was a "legislative rule" that had to go through notice and comment. *Mock v. Garland*, 75 F.4th 563, 586 (5th Cir. 2023); *see Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019) ("[T]hat the Guidance is a substantive rule subject to the APA's notice-and-comment requirement … follows naturally from our holding that the Guidance is a final agency action."). By issuing a rule that constrains its examiners, changes regulated entities' obligations, and cuts out the public's right to weigh in, the CFPB violated the APA. 5 U.S.C. §706(2)(D); *see* ROA.205-08; ROA.1785-87, 1767-74.

The update was also arbitrary and capricious. Under the APA, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998). Even if the CFPB could reach discrimination under its statutory UDAAP authority, its attempt here was unreasoned and unreasonable. *See* ROA.201-05; ROA.1782-85.

Most notably, the CFPB omitted the essential safeguards that the Supreme Court requires for disparate-impact liability. *See Inclusive Cmtys.*, 576 U.S. at 542 (insisting on a "robust causality requirement"); ROA.430 (recognition in the administrative record that the CFPB would need to "identif[y] protected classes because they are not enumerated in the FTC or Dodd-Frank Acts"). Those safeguards are needed to prevent constitutional violations; without them, federal law would impermissibly "inject racial considerations" into every decision and invite "racial quotas." *Inclusive Cmtys.*, 576 U.S. at 543. Disparate-impact liability "must be limited" so that "regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 533. Yet the CFPB has failed to even acknowledge, let alone discuss, these well-established guardrails. Whatever it says now will not be something it said at the time of rulemaking. *Contra DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 22-23 (2020).

## III. The district court's remedy was appropriate.

The CFPB claims that, if Plaintiffs are correct, then the district court should have vacated the manual update but not also entered declaratory or injunctive relief. Blue-Br.65-68. That vacatur-only position is ironic. The federal government's official position is that "the APA does not allow vacatur," ever. *Corner Post v. Bd. of Govs. of Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2460 (2024) (Kavanaugh, J., concurring). Under this "far-reaching" view, *id.*, district courts should *only* be granting injunctive and declaratory relief in APA cases—the very relief that the CFPB now faults the district court for entering, *id.* at 2467. The CFPB's vacatur-only view is also convenient. Its position in this case is that, regardless of what its manual says, it has the power to police discrimination as a UDAAP. *See* Blue-Br.43. Had the district court merely vacated the update, the CFPB would have said that nothing had changed vis-à-vis Plaintiffs' members because its *statutory* UDAAP authority still mandated the same result.

The district court's refusal to go along was not an "abuse of discretion." Blue-Br.17. As to declaratory relief, the abuse-of-discretion standard cannot possibly be overcome, since the district court found that the CFPB both "offer[ed] no argument against declaratory relief" and "concede[d] that 'declaratory relief would be an appropriate remedy.'" ROA.3104. And on appeal, the CFPB overstates the scope of the district court's judgment. The court entered a party-specific declaration that declares unlawful any attempt by the CFPB to pursue its UDAAP interpretation against any of Plaintiffs' members. ROA.3104-05. It did not hold that the CFPB lacks the "authority to ever treat a

discriminatory act or practice as unfair" that otherwise meets the statutory definition of a UDAAP. Blue-Br.67. It bars the CFPB from considering discrimination itself to be a UDAAP. ROA.3088.

As for the injunction, the CFPB faces an uphill climb. Not only under the abuse-of-discretion standard of review, but also because it never contests on appeal that Plaintiffs satisfy all four factors for injunctive relief. *See* ROA.3105 (concluding that Plaintiffs satisfied irreparable harm, the balance of the equities, and the public interest). Its limited arguments about the injunction's necessity and scope do not justify reversal.

Vacatur does not bar courts from also issuing an injunction. Courts commonly issue both. ROA.3106 (collecting cases[9]). While the CFPB says an injunction must have an effect beyond the vacatur, the injunction here does. The CFPB has stated that, even if the update didn't exist (or was vacated), the *statute* would still let it supervise and commence enforcement actions for discrimination as a UDAAP. *See, e.g.*, Blue-Br.1; ROA.1464, 1813. An injunction thus had a "'meaningful practical effect'" by ensuring that the CFPB did not use this theory to circumvent the district court's vacatur of the update. *Franciscan All.*, 553 F. Supp. 3d at 377 (quoting *Monsanto Co. v. Geertson Seed*

---

[9] *E.g.*, *Franciscan All. v. Becerra*, 553 F. Supp. 3d 361, 377 (N.D. Tex. 2021) (rejecting the government's argument that a permanent injunction was duplicative with vacatur), *aff'd in relevant part*, 47 F.4th 368, 377-80 (5th Cir. 2022); *Texas v. United States*, 50 F.4th 498, 530-31(2022) (affirming the district court's grant of both vacatur and an injunction); *Shell Offshore v. Babbitt*, 61 F. Supp. 2d 520, 529 (W.D. La. 1999) (both setting aside an order and enjoining the agency from enforcing it), *aff'd in relevant part*, 238 F.3d 622, 630-31 (5th Cir. 2011); *NAM v. SEC*, 631 F. Supp. 3d 423, 431 (W.D. Tex. 2022) (following "the ordinary practice" of granting both vacatur and an injunction).

*Farms*, 561 U.S. 139, 165 (2010)). The district court did not abuse its discretion by crediting this threat and stopping it. Indeed, given the significant number of Plaintiffs' members who are not directly subject to supervision by the CFPB, but who are still subject to the CFPB's enforcement, this injunction was particularly important and appropriate.

Nor did the district court abuse its discretion by granting an injunction that protects Plaintiffs' "future members." Blue-Br.66. The CFPB cites no case reversing an injunction on the ground that it wasn't limited to the associational plaintiff's current members. Injunctions routinely protect an association's "members, both current and prospective." *Kansas v. DOE*, 2024 WL 3471331, at *3-4 (D. Kan. July 19) (collecting cases); *accord Christian Emps. All. v. Azar*, 2019 WL 2130142, at *5 (D.N.D. May 15) ("current and future members"); *Reaching Souls Int'l v. Azar*, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15) ("current and future" members). The Supreme Court, too, has upheld an injunction that protected organizational plaintiffs' "'present and *prospective* patrons.'" *Kansas*, 2024 WL 3471331, at *3-4 (quoting *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925)). When "an organization obtains … something of value through litigation," there is nothing unusual, untoward, or illegal about others "trying to benefit" by "joining the organization." *Id.*

This is not a question of "standing" or "uninjured members." *Cf.* Blue-Br.42. Plaintiffs have standing if one of them has standing, and one of them has standing if "any one" of their members has standing (and *Hunt*'s other two requirements are satisfied). *Warth*, 422 U.S. at 511. When an association wins an injunction, the injunction

runs to the association and thus "applies equally to all members," even if "not every member may derive any immediate benefit." *Playboy Enters. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 35 (1st Cir. 1990); *accord Guidry v. Int'l Union of Operating Eng'rs*, 882 F.2d 929, 944 (5th Cir. 1989) (the "benefit of the awards" will "inure to the benefit of all union members"), *vacated on other grounds*, 494 U.S. 1022 (1990). This efficiency is an upside and is why "associational standing was originally recognized." *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007); *see also UAW*, 477 U.S. at 289 (refusing to overrule associational standing because of its "special features, advantageous both to the individuals represented and to the judicial system as a whole"). Though Justice Thomas recently raised questions about associational standing, he recognized that existing law "permits [an] association to seek relief for its entire membership—even … non-injured members." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring). This Court, of course, must follow existing law.[10]

The CFPB's concern about future members is overblown. Plaintiffs already represent most of the major entities that the CFPB regulates. ROA.261. The injunction, by definition, does not cover "nonmembers." Blue-Br.66. Even if someone becomes a

---

[10] As the CFPB's main authority explains, "it can reasonably be *supposed* that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515 (emphasis added). Here, for example, the CFPB doubts whether Plaintiffs' members are really affected by its new UDAAP rule and challenges whether they can be anonymous. But the injunction becomes relevant only if the CFPB decides to enforce its rule against a specific member and that member tells the CFPB that they're protected by the injunction—thus proving their standing, even by the CFPB's lights.

member to take advantage of the injunction, the CFPB has many options. It could ask for a stay pending appeal, though it didn't here. *See Labrador v. Poe ex rel. Poe*, 144 S.Ct. 921, 932 (2024) (Kavanaugh, J., concurring in grant of stay). It can appeal, as it's doing now, and try to get the district court reversed on the merits. And even if it loses on appeal—and thus obtains precedent barring its interpretation throughout this circuit— it can relitigate the question in other circuits. Or it can petition the Supreme Court for certiorari. But nothing required the district court to gerrymander Plaintiffs' membership, depriving only some from their hard-fought victory while leaving others vulnerable to the CFPB's unlawful power grab.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: October 7, 2024                     Respectfully submitted,

                                           */s/ Cameron T. Norris*

Jennifer B. Dickey                         Cameron T. Norris
Jordan L. Von Bokern                       David L. Rosenthal
U.S. CHAMBER LITIGATION CENTER             CONSOVOY MCCARTHY PLLC
1615 H Street NW                           1600 Wilson Blvd., Ste. 700
Washington, DC 20062                       Arlington, VA 22209
(202) 463-5337                             (703) 243-9423
jdickey@uschamber.com                      cam@consovoymccarthy.com

                                           Thomas Pinder
                                           Andrew R. Doersam
                                           AMERICAN BANKERS ASSOCIATION
                                           1120 Connecticut Ave. NW
                                           Washington, DC 20036
                                           (202) 663-5035
                                           tpinder@aba.com

                        *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I e-filed this brief with the Court, which will email everyone requiring service.

Dated: October 7, 2024                    *s/ Cameron T. Norris*

## CERTIFICATE OF COMPLIANCE

The brief complies with Rule 32(a)(7)(B) because it contains 12,506 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced font using Microsoft Word in 14-point Garamond (for body and footnote text) and 16- and 15-point Helvetica Neue (for headings).

Dated: October 7, 2024                    *s/ Cameron T. Norris*