No. 23-40650

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA; LONGVIEW CHAMBER OF COMMERCE; AMERICAN
BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION;
INDEPENDENT BANKERS ASSOCIATION OF TEXAS; TEXAS
ASSOCIATION OF BUSINESS; TEXAS BANKERS ASSOCIATION,
*Plaintiffs-Appellees*,

v.

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT
CHOPRA,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Texas
Case No. 1:22-cv-00381-JCB

BRIEF FOR *AMICI CURIAE* BANK POLICY INSTITUTE,
AMERICA'S CREDIT UNIONS, AND AMERICAN FINANCIAL
SERVICES ASSOCIATION IN SUPPORT OF APPELLEES
AND AFFIRMANCE

Alexander V. Maugeri
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939

*Additional counsel listed in
signature block*

Brett A. Shumate
  *Counsel of Record*
Jonathan V. Gould
Riley W. Walters
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939

## CERTIFICATE OF INTERESTED PERSONS

### No. 23-40650, *Chamber of Commerce of the United States of America, et al. v. Consumer Financial Protection Bureau, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Defendants-Appellants:

- Consumer Financial Protection Bureau
- Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau

2.    Counsel for Defendants-Appellants:

- Seth Frotman
- Steven Y. Bressler
- Christopher Deal
- Justin M. Sandberg
- Ryan Cooper

3.    Plaintiffs-Appellees:

- Chamber of Commerce of the United States of America
- Longview Chamber of Commerce
- American Bankers Association
- Consumer Bankers Association
- Independent Bankers Association of Texas

- Texas Association of Business
- Texas Bankers Association

4. Counsel for all Plaintiffs-Appellees:

- Bryan K. Weir
- Cameron Thomas Norris
- David Leighton Rosenthal
- Bruce Alan Smith
- Consovoy McCarthy PLLC
- Ward, Smith & Hill, PLLC

5. Counsel for Plaintiff-Appellee Chamber of Commerce of the United States of America:

- Jennifer B. Dickey
- Jordan Von Bokern

6. Counsel for Plaintiff-Appellee American Bankers Association:

- Thomas Pinder

7. Counsel for Plaintiff-Appellee Consumer Bankers Association:

- David Pommerehn

8. *Amici Curiae*

- Bank Policy Institute
- America's Credit Unions
- American Financial Services Association

9. Counsel for all *Amici Curiae*

- Brett A. Shumate
- Jonathan V. Gould

- Alexander V. Maugeri
- Riley W. Walters

10.   Counsel for *Amicus Curiae* American Financial Services Association

- Scott J. Hyman

Dated: October 14, 2024          Respectfully submitted,

*/s/ Brett A. Shumate*

*Counsel of Record for all*
Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE*.............................................................. 1

INTRODUCTION.................................................................................. 3

ARGUMENT ........................................................................................ 6

    I.      THE EXAM MANUAL IS LEGALLY BINDING. ................. 8

          A.    Agency Guidance Is Reviewable If It Imposes
Binding Legal Obligations. ........................................... 8

          B.    The Manual Update Imposes Binding Legal
Obligations On The Nation's Financial
Institutions.................................................................. 13

    II.     FINANCIAL INSTITUTIONS INCUR SUBSTANTIAL
COSTS TO COMPLY WITH THE EXAM MANUAL.......... 19

          A.    The Exam Manual Governs CFPB Supervision
and Enforcement. ....................................................... 20

          B.    The Manual Update Imposes Substantial Costs
on Financial Institutions. ........................................... 24

CONCLUSION .................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ................................................................ 19

*Contender Farms L.L.P. v. U.S. Dep't of Agric.*,
779 F.3d 258 (5th Cir. 2015) ................................................................. 7

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................................. 18

*Flight Training Int'l v. FAA*,
58 F.4th 234 (5th Cir. 2023) ............................................................... 16

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019) ............................................................... 31

*R.J. Reynolds Vapor Co. v. FDA*,
65 F.4th 182 (5th Cir. 2023) ....................................... 10, 11, 12, 17

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities
Project, Inc.*,
576 U.S. 519 (2015) ...................................................................... 25, 31

*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024) ........................................................ 11, 12

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) ................................................... *passim*

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) .......................................................... 8, 9

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ................................................................ 8

**STATUTES**

12 U.S.C. § 1818 ................................................................................ 20

12 U.S.C. § 5493 .................................................................................. 6

12 U.S.C. § 5531 ................................................................................ 32

12 U.S.C. § 5536 ........................................................................ 3, 6, 16

15 U.S.C. § 1691 ............................................................................ 6, 30

42 U.S.C. § 2000e-2 ........................................................................... 30

42 U.S.C. § 3604 ............................................................................ 6, 30

42 U.S.C. § 3605 ............................................................................ 6, 30

**OTHER AUTHORITIES**

12 C.F.R. § 1002.4 ............................................................................. 32

12 C.F.R. § 1002.5 ............................................................................. 26

12 C.F.R. § 1002.6 ............................................................................. 32

12 C.F.R. § 1002.8 ............................................................................. 32

*Business Combinations Under the Bank Merger Act*, 89 Fed.
  Reg. 78,207, 78,209–10 (Sept. 25, 2024) .......................................... 24

CFPB Examination Manual: Supervision and Examination
  Process (Sept. 2023), https://tinyurl.com/3kcwtdn9 ......................... 21

CFPB Examination Manual, *Unfair, Deceptive, or Abusive
  Acts or Practices* (March 2022) .................................................. *passim*

CFPB Examination Procedures, Compliance Management Review (Aug. 2017), https://tinyurl.com/sxphtmyj ............................ 29

CFPB's Exam Manual Changes, BPI (June 27, 2022), https://tinyurl.com/2u622md4 ........................................................... 33

CFPB, Supervision and Examinations, https://tinyurl.com/256jnmd5 ...................................................... 15, 16

Comptroller's Handbook, Consumer Compliance: Fair Lending, OCC (Jan. 2023), https://tinyurl.com/j538msad ................. 33

Federal Consumer Financial Protection Guide: Unfair, Deceptive, or Abusive Acts of Practices, National Credit Union Administration, https://tinyurl.com/yc5zt8zj .......................... 17

Press Release, *CFPB Targets Unfair Discrimination in Consumer Finance* (Mar. 16, 2022), https://tinyurl.com/yskphjyk ............................................. 13, 14, 17, 25

## INTEREST OF *AMICI CURIAE*[1]

*Amicus Curiae* the Bank Policy Institute ("BPI") is a nonpartisan public policy, research and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States.  BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

*Amicus Curiae* America's Credit Unions ("ACU") represents the nation's nearly 5,000 federal- and state-chartered credit unions that collectively serve over 140 million consumers with personal and small business financial service products.  ACU delivers strong advocacy, resources, and services to protect, empower, and advance credit unions and the people they serve.  ACU advocates for responsible legislative policies and regulations so credit unions can efficiently meet the needs of their members and communities.

---

[1] No counsel for a party authored any part of this brief.  No one other than *Amici*, their members, or their counsel financed the preparation or submission of this brief.  All parties consent to the filing of this brief.

*Amicus Curiae* the American Financial Services Association ("AFSA"), founded in 1916, is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.

This brief explains how the new rule announced by the Consumer Financial Protection Bureau ("CFPB") in an amendment to its Supervision and Examination Manual ("Exam Manual"), Unfair, Deceptive, or Abusive Acts or Practices Section, issued on March 16, 2022 ("Manual Update") affects the nation's financial institutions. *Amici's* members include depository institutions that are subject to CFPB supervision and examination, as well as institutions that are not subject to CFPB supervision yet still subject to the Dodd-Frank Act's prohibition on unfair, deceptive, or abusive acts and practices. Given the Exam Manual's binding nature, *Amici's* members are adversely affected by the Manual Update—both legally and practically.

## INTRODUCTION

*Amici's* members are firmly committed to identifying and preventing discriminatory acts and practices in the financial services industry.  For example, members have dedicated significant resources toward developing and implementing anti-discrimination policies and compliance systems designed to prevent, detect, and correct failures in the execution of their programs that could result in unlawful discrimination.  These efforts reflect a core value shared by *Amici's* members:  Discrimination is wrong, and it is corrosive to the integrity and strength of the nation's financial system.

The CFPB's new rule, however, goes far beyond policing intentional discrimination by imposing significant new obligations on financial institutions, affecting their operations and compliance frameworks.  The CFPB decreed through a Manual Update—without any statutory basis— that disparate impact alone in connection with the provision of any consumer financial product or service may constitute discriminatory conduct that violates the Dodd-Frank Act's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]" ("UDAAP").  12 U.S.C. § 5536(a)(1)(B).  This is a marked departure from the status quo because

the CFPB seeks to impose disparate-impact liability where none exists. Although the lending practices of banks and other financial institutions may be subject to potential disparate-impact liability under fair lending laws and regulations, that liability does not extend to their non-lending practices, nor does it extend to UDAAP.

Worse still, the CFPB provides no guidance on how financial institutions should approach compliance with the Manual Update, nor does it even acknowledge the challenges of monitoring and combatting disparate-impact liability. Indeed, the CFPB has failed to even identify any protected classes or explain what legal test the agency will use to determine whether discrimination occurred, and the CFPB appears to have ignored the industry's request for clarity on these and other critical points. Those subject to the UDAAP prohibition are forced to figure these things out for themselves—on pain of a supervisory or enforcement action if they guess wrong.

The CFPB's attempt to sweep these problems under the rug is even more alarming. It contends Appellees lack standing because they complain about "self-inflicted" injuries in response to "hypothetical supervisory and enforcement actions." *See* CFPB Br. 39–40. But there

is nothing hypothetical about the Manual Update's effect on regulated entities because this new rule has the force and effect of law.

As explained below, regulated entities—including *Amici's* members—have incurred, and will continue to incur, substantial costs to comply with the 2022 Manual Update unless the district court's vacatur is upheld. While guidance should normally be treated as non-binding, the 2022 Manual Update carries the force and effect of law for financial institutions that offer financial consumer products and services. And as a practical matter, regulated entities face immense pressure to comply with the Exam Manual due to the broad power the CFPB exerts over them, and given that state regulators leverage the Exam Manual on matters that overlap with federal law. For these reasons, it blinks reality for the CFPB to claim that Appellees' injuries are "self-inflicted." These injuries instead stem directly from the binding legal obligations the CFPB has imposed on Appellees through its Exam Manual. This Court should affirm the judgment below.

## ARGUMENT

As Appellees explain, the CFPB's Manual Update exceeds the agency's authority because Congress did not authorize the CFPB to regulate discrimination as "unfair" conduct under UDAAP.[2]  The CFPB attempts to evade judicial review of the Manual Update with a mishmash of threshold arguments, but the thrust of the CFPB's defense is that the Manual Update does not require regulated entities to do anything—and therefore does not, and cannot, injure anyone.  CFPB Br. 39–40.

The CFPB's characterization of Appellees' injuries as "self-inflicted" betrays a fundamental misunderstanding of its own Exam Manual and

---

[2]   Indeed, fair lending laws such as the Fair Housing Act and the Equal Credit Opportunity Act contain explicit prohibitions on discriminatory conduct that courts have construed to include disparate-impact liability. *See* 42 U.S.C. § 3604(a) (prohibiting discrimination in "the sale or rental of housing" on grounds of "race, color, religion, sex, familial status, or national origin"); *id.* § 3605(a) (prohibiting discrimination in "residential real estate-related transactions" on grounds of "race, color, religion, sex, handicap, familial status, or national origin"); 15 U.S.C. § 1691(a) (prohibiting discrimination in "any aspect of a credit transaction" on grounds of "race, color, religion, national origin, sex or marital status, or age").  By contrast, Dodd-Frank's UDAAP prohibition says nothing about discrimination *at all*.  *See* 12 U.S.C. § 5536(a)(1)(B).  Rather, Congress intended the CFPB to be exclusively focused on discrimination in *providing credit*, as reflected in its mandate to create an "Office of Fair Lending and Equal Opportunity."  *Id.* § 5493(c)(1).

how it is used.  The Exam Manual does far more than state the agency's enforcement policy—rather, the Manual practically binds CFPB examiners and, by extension, regulated entities, thereby affecting their rights and obligations.

This Court's precedent interpreting the Administrative Procedure Act's ("APA") final agency action requirement—and the related distinction between substantive rules and general statements of policy— provides the framework for determining whether the Manual Update is binding and thus causes Article III injury by "produc[ing] legal consequences or determin[ing] rights and obligations."  *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).  Put simply, if agency action imposes legally binding obligations, then the objects of that action generally have standing to challenge it.  *See id.* at 446; *see also Contender Farms L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015).

The Manual Update imposes such binding obligations under a straightforward application of this Court's precedent.  The facts on the ground confirm as much, because regulated entities treat the Exam Manual as binding in practice.  Put another way, the Exam Manual "has practical binding effect" because regulated entities "are reasonably led to

believe that failure to conform" to its dictates "will bring adverse consequences." *EEOC*, 933 F.3d at 442 (cleaned up). This Court should accordingly reject the CFPB's challenge to Appellees' standing and affirm the district court's decision.

## I. THE EXAM MANUAL IS LEGALLY BINDING.

### A. Agency Guidance Is Reviewable If It Imposes Binding Legal Obligations.

This Court has held that a variety of guidance documents are reviewable because the agencies used the guidance to impose binding legal obligations. *See Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (noting that courts must be "mindful but suspicious of the agency's own characterization" of what it has done); *Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) ("Courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*." (cleaned up)).

Consider the EEOC's so-called "Enforcement Guidance" on employers' consideration of criminal records in hiring. *See EEOC*, 933 F.3d at 437. That "guidance" declared that "there is Title VII disparate impact liability" if "a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group" without sufficient justification. *Id.* at 438. Among much else, it further

specified that "an employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact." *Id.* (cleaned up).

This Court had no trouble holding that the purported guidance constituted final agency action subject to judicial review. That was because the guidance bound "EEOC staff to an analytical method in conducting Title VII investigations and direct[ed] their decisions about which employers to refer for enforcement actions." *Id.* at 443. It also "limit[ed] discretion [of EEOC staff] respecting the use of certain evidence" in investigations, "mandating that evidence of a racially-balanced workforce cannot overcome a showing of disparate impact." *Id.* And it "le[ft] no room for EEOC staff *not* to issue referrals to the Attorney General when an employer use[d] a categorical felon-hiring ban." *Id.* In sum, the guidance was binding—and thus produced legal consequences and determined rights and obligations—because it "ha[d] the effect of committing the agency itself to a view of the law that, in turn, force[d] the plaintiff either to alter its conduct, or expose itself to potential liability." *Id.* at 446; *accord Texas*, 50 F.4th at 522 (observing that substantive rules, unlike policy statements, "grant rights, impose

obligations, or produce other significant effects on private interests" (cleaned up)).

The Court then considered Article III standing in light of its conclusion that the guidance was final agency action. *EEOC*, 933 F.3d at 441 ("We begin with whether the Guidance is a reviewable final agency action because that analysis contextualizes the standing inquiry."). And, as relevant here, the Court stressed that because the guidance was binding, the plaintiff "face[d] the possibility of investigation by EEOC and referral to the Attorney General for enforcement proceedings if it fail[ed] to align its … policies with the Guidance." *Id.* at 447. That injury, moreover, was "immediate[ ] enough to constitute an injury-in-fact." *Id.* at 448. Finally, causation and redressability were easily satisfied because the plaintiff was "the object" of the challenged action. *Id.* at 446.

Next consider the FDA's internal memo setting forth a "standard of evidence" for reviewing applications for flavored e-cigarettes. *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 192–93 (5th Cir. 2023). This Court had to decide whether the memo was exempt from the APA's notice-and-comment requirements, a question that turned on whether the memo was a general statement of policy or a substantive rule.

Citing *EEOC*, the Court observed that the defining feature of a substantive rule is the agency's intent "to bind *itself* to a particular legal position." *Id.* at 193. And the memo, the Court continued, "b[ore] all the hallmarks" of a binding action. *Id.* The memo was "binding on its face" because it mandated certain types of evidence to support e-cigarette applications. *Id.* The memo was also "applied in a way that indicat[ed] it [wa]s binding," as "myriad Denial Orders refer[red] to the same deficiencies identified as 'fatal' in the memo." *Id.* Moreover, the memo "took away the FDA reviewers' former discretion to consider individual [applications] solely on their merits and instead require[d] a cursory, box-checking review." *Id.* at 193–94. Finally, the memo "affected the rights of literally hundreds of thousands of applicants whose [applications] were denied." *Id.* The Court accordingly held that the memo was a substantive rule subject to notice and comment—and it was "not a close call." *Id.* at 194.

Similarly, in *Texas v. Becerra*, this Court held that a guidance document was binding—and was thus final agency action—because it used "mandatory language." 89 F.4th 529, 538–39 (5th Cir. 2024). The Court also stressed that agency action is final if the "rights, obligations,

or legal consequences created by the challenged action" are "new." *Id.* at 540 (cleaned up). And the guidance in that case did not "merely restate" existing obligations—it "set[ ] out [the agency's] legal position … for the first time." *Id.* at 541.

These cases teach that at least five factors govern whether agency action is binding—and the presence of any one is dispositive. *See R.J. Reynolds*, 65 F.4th at 193. *First*, agency action is binding "if it appears on its face to be binding." *Id.* The agency's use of "mandatory language" is a telltale sign, and "alone can be sufficient to render [the action] binding." *EEOC*, 933 F.3d at 441–42. *Second*, agency action is binding if it "is applied by the agency in a way that indicates it is binding." *R.J. Reynolds*, 65 F.4th at 193. *Third*, agency action is binding if it "retracts an agency's discretion to adopt a different view of the law." *Id.* After all, action that binds the agency itself to a particular view of the law "indicates [that] legal consequences flow from that action" because it "forces [regulated entities] either to alter [their] conduct" in compliance with the agency's view, "or expose [themselves] to potential liability." *EEOC*, 933 F.3d at 445–46. *Fourth*, agency action is binding if it "affects the rights of broad classes of unspecified individuals." *R.J. Reynolds*, 65

F.4th at 193.  *Finally*, agency action is binding if it creates "new" obligations or legal consequences by setting out the agency's "legal position … for the first time."  *Texas*, 89 F.4th at 540–41.

## B. The Manual Update Imposes Binding Legal Obligations On The Nation's Financial Institutions.

Under this precedent, Appellees have standing to challenge the Exam Manual's new UDAAP provisions under the APA because they bind CFPB examiners and financial institutions.

*First*, the Manual Update is binding on its face.  The CFPB announced the Manual Update in a *press release* reflecting the agency's intent to put all players—examiners and financial institutions alike—on notice of its new UDAAP interpretation.  And in the press release, the CFPB used mandatory language to make clear that it intends for the new interpretation to be binding.  For instance, the agency declared that when "examining banks' and other companies' compliance with consumer protection rules, the CFPB *will* scrutinize discriminatory conduct that violates the federal prohibition against unfair practices," now defined to include intentional and unintentional discrimination.  *See* Press Release, *CFPB Targets Unfair Discrimination in Consumer Finance* (Mar. 16, 2022) (emphasis added), https://tinyurl.com/yskphjyk.

The press release further stated that "[t]he CFPB *will* closely examine financial institutions' decision-making in advertising, pricing, and other areas to ensure that companies are appropriately testing for and eliminating illegal discrimination." *Id.* (emphasis added). And it made clear that "CFPB examiners *will* require supervised companies to show their processes for assessing risks and discriminatory outcomes, including documentation of customer demographics and the impact of products and fees on different demographic groups." *Id.* (emphasis added).

The language of the Manual Update itself also indicates that it is binding. For example, it instructs CFPB examiners to determine whether "[t]he entity has a process to prevent discrimination in relation to all aspects of consumer financial products or services the entity offers or provides" and whether "[t]he entity has established policies and procedures to review, test, and monitor any decision-making processes it uses for potential UDAAP concerns, including discrimination." CFPB Examination Manual, *Unfair, Deceptive, or Abusive Acts or Practices* at 13–14 (March 2022).

Moreover, it instructs examiners to "obtain and review copies" of "[i]nformation collected, retained or used regarding customer demographics … and the breakdown of consumer demographics for various product uses, fees, revenue sources and costs, or the impacts of various products and services on specific demographics." *Id.* at 11-12. And it instructs examiners to "identify acts or practices that materially increase the risk of consumers being treated in an unfair, deceptive, or abusive manner, including discriminatory acts or practices." *Id.* at 11.

The Manual Update even concludes that one element required for a finding of unfairness is *always* satisfied in discrimination cases. *Id.* at 2 ("Consumers cannot reasonably avoid discrimination."). These are not mere suggestions but rather "direction" to examiners "on how to assess compliance with federal consumer financial laws." CFPB, Supervision and Examinations, https://tinyurl.com/256jnmd5.

*Second*, the Exam Manual is applied by the CFPB in a way that indicates it is binding. As the experiences of *Amici's* members confirm, CFPB examiners treat the Manual as binding and use it as a blueprint for their examinations. *See infra* Part II. And there is no reason to believe things would be different with the CFPB's new UDAAP

interpretation if the district court's vacatur were overturned.  Indeed, the language discussed above instructs examiners to apply the Manual Update as if it were binding.

*Third*, the Manual Update limits examiners' discretion by requiring them to act on a new understanding of what constitutes an "unfair … act or practice."  12 U.S.C. § 5536(a)(1)(B).  Examiners have no "discretion to adopt a different view of the law."  *EEOC*, 933 F.3d at 442.  Instead, the Manual Update binds the CFPB "and its staff to a legal position"—namely, that both disparate treatment and disparate impact can constitute unfair acts or practices—and in doing so "alters the legal regime" by "impos[ing]" a new "legal norm."  *Id.* at 441–42; *see also Flight Training Int'l v. FAA*, 58 F.4th 234, 240–41 (5th Cir. 2023) ("The hallmark of a legislative rule is that it 'modifies or adds to a legal norm.'").

For example, UDAAP examiners must now determine whether a company "engages in targeted advertising or marketing in a discriminatory way," CFPB Examination Manual, *Unfair, Deceptive, or Abusive Acts or Practices* at 15 (March 2022)—something they were not previously required to do.  Examiners must also "require supervised companies to show their processes for assessing risks and discriminatory

outcomes, including documentation of customer demographics and the impact of products and fees on different demographic groups." Press Release, *CFPB Targets Unfair Discrimination in Consumer Finance* (Mar. 16, 2022), https://tinyurl.com/yskphjyk. This, too, was not something CFPB UDAAP examiners had to do before the Manual Update. Also new is the requirement that examiners "determine whether … [t]he entity uses decision-making processes in its eligibility determinations, underwriting, pricing, servicing or collections that result in discrimination." CFPB Examination Manual, *Unfair, Deceptive, or Abusive Acts or Practices* at 15 (March 2022).

*Fourth*, the Manual Update affects the rights of every financial institution subject to either CFPB supervision or the statutory UDAAP prohibition.[3] This industry-wide effect is a hallmark of a binding substantive rule. *R.J. Reynolds*, 65 F.4th at 193.

---

[3] Financial institutions not subject to CFPB supervision may face supervisory or enforcement actions from other regulators for UDAAP violations premised on the Manual Update. *See, e.g.*, Federal Consumer Financial Protection Guide: Unfair, Deceptive, or Abusive Acts or Practices (UDAAP), National Credit Union Administration (advising credit unions on compliance with consumer financial protection laws, including the UDAAP prohibition), https://tinyurl.com/yc5zt8zj.

*Finally*, the Manual Update creates "new" obligations and legal consequences. *Texas*, 89 F.4th at 540. It does not "merely restate a statutory requirement or merely reiterate what has already been established." *Id.* (cleaned up). Rather, the CFPB has claimed—for the first time—the power to examine CFPB-supervised financial institutions for alleged discriminatory conduct, including disparate impact, under its UDAAP authority. This groundbreaking position encroaches on an area that Congress has specifically and intentionally addressed through other statutes, such as the Fair Housing Act and the Equal Credit Opportunity Act, that expressly cover discrimination and outline protected characteristics. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address … it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"). By attempting to regulate discrimination under UDAAP, the CFPB has therefore ventured into a domain that Congress carefully delineated through targeted legislation. This novel "legal position" binds both the agency and the entities it supervises. *See Texas*, 89 F.4th at 541.

18

In sum, the binding nature of the Manual Update means that regulated entities face the possibility of CFPB supervisory and enforcement actions if they fail to align their policies and practices with the agency's new requirements. In other words, by binding itself and its staff to a particular view of the law, the CFPB forces regulated entities to "either … alter [their] conduct" accordingly, "or expose [themselves] to potential liability." *EEOC*, 933 F.3d at 446. Because the Manual Update "require[s] action immediately enough to constitute an injury-in-fact," *id.* at 448, there is no merit to the CFPB's argument that the harm here is "self-inflicted" and premised on "hypothetical supervisory and enforcement actions," CFPB Br. 39–40.

## II. FINANCIAL INSTITUTIONS INCUR SUBSTANTIAL COSTS TO COMPLY WITH THE EXAM MANUAL.

The CFPB's contention that Appellees lack standing also ignores that financial institutions incur substantial costs to comply with the Exam Manual to avoid CFPB supervisory and enforcement actions premised on conduct inconsistent with the Manual. *See Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (compliance costs are irreparable harm). These costs are not self-

inflicted, as the Exam Manual cannot simply be ignored. Financial institutions therefore must either incur the costs to incorporate the Exam Manual's requirements into their compliance management systems, or risk CFPB supervisory and enforcement action for failing to do so. Given the vast power the CFPB wields over financial institutions, the only rational choice is to incur the costs of complying with the Exam Manual. That is exactly what financial institutions are doing or plan to do if the novel legal interpretation set forth in the Exam Manual is reinstated.

### A. The Exam Manual Governs CFPB Supervision and Enforcement.

As a practical matter, *Amici's* members—like other regulated entities—treat the Exam Manual as binding. The reason is simple: The Exam Manual serves as a standard for all financial institutions subject to the CFPB's jurisdiction and outlines the CFPB's expectations for entities' compliance management systems.[4] As for UDAAP risk management in particular, the Exam Manual takes on heightened

---

[4] This is also true for institutions not subject to CFPB supervision who may face enforcement actions by prudential regulators that rely on the Exam Manual to identify unlawful conduct for other purposes, such as for instituting cease-and-desist proceedings under 12 U.S.C. § 1818(b).

importance. That is because there are generally no formal regulations that implement Dodd-Frank's UDAAP prohibition. Accordingly, financial institutions must look to other sources, including the Exam Manual, to clarify their UDAAP obligations—and to understand what examiners will look for in their examinations. For this reason, financial institutions use the Exam Manual to structure their compliance systems and policies in order to align their practices with the CFPB's expectations.

The Manual is also indispensable for financial institutions preparing for CFPB examinations. *See* CFPB Examination Manual: Supervision and Examination Process (Sept. 2023), https://tinyurl.com/3kcwtdn9. In a typical exam, the CFPB sends a "Request for Information" seeking documentation and data such as policies and procedures, training materials, and consumer complaints. The scope of the documentation and information requested is often broad and can include highly sensitive and confidential data.

CFPB examiners then go onsite to observe the entity's practices, conduct interviews with personnel, and review additional documents and information. Importantly, examiners adhere to the Exam Manual

throughout the course of the exam.   A typical exam may include transaction testing—that is, reviewing a sample of transactions—to compare a firm's policies and procedures to its practices and to identify potential UDAAP violations.  Some exams result in the CFPB assigning the entity a consumer compliance rating; in such cases the agency will provide an exam report that includes any identified violations of law, areas of concern, and recommendations for corrective action. In exams that do not result in such a rating, the CFPB will provide a supervisory letter, which similarly communicates the agency's findings.

An exam may result in the CFPB issuing "Matters Requiring Attention" ("MRAs"), which set specific goals for the regulated entity and timeframes in which those goals must be achieved.  MRAs, though non-public and less serious than a public enforcement action, cannot be ignored.  An entity's response to an MRA, for example, can affect its compliance rating, which the CFPB shares with the entity's management and, in some cases, with its board of directors.  The CFPB may also issue "Supervisory Recommendations" to address violations of law or other weaknesses in an entity's compliance system.  In more serious cases—or if an entity fails to comply with an MRA—examiners may refer matters

to CFPB enforcement staff for consideration of an enforcement action. In all events, the CFPB treats the Exam Manual as the standard with which financial institutions must conform. Financial institutions accordingly devote substantial attention and resources to aligning their policies and practices with the standards in the Manual.

Because the CFPB uses the Exam Manual as the standard for identifying UDAAP violations and weaknesses in a financial institution's compliance management system, the Exam Manual is effectively binding on supervised entities. An institution that deviates from its provisions may face a supervisory directive (e.g., MRAs), an enforcement action, fines and other financial harms, bans on offering certain financial products or services, personal liability for senior leaders, and reputational harm. And on top of CFPB supervision and enforcement, prudential regulators can also lower a financial institution's rating under the Community Reinvestment Act (commonly called a "CRA rating," which measures an institution's record of meeting community credit needs) based on a CFPB determination—pursuant to the Exam Manual—that the entity has engaged in discriminatory or other illegal credit practices. This CRA rating, in turn, may affect the entity's ability

to change its corporate structure or grow its business, such as engaging in a merger and acquisition. That is because prudential regulators consider an institution's record of meeting community needs as part of their review of certain transactions. *See Business Combinations Under the Bank Merger Act*, 89 Fed. Reg. 78,207, 78,209–10 (Sept. 25, 2024) (noting that regulators review CRA ratings when considering merger applications).

Nor, as a practical matter, can supervised institutions push back on CFPB inquiries even if they believe the expectations or interpretations set forth in the Exam Manual are unreasonable or unsupported by law. If the Manual revisions are reinstated, then supervised entities will be required to respond to examiner requests premised on the CFPB's new UDAAP interpretation. Given the CFPB's supervisory authority over them and the serious consequences of failing to meet supervisory expectations, financial institutions naturally feel intense pressure to comply with the Manual.

## B. The Manual Update Imposes Substantial Costs on Financial Institutions.

The Manual Update has caused—and will continue causing—*Amici's* members to incur substantial compliance costs. Most notably,

24

the Manual Update significantly expands the anti-discrimination monitoring that financial institutions previously conducted in the non-lending context. Although fair lending laws and regulations have been interpreted to require entities to monitor for disparate impact, *see, e.g.*, *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) (Fair Housing Act), the Manual Update requires these entities to update and expand their policies and procedures to address disparate impact in the context of their non-lending products and services, *see* CFPB Examination Manual, *Unfair, Deceptive, or Abusive Acts or Practices* at 18 (March 2022) (directing examiners to consider whether an institution "ensures that employees and third party contactors refrain from engaging in servicing or collection practices that lead to differential treatment or *disproportionately adverse impacts* on a discriminatory basis" (emphasis added)); Press Release, *CFPB Targets Unfair Discrimination in Consumer Finance* (Mar. 16, 2022) ("Consumers can be harmed by discrimination regardless of whether it is intentional), https://tinyurl.com/yskphjyk. For this reason, *Amici's* members have begun the significant task of repurposing compliance frameworks for their lending programs to mitigate the risk of potential

disparate-impact liability in non-lending business lines, such as deposit accounts.

Financial institutions have also taken other steps, including performing fair lending reviews of models that would otherwise be beyond the scope of fair lending laws and regulations, discontinuing certain types of checking accounts out of an abundance of caution, and increasing the level of review of complaints alleging discrimination for non-lending transactions. This has required significant investment in data infrastructure, personnel, and training.

Conducting disparate-impact analysis, moreover, is extremely burdensome and resource intensive. For starters, disparities may be traceable to pre-existing historical, social, and economic factors that are outside the financial institution's control. In practice, it has proven extremely difficult to control for these external factors by separating them from the institution's own policies and processes.

Lack of access to complete and accurate demographic data is another key challenge to monitoring for disparate impact. Indeed, Regulation B prohibits the collection of certain demographic data from applicants in connection with a credit transaction. *See* 12 C.F.R.

§ 1002.5(b).  And financial institutions often limit their collection of such information even outside the credit context due to the existence of, or potential for, credit relationships with those customers.  Accordingly, any analysis of disparate impact in the non-lending space will likely rely on estimations of a consumer's race, ethnicity, and gender based on existing customer data.  Worse, given the lack of data captured for non-lending transactions, disparate-impact analysis may result in false positives.  Some financial institutions report that their CFPB-approved algorithm to impute race and ethnicity is unable to sufficiently predict these characteristics for nearly 40% of consumers.  Without the ability to collect valuable demographic data, financial institutions are hamstrung in their ability to accurately conduct disparate-impact analysis.  Yet the CFPB's Manual Update imposes potential liability for a failure to do so.

More still, whenever sensitive demographic data is collected on customers or prospective customers, access to and use of this data must be carefully overseen and monitored to ensure compliance with existing data protection laws and to mitigate potential discrimination and reputational risks associated with improper use of the data.  Financial institutions therefore must build systems to securely store this

information, and they must establish procedures around data validation, delivery, and refresh that were previously limited to credit products and services.

Finally, conducting disparate impact analysis requires expertise in both data analytics and evaluating and addressing discrimination risk associated with various business strategies, policies, and processes. On the analytics side, this includes expertise in evaluating the results of the statistical analyses, identifying and isolating the numerous variables that could contribute to any disparities found, understanding the impact of proposed less discriminatory alternatives on the disparities in the data, and determining what, if any, action is needed to mitigate the risk of discrimination.

The upshot is that monitoring for potential disparate-impact liability is labor intensive, requiring significant and ongoing investment in the necessary technology, personnel, and training. All of these burdens would exist even if the Manual Update were crystal clear on the nature of financial institutions' discrimination-related UDAAP obligations.

But the Manual Update's lack of clarity surrounding key questions exacerbates these burdens. When the CFPB issued the Manual Update in March 2022, *Amici's* members devoted significant time and resources to analyzing how to incorporate the changes into their compliance systems for non-lending products and services. Much of this time was spent addressing the many unanswered questions raised by the UDAAP revisions. Given the Manual Update's lack of clarity, many institutions have also found it necessary to engage outside counsel for guidance and to better understand industry best practices.

Most fundamentally, the Manual Update does not identify which types of non-credit transactions will be the focus of regulatory concern and attention. It is not possible for financial institutions to conduct disparate-impact testing on *every* type of account transaction or review *every* non-lending policy. And the CFPB expects institutions to take a risk-based approach to their compliance management systems in any event.[5] But because the CFPB provides no guidance on which specific

---

[5] *See* CFPB Examination Procedures, Compliance Management Review at 4 (Aug. 2017) (directing examiners to determine whether an entity has compliance resources "commensurate with the institution's size, complexity, and risk profile"), https://tinyurl.com/sxphtmyj.

areas the agency intends to target in connection with its new legal theory, institutions must guess on where to allocate resources, which in turn may result in needless efforts to examine areas that the CFPB has no intention of scrutinizing.

Nor does the Manual Update specify which characteristics are protected, the framework for analyzing potential disparate-impact liability, or what, if any, defenses are available. As a result, financial institutions face complex questions with little or no guidance on how to answer them. For example, because Dodd-Frank does not identify any protected characteristics, where should institutions look on the broad menu of potential options? The Fair Housing Act? *See* 42 U.S.C. §§ 3604, 3605(a) (prohibiting discrimination on grounds of "race, color, religion, sex, handicap, familial status, or national origin"). The Equal Credit Opportunity Act? *See* 15 U.S.C. § 1691(a) (prohibiting discrimination on grounds of "race, color, religion, national origin, sex or marital status, or age"). Title VII? *See* 42 U.S.C. § 2000e-2(a) (prohibiting discrimination on grounds of "race, color, religion, sex, or national origin"). State law? *See* CFPB Br. 31 (observing that some states prohibit discrimination on grounds of political viewpoint).

Beyond the question of protected characteristics, further complexities await. Assume, for example, that political viewpoint may be a protected characteristic in this context. *See id.* Will financial institutions be required to either collect data on their customers' political affiliation or estimate such views? If so, is there a methodology for estimating political affiliations that the CFPB would view as acceptable in assessing discrimination risk? And if a policy or practice results in a disparity among different political groups, how far will the CFPB expect banks to go in implementing a less discriminatory alternative that may conflict with other goals, such as reducing costs for consumers or protecting vulnerable populations from fraud? The Manual Update provides no direction.[6]

---

[6] Even when it is clear disparate-impact liability can exist, differing standards for the *prima facie* case, potential defenses, and any burden-shifting can have real-world consequences. *See, e.g.*, *Inclusive Communities Project, Inc.*, 576 U.S. at 544 ("If the specter of disparate-impact litigation causes private developers to no longer construct or renovate housing units for low-income individuals, then the FHA would have undermined its own purpose as well as the free-market system."); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903 (5th Cir. 2019) (enforcing a "stricter version of the burden-shifting analysis" than a government regulation pertaining to the Fair Housing Act's disparate-impact provision). Faced with this uncertainty and the

Nor does the Manual Update specify whether exceptions to the general rule against discrimination analogous to those afforded by Regulation B are available in the non-lending context. For example, Regulation B allows a credit program to offer "more favorable credit terms to applicants age 62 or older." 12 C.F.R. § 1002.6(b)(2) cmt. 1. Does a similar exception apply to discrimination under UDAAP? Can institutions implement or participate in special programs for underserved populations for non-credit-related products and services, like the special purpose credit program concept found in Regulation B? *See id.* § 1002.8. Can supervised entities engage in affirmative advertising of non-credit-related products and services to traditionally disadvantaged groups, as permitted by Regulation B in the credit context? *See id.* § 1002.4(b) cmt. 2. The Manual Update addresses none of these questions. Nor does it answer how the balancing test applicable to the "unfair" prong of UDAAP—whether an injury is outweighed by countervailing consumer or competitive benefits, *see* 12 U.S.C. § 5531(c)(1)—interacts with the "legitimate business objective" analysis

---

desire to reduce the risk of disparate-impact liability, institutions may become overly cautious, limiting innovation.

that applies in the fair lending context, *see* Comptroller's Handbook, Consumer Compliance: Fair Lending, OCC at 9 (Jan. 2023), https://tinyurl.com/j538msad.

Industry representatives asked the CFPB to address many of these uncertainties in June 2022, emphasizing that answers to these questions would help institutions understand the agency's expectations and would support the CFPB's goal of combatting discrimination. *See* BPI and American Financial Services Association Comment on CFPB's Exam Manual Changes, BPI (June 27, 2022), https://tinyurl.com/2u622md4. They also noted that without additional guidance, institutions would struggle to develop and implement processes for assessing discrimination risk. The CFPB has not responded to any of the questions raised, forcing financial institutions to divine their own answers—and hope the CFPB agrees.

All these questions bear directly on UDAAP liability. Yet the CFPB has outsourced the hard work of answering the questions to regulated entities—under threat of supervisory or enforcement actions. Until the agency provides additional clarification, these uncertainties will only

magnify the time and resources financial institutions will have to devote to mitigating UDAAP risk because of the Manual Update.

*                    *                    *

For all of these reasons, the Exam Manual is binding both in law and fact. Under this Court's precedent, the Manual Update is reviewable because it creates binding legal obligations. And in practice, both the CFPB and *Amici's* members treat the Exam Manual as binding, causing financial institutions to incur substantial costs to comply with the expectations set forth in the Manual so they can avoid supervisory and enforcement actions from the CFPB and other agencies. Appellees therefore have Article III standing to challenge the Manual Update.

**CONCLUSION**

This Court should affirm the district court's judgment.

Dated:  October 14, 2024

Respectfully submitted,

*/s/* Brett A. Shumate

Brett A. Shumate
  *Counsel of Record*

Alexander V. Maugeri

Jonathan V. Gould

JONES DAY

Riley W. Walters

250 Vesey Street

JONES DAY

New York, NY 10281

51 Louisiana Ave. NW

(212) 326-3939

Washington, DC  20001

amaugeri@jonesday.com

(202) 879-3939

bshumate@jonesday.com

jgould@jonesday.com

rwalters@jonesday.com

*Counsel for all* Amici Curiae

Scott J. Hyman
WOMBLE BOND DICKINSON
400 Spectrum Center Dr.
Suite 1700
Irvine, CA 92618
(714) 557-3800
Scott.hyman@wbd-us.com

*Counsel for* Amicus Curiae *American Financial Services Association*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.     I am  a member in good standing of the Bar of this Court.

2.     This Brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 5,879 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3,     This Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced 14-point font (namely, Century Schoolbook Standard) in the text and the footnotes.

4.     The text of the electronic Brief is identical to the text in the paper copies.

5.     The electronic file containing the Brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.

Dated: October 14, 2024          */s/* Brett A. Shumate
                                 Brett A. Shumate
                                 *Counsel for all* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2024, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system, which will accomplish service on all parties.

Dated: October 14, 2024                    /s/ Brett A. Shumate
                                           Brett A. Shumate
                                           *Counsel for all* Amici Curiae