No. 23-40650

# In the
# United States Court of Appeals
## for the Fifth Circuit

Chamber of Commerce of the United States of America et al.,
*Plaintiffs-Appellees,*

v.

Consumer Financial Protection Bureau et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Texas.
No. 6:22-cv-00381-JCB

## BRIEF OF AMICI CURIAE GEORGIA AND 17 OTHER STATES SUPPORTING APPELLEES AND AFFIRMANCE

Christopher M. Carr
*Attorney General of Georgia*
Stephen J. Petrany
*Solicitor General*
Elijah J. O'Kelley
*Assistant Solicitor General*

Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Amicus States*

*(Additional counsel on signature page)*

# CERTIFICATE OF INTERESTED PERSONS

Amici Curiae are governmental parties.  Under Fifth Circuit Rule 28.2.1, a certificate of interested persons is not required.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons.......................................................i

Table of Authorities ........................................................................iii

Summary of Argument and Interest of the *Amici* States............... 1

Argument ....................................................................................... 4

    I.   CFPB's manual update is another example of an agency implementing a major policy change without statutory authority while trying to shield that overreach from judicial review. ................................................................................... 4

    II.  Plaintiffs have incurred a burden because of CFPB's new rule. ................................................................................... 18

    III. The updated examination manual encroaches on States' traditional authority without clear statutory authorization or notice-and-comment rulemaking. ................................ 21

Conclusion.................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum.*
   *Servs.*,
   141 S. Ct. 2320 (2021) ................................................ 5

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum.*
   *Servs.*,
   594 U.S. 758 (2021) ........................................6, 25, 29

*Badgerow v. Walters*,
   596 U.S. 1 (2022) ...................................................... 24

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ...........................................12, 17

*Bond v. United States*,
   572 U.S. 844 (2014) .................................................. 25

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 (5th Cir. 2021)...................................... 8

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024)............................2, 3, 12, 15, 17, 18

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) .................................................. 30

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
   779 F.3d 258 (5th Cir. 2015) .................................... 20

*Davidson v. Glickman*,
   169 F.3d 996 (5th Cir. 1999) .................................... 28

*Garrison v. U.S. Dep't of Educ.*,
   636 F. Supp. 3d 935 (S.D. Ind. 2022) ...................... 16

*Georgia v. Biden*,
    574 F. Supp. 3d 1337 (S.D. Ga. 2021) ....................................... 15

*Georgia v. President of the U.S.*,
    46 F.4th 1283 (11th Cir. 2022) ..................................................... 7

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) .................................................................... 14

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) .................................................................... 26

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) (en banc) ..................................... 23

*Mann Constr., Inc. v. United States*,
    27 F.4th 1138 (6th Cir. 2022) ..................................................... 28

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024) ..............................................13, 17

*Missouri v. U.S. Dep't of Educ.*
    No. 4:24cv01316, 2024 WL 4426370 (E.D. Mo. Oct. 3,
    2024) ............................................................................................ 13

*Missouri v. U.S. Dep't of Educ.*,
    No. CV 224-103, 2024 WL 4069224 (S.D. Ga. Sept. 5,
    2024) ............................................................................................ 13

*NFIB v. U.S. Dep't. of Labor*,
    595 U.S. 109 (2022) ............................................................21, 26

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...................................................................... 28

*Sekhar v. United States*,
    570 U.S. 729 (2013) .................................................................... 24

*Tennessee v. U.S. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) .........................................9, 16, 20

iv

*Texas v. Biden*,
   694 F. Supp. 3d 851 (S.D. Tex. 2023)........................................... 8

*U.S. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) ........................................................................ 17

*United States v. Gonzalez*,
   592 F.3d 675 (5th Cir. 2009) ..................................................... 29

*United States v. Reynolds*,
   710 F.3d 498 (3d Cir. 2013) ....................................................... 29

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) .................................................................... 22

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................... 23

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) .................................................................... 20

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ..........................................11, 17, 26, 27, 28

*Zucht v. King*,
   260 U.S. 174 (1922) .................................................................... 14

**Statutes**

5 U.S.C. § 553..........................................................................28, 29

5 U.S.C. § 706..........................................................................21, 28

12 U.S.C. § 5493 ........................................................................ 23

12 U.S.C. § 5511 ........................................................................ 23

12 U.S.C. § 5531.................................................................3, 21, 22, 23

12 U.S.C. § 5536...................................................................3, 21, 23

15 U.S.C. § 45............................................................................ 24

20 U.S.C. § 1098bb................................................................... 12

20 U.S.C. § 1098ee.................................................................... 12

29 U.S.C. § 655............................................................................ 7

40 U.S.C. § 121............................................................................ 7

Ariz. Rev. Stat. § 41-1491.20 ................................................. 14

Ark. Code Ann. § 4-87-104.................................................... 14

Ark. Code Ann. § 16-123-107................................................ 14

Ind. Code Ann. § 24-9-3-9 .................................................... 14

La. Stat. Ann. § 51:2255 ......................................................... 14

Miss. Code Ann. § 43-33-723 ................................................ 14

O.C.G.A. § 7-6-1 ..................................................................... 14

Ohio Rev. Code Ann. § 4112.021 ......................................... 14

S.C. Code Ann. § 31-21-60 .................................................... 14

Tenn. Code Ann. § 47-18-802................................................ 14

Tex. Prop. Code Ann. § 301.026........................................... 14

Utah Code Ann. § 57-21-6..................................................... 14

**Executive Materials**

Certification of New Interstate Natural Gas Facilities,
178 FERC ¶ 61,107 (2022) ........................................................ 10

COVID-19 Vaccination and Testing; Emergency Temporary
Standard, 86 Fed. Reg. 61402 (Nov. 5, 2021) ............................ 7

Enhanced Disclosures by Certain Investment Advisers
and Investment Companies About Environmental,
Social, and Governance Investment Practices, 87
Fed. Reg. 36654 (June 17, 2022) ............................................... 10

The Enhancement and Standardization of Climate-
Related Disclosures for Investors, 89 Fed. Reg.
21668 (Mar. 28, 2024) ............................................................... 10

Exec. Order No. 14008, 86 Fed. Reg. 7619 (Jan. 27,
2021) .......................................................................................... 9

Exec. Order No. 14026, 86 Fed. Reg. 22835 (Apr. 27,
2021) .......................................................................................... 8

Exec. Order No. 14030, 86 Fed. Reg. 27967 (May 20,
2021) .......................................................................................... 9

Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 9,
2021) .......................................................................................... 7

Federal Student Aid Programs, 87 Fed. Reg. 61512 (Oct. 12, 2022)
..................................................................................................11, 12

Improving Income Driven Repayment for the William
D. Ford Federal Direct Loan Program and the
Federal Family Education Loan (FFEL) Program, 88
Fed. Reg. 43820 (July 10, 2023) ............................................... 12

Jen Psaki, *Press Briefing* (Aug. 3, 2021) ........................................ 5

Jen Psaki, *Press Briefing* (July 23, 2021) ...................................... 6

Joseph R. Biden, *Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks* (Aug. 5, 2021) .................................................5, 15, 16

Joseph R. Biden, *Remarks Laying Out the Next Steps in Our Effort to Get More Americans Vaccinated and Combat the Spread of the Delta Variant* (July 29, 2021) ........................................................................... 6

Joseph R. Biden, *Remarks on Fighting the COVID-19 Pandemic* (Aug. 3, 2021)................................................................. 5

Mun. Secs. Rulemaking Bd., Request for Information on Environmental, Social and Governance (ESG) Practices in the Municipal Securities Market (Dec. 8, 2021) ............................... 9

National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85364 (Dec. 7, 2023) .................................................. 10

Office of the Comptroller of the Currency, OCC Bull. No. 2021-62, Principles for Climate-Related Financial Risk Management for Large Banks (Dec. 16, 2021) .................................................................... 10

Principles for Climate-Related Financial Risk Management for Large Financial Institutions, 88 Fed. Reg. 74183 (Oct. 30, 2023) ................................................ 10

Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 87 Fed. Reg. 73822 (Dec. 1, 2022) ................................................................ 10

Request for Information on Climate-Related Financial Risk, 87 Fed. Reg. 34856-01 (June 8, 2022) ............................................. 10

Temporary Halt in Residential Evictions in Communities With Substantial or High Transmission of COVID-19 to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 43244 (Aug. 6, 2021) ................................................................................................. 5

**Other Authorities**

*Biden v. Missouri*, No. 24A173 (Aug. 28, 2024) ........................................................ 13

Black's Law Dictionary (11th ed. 2019) ...................................... 22

Comm'r Hester M. Peirce, *Statement* (Mar. 21, 2022) .................. 11

Emily Cochrane & Catie Edmondson, *Minimum wage increase fails as 7 Democrats vote against the measure*, N.Y. Times (Mar. 5, 2021) ........................................... 8

H.R. 2034, 117th Cong. § 2 (2021) ............................................... 11

Katie Lobosco, *Biden administration scales back student loan forgiveness plan as states sue*, CNN (Sept. 30, 2022) ..................................................................... 16, 17

Nancy Pelosi, *Transcript of Pelosi Weekly Press Conference Today* (July 28, 2021) ........................................... 11

S. 2235, 116th Cong. § 101 (2019) ................................................ 11

U.S. Const. art. I, § 1 ................................................................... 17

## SUMMARY OF ARGUMENT AND INTEREST OF THE *AMICI* STATES

*Amici curiae*, the States of Georgia, Alabama, Alaska, Arkansas, Florida, Idaho, Indiana, Iowa, Kansas, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia respectfully submit this brief in support of Plaintiffs-Appellees. As separate sovereigns within our federal system, the *amici* States have a strong interest in ensuring that the federal government does not disrespect the rule of law and arbitrarily impinge upon States' authority. But the Consumer Financial Protection Bureau seems intent on doing exactly that with its attempt to appoint itself as anti-discrimination czar for the financial services sector.

CFPB's manual update is a clear example of federal executive overreach that significantly impacts the States' capacity to regulate within their borders. The Dodd-Frank Act empowers CFPB to police "unfair" practices—not discrimination. Despite that obvious textual limitation, CFPB has issued a rule declaring that "unfair" practices *include* acts of discrimination (broadly defined to include disparate impact). *See* Doc. 17-9 at 11, 13–15, 17; Doc. 17-11 at 2–3. And it announced this novel rule without any opportunity for notice and comment by interested parties—

including *States*, which are deeply concerned with this sort of expansion of federal executive authority.  CFPB's actions are unlawful.

**I.** CFPB's behavior is unfortunately typical of a recent federal executive practice: undertaking major policy changes through agency action rather than the constitutionally prescribed legislative process.  In contexts ranging from vaccine mandates to student loan cancellation to minimum wage increases to prohibiting elementary schools from keeping males out of girls' bathrooms, the executive has attempted to sidestep Congress.  Worse still, executive agencies have regularly buried their actions in ostensibly unofficial rules to shield them from State and private challenges.  Courts have repeatedly rejected that behavior.  This Court should do the same.

**II.** CFPB tries escaping judicial review by arguing that trade associations who have spent time and resources complying with the revised manual have not incurred a burden because of CFPB's actions.  This Court should reject that argument as another example of the executive branch "curiously … devot[ing] nearly one [half] of its argument to insisting that the plaintiffs lack standing" even though that "contention is more bewildering than persuasive." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,

98 F.4th 220, 234 (5th Cir. 2024).  Because the revised manual "broaden[s] the kinds of actions that can give rise to" liability for Plaintiffs' members and "requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols," *id.* at 234 (quotation omitted), Plaintiffs have incurred a burden because of CFPB.

**III.** On the merits, the revised manual exceeds CFPB's statutory authority and was improperly promulgated without notice-and-comment rulemaking.  Congress authorized CFPB to enforce rules on any "unfair, deceptive, or abusive act or practice under Federal law."  12 U.S.C. §§ 5531(a), 5536(a)(1)(B).  But an "unfair" practice under the statute does not include "discrimination," much less disparate impact.  The statutory text and context confirm that point, as do canons of construction regarding federalism and major questions.  CFPB brushes that aside to claim an incredible power despite having no clear authorization from Congress.  Making matters worse, CFPB announced its newfound authority without going through legally required notice-and-comment rulemaking.  This Court should hold CFPB's revised manual unlawful.

# ARGUMENT

**I.  CFPB's manual update is another example of an agency implementing a major policy change without statutory authority while trying to shield that overreach from judicial review.**

CFPB wants to impose on the financial services industry far-reaching anti-discrimination requirements, giving itself the power to police and punish claims of disparate impact.  But CFPB has done that through an update to its examination manual, not the required notice-and-comment rulemaking process and, worse still, despite lacking statutory authorization for the claimed power in the first place.  CFPB's action typifies troubling trends of recent federal executive overreach, including trying to skirt public criticism and judicial review by burying a major policy shift in a nearly 2,000 page "manual."  Courts have rejected those tactics repeatedly.  The district court rejected them here.  This Court should reject them, too.

**1.** The President and his agencies have regularly taken actions they know exceed their statutory authority—indeed, executive officers have often admitted publicly that they lack authority to do something before doing it anyway.  For instance, in June 2021, a majority of the Supreme Court made clear that the Centers for Disease Control and Prevention lacked the authority

to issue a nationwide moratorium on evictions during the COVID-19 pandemic. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2320, 2320 (2021) (Kavanaugh, J., concurring) ("[T]he Centers for Disease Control and Prevention exceeded its existing statutory authority by issuing a nationwide eviction moratorium."). President Biden agreed, acknowledging that any additional moratorium was "not likely to pass constitutional muster." Joseph R. Biden, Remarks on Fighting the COVID-19 Pandemic (Aug. 3, 2021), available at https://bit.ly/3untKvw. His press secretary was even more direct: "any further action" on an eviction moratorium "would need legislative steps." Jen Psaki, Press Briefing (Aug. 3, 2021), available at https://bit.ly/3VsVN8C.

The President, however, was undeterred. Despite acknowledging that he lacked authority to issue a new eviction moratorium, he did exactly that. *See* Temporary Halt in Residential Evictions in Communities With Substantial or High Transmission of COVID-19 to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 43244, 43244–52 (Aug. 6, 2021). "[I] don't have the authority to [issue a new moratorium]," but "I went ahead and did it." Joseph R. Biden, Remarks on Strengthening American Leadership on Clean Cars and Trucks (Aug. 5, 2021),

available at https://bit.ly/3XWsQn1.  The Supreme Court
intervened only weeks later to end the unlawful moratorium,
noting that the Administration's pretextual reading of the statute
was "unprecedented" and "breathtaking."  *See Ala. Ass'n of
Realtors v. U.S. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764–
65 (2021).

The President used the COVID-19 pandemic as an excuse to
exceed his statutory authority in other contexts as well.  In the
summer of 2021, the President publicly recognized that vaccine
mandates are "not the role of the federal government."  Jen Psaki,
Press Briefing (July 23, 2021), available at https://bit.ly/3VyxLJk.
He made clear that he wanted to "work with states to encourage
unvaccinated people to get vaccinated."  Joseph R. Biden,
Remarks Laying Out the Next Steps in Our Effort to Get More
Americans Vaccinated and Combat the Spread of the Delta
Variant (July 29, 2021), available at https://bit.ly/3VNo75j.  He
even praised political opponents, like "Alabama Republican
Governor Kay Ivey" and Senator McConnell, who "spoke out to
encourage vaccination."  *Id.*

But the White House suddenly changed course in September
2021, issuing a raft of vaccine mandates with the most tenuous of
purported statutory authority.  The Occupational Safety and

Health Administration issued an unprecedented national vaccine mandate covering two-thirds of all private sector workers, supposedly under its authority to regulate workplace safety. *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61402, 61403 (Nov. 5, 2021). The mandate relied on 29 U.S.C. § 655(c)(1), which empowers OSHA to issue "emergency temporary standard[s]" when necessary to protect employees from workplace dangers—not public health crises.

Similarly, the President issued a vaccine mandate directed at all employees of all federal contractors and subcontractors. *See* Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 9, 2021). He claimed authority under the Federal Property and Administrative Services Act. *Id.* That modest law reduces inefficiencies in government by authorizing the president to "prescribe policies and directives" that streamline executive agencies' systems for procuring goods and services. 40 U.S.C. § 121(a). But the President asserted a tortured reading of the Act's statement of purpose that converted it into an unlimited source of unilateral authority over all federal contractors. Without notice or comment, the President imposed an "all-encompassing vaccine requirement." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1296 (11th Cir. 2022). As the President's own chief of staff advertised, these

outlandish statutory interpretations were "the ultimate work-around for the Federal govt to require vaccinations." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 n.13 (5th Cir. 2021) (quoting retweet from White House Chief of Staff Ron Klain).

This Administration's overreach goes well beyond public health regulation. Consider the President's decision to unilaterally raise the minimum wage for all companies doing business with the federal government. After Congress specifically rejected President Biden's federal minimum wage increase, *see* Emily Cochrane & Catie Edmondson, *Minimum wage increase fails as 7 Democrats vote against the measure*, N.Y. Times (Mar. 5, 2021), https://nyti.ms/3OVMg7s, the President decided he would raise the minimum wage on his own, *see* Exec. Order No. 14026, 86 Fed. Reg. 22835 (Apr. 27, 2021). Unsurprisingly, "the President acted ultra vires and exceeded his authority." *Texas v. Biden*, 694 F. Supp. 3d 851, 869 (S.D. Tex. 2023) (enjoining enforcement of Executive Order 14026 as to Texas, Louisiana, and Mississippi).

Or consider the Department of Education's announcement that, for the first time in history, it would enforce Title IX against "discrimination based on sexual orientation and gender identity"—including against schools and colleges that prevent

biological males from using girls' bathrooms or playing on girls'
sports teams. *Tennessee v. U.S. Dep't of Educ.*, 104 F.4th 577, 586
(6th Cir. 2024) (quotation omitted). Remarkably, the Department
of Education announced that rule and "opened dozens of gender
discrimination investigations" based on it without doing what the
law requires: going through notice and comment rulemaking. *Id.*
at 601, 613–15 (affirming preliminary injunction).

The executive branch has also, again and again, tried to
impose climate policy without congressional action. President
Biden ordered federal agencies to take "bold, progressive action" to
"combat the climate crisis," even if it took some "creativity." Exec.
Order No. 14008, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021); *see also*
Exec. Order No. 14030, 86 Fed. Reg. 27967, 27967 (May 20, 2021).
In response, at least eight federal agencies—including such
environmentally focused agencies as the Securities and Exchange
Commission, the Federal Deposit Insurance Corporation, and the
Office of the Comptroller of the Currency—have issued rules,
proposed rules, or requests for information imposing burdensome
climate-related regulations affecting States and private entities.[1]

---

[1] *See, e.g.*, Mun. Secs. Rulemaking Bd., Request for Information on
Environmental, Social and Governance (ESG) Practices in the Municipal
Securities Market (Dec. 8, 2021), available at https://bit.ly/3VKs8Ym
(inquiring into ESG disclosure practices of municipalities); Off. of the

But exhortations from the president are no stand-in for statutory authorization. And none of these agencies have any statutory responsibility for climate policy. To take just one example, the SEC has aggressively moved to enforce climate-related disclosures and other policies on regulated entities. But

---

Comptroller of the Currency, OCC Bull. No. 2021-62, Principles for Climate-Related Financial Risk Management for Large Banks (Dec. 16, 2021), available at https://bit.ly/3z58kqj (dictating corporate governance policies to large banks under the pretext of mitigating "exposures to climate-related financial risks"); Certification of New Interstate Natural Gas Facilities, 178 FERC ¶ 61,107, *deemed draft*, 178 FERC ¶ 61,197 (2022) (regarding how the Federal Energy Regulatory Commission should require natural gas companies to mitigate greenhouse gas emissions); Principles for Climate-Related Financial Risk Management for Large Financial Institutions, 88 Fed. Reg. 74183 (Oct. 30, 2023) (Office of the Comptroller General of the Currency, Board of Governors of the Federal Reserve System, and Federal Deposit Insurance Corporation's interagency "guidance" imposing the ESG framework on large financial institutions); Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 87 Fed. Reg. 73822 (Dec. 1, 2022) (final rule from Employee Benefits Security Administration, Department of Labor encouraging retirement fund managers to make investment decisions that reflect climate change and other ESG considerations); The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21668 (Mar. 28, 2024) (final rule from the Securities Exchange Commission to impose a variety of intrusive climate-related disclosure requirements on publicly traded companies); Request for Information on Climate-Related Financial Risk, 87 Fed. Reg. 34856-01 (June 8, 2022) (Commodity Futures Trading Commission); Enhanced Disclosures by Certain Investment Advisers and Investment Companies About Environmental, Social, and Governance Investment Practices, 87 Fed. Reg. 36654 (June 17, 2022) (proposal from the SEC requiring ESG funds to provide detailed reports); National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85364 (Dec. 7, 2023) (final rule from the Federal Highway Administration to require state transportation departments to establish declining carbon dioxide emission targets).

the SEC is the Securities and Exchange Commission, "[n]ot the Securities and Environment Commission." *See, e.g.*, Comm'r Hester M. Peirce, Statement (Mar. 21, 2022), available at https://bit.ly/3unuSzg. That point is underscored by the Supreme Court's decision in *West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022). The Court held that not even the EPA—an agency that does have some measure of responsibility over climate policy— may "restructure" entire sectors of the American economy without clear statutory authorization to do so. *Id.*

There are also the Administration's many attempts to cancel hundreds of billions of dollars in student loans for tens of millions of borrowers. *See* Federal Student Aid Programs, 87 Fed. Reg. 61512, 61514 (Oct. 12, 2022). Never mind that Congress had declined multiple times to pass a bill that would authorize exactly the kind of debt cancellation the President sought. *See, e.g.*, S. 2235, 116th Cong. § 101 (2019); H.R. 2034, 117th Cong. § 2 (2021). Never mind that even the then-Speaker of the House—a member of the President's own party—insisted that the President "does not have [the] power [to cancel loans]. That has to be an act of Congress." Nancy Pelosi, Transcript of Pelosi Weekly Press Conference Today (July 28, 2021), available at https://bit.ly/3zQ7voc. And never mind that the executive branch

has no inherent authority to remove hundreds of billions of dollars from the federal treasury and distribute it to favored constituents. The President, incredibly, claimed to derive such power from the HEROES Act, *see* 87 Fed. Reg. 61512, 61513–14, which merely allows the Department of Education to "waive or modify" certain minor and typically procedural aspects of the law, 20 U.S.C. §§ 1098bb(a)(1)–(2), 1098ee(2).  It is no surprise that, in response to a lawsuit brought by six States, the Supreme Court held that the President's brazen attempt to unilaterally and "exhaustive[ly] rewrite" the statute was unconstitutional.  *See Biden v. Nebraska*, 600 U.S. 477, 500 (2023).

Even then, the executive branch attempted to "sidestep[] to the greatest extent possible" the Court's decision.  *Career Colls.*, 98 F.4th at 226 n.1.  Just a month after the *Nebraska* decision, the Department of Education issued the "Saving on a Valuable Education" or "SAVE" plan, which was just another form of student loan cancellation.  *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023).

Despite the Supreme Court's rebuke in *Nebraska*, the "SAVE plan is even larger in scope than the loan-cancellation program at

issue in *Nebraska*." *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024). The Administration *again* relied on a never-seen-before statutory interpretation that was contrary to the statute's clear text. *See id.* at 536–538. Unsurprisingly, the Eighth Circuit has already favorably ruled on a State-led challenge and enjoined the SAVE loan cancellation scheme because it exceeds the executive's authority. *Id.* And the Supreme Court denied an application to vacate the Eighth Circuit's injunction. *See* Order, *Biden v. Missouri*, No. 24A173 (Aug. 28, 2024).

And in the most stunning attempt yet, the Department of Education next tried to cancel hundreds of billions of dollars of student loans—in secret and before anyone could sue. *See Missouri v. U.S. Dep't of Educ.*, No. CV 224-103, 2024 WL 4069224, at *1 (S.D. Ga. Sept. 5, 2024). When states caught wind of the scheme, they sued for injunctive relief—and won, again. *See id.*; *Missouri v. U.S. Dep't of Educ.* No. 4:24cv01316, 2024 WL 4426370, at *1–2 (E.D. Mo. Oct. 3, 2024). Indeed, one court noted that the states are likely to succeed on the merits because "every court reviewing the previous plans to unilaterally erase" student loan debt had found the efforts unlawful. *Missouri*, 2024 WL 4426370, at *1.

13

All of these actions share another point in common: they intrude on State prerogatives and interests. States' police powers traditionally include the "protection of the lives, limbs, health, comfort, and quiet of" its citizens. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). That includes, for instance, "compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176 (1922). Yet the executive branch attempted to override State decisions on this point with barely-there arguments as to statutory authority.

CFPB's action follows the same pattern: States have their own consumer protection and anti-discrimination statutes. *See, e.g.*, O.C.G.A. § 7-6-1(a); Ariz. Rev. Stat. § 41-1491.20; Ark. Code Ann. §§ 4-87-104, 16-123-107(a)(4); Ind. Code Ann. § 24-9-3-9; La. Stat. Ann. § 51:2255; Miss. Code Ann. § 43-33-723; Ohio Rev. Code Ann. § 4112.021; S.C. Code Ann. § 31-21-60; Tenn. Code Ann. § 47-18-802; Tex. Prop. Code Ann. § 301.026; Utah Code Ann. § 57-21-6. If Congress wishes to displace those laws in favor of a unified federal regime, Congress must do it.

**2.** Equally troubling is that these executive overreaches are often designed to avoid State input and judicial review. The Executive has repeatedly buried major policy changes in memos and "manuals" rather than following notice and comment rulemaking. Agencies also often manipulate the delay in judicial

proceedings to prevent courts from ruling on their actions, or they try to structure their policies so that no one has standing to challenge them.  And when their policies are challenged in court, agencies will "curiously" devote large portions of their arguments to challenging the plaintiff's standing, even when the agencies' standing arguments are "more bewildering than persuasive." *Career Colls.*, 98 F.4th at 234.

One example is the renewed eviction moratorium.  President Biden touted that even though the Supreme Court would certainly enjoin it, he could "keep [the new moratorium] going for a month at least" before litigation concluded.  Joseph R. Biden, Remarks by President Biden on Strengthening American Leadership on Clean Cars and Trucks (Aug. 5, 2021), available at https://bit.ly/3Vsx7Nz.

In defending the contractor vaccine mandate, the government repeatedly argued that States lacked standing to sue because they had (supposedly) not yet been forced to comply with the mandate. *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1349 (S.D. Ga. 2021), *partially vacated on other grounds*, 46 F.4th 1283 (11th Cir. 2022). In its view, States should have waited to sue until they lost hundreds of millions of dollars in contracts.

When the Department of Education announced it would impose liability on schools for separating bathrooms and sports by sex, it insisted that its new rule was merely an "[i]nterpretation," not a final agency action subject to judicial review—even though it had already "opened dozens of gender discrimination investigations" based on its new rule. *See Tennessee*, 104 F.4th at 600–01. The Sixth Circuit saw through the façade. *Id.* at 601–03, 613.

And in a brazen effort to block review of its attempted cancellation of student loans, the Department of Education repeatedly revised the initial plan, not to make it more equitable or fair (or, for that matter, legal), but specifically to avoid affecting anyone who might have standing. When an individual debtholder alleged that forgiveness would increase his state income taxes, the Department of Education "opted [him] out of the loan forgiveness program which prevented [him] from establishing … harm." *Garrison v. U.S. Dep't of Educ.*, 636 F. Supp. 3d 935, 938 (S.D. Ind. 2022). And when a coalition of States alleged that the federal loan forgiveness program would deprive loan servicers of revenue, the Department again revised the policy so that debtholders could no longer consolidate private loans into the federal program. *See* Katie Lobosco, *Biden administration scales back student loan*

*forgiveness plan as states sue*, CNN (Sept. 30, 2022), https://cnn.it/3H2OtfD.  The Department tried to make its loan cancellation a moving target, immune to judicial review. Fortunately, the tricks ran out: courts have held that States do have standing to challenge the student loan cancellation programs, and they have held the programs unlawful.  *See Nebraska*, 600 U.S. at 482, 494; *Missouri*, 112 F.4th at 536; *see also Career Colls.*, 98 F.4th at 256.

As the Supreme Court has said, federal agencies cannot treat statutes like an "open book to which the agency may add pages and change the plot line." *West Virginia*, 597 U.S. at 723 (alteration adopted and quotation omitted).  Doing so thwarts the Constitution, *see* U.S. Const. art. I, § 1, and upsets the balance between efficient rulemaking and democratic accountability embodied in the Administrative Procedure Act, which ensures "federal agencies are accountable to the public and their actions subject to review by the courts." *U.S. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation omitted). Yet CFPB is determined to change the plot line authored by Congress—indeed, to entirely retcon its statutory authority. Unless a court stops it.

## II.  Plaintiffs have incurred a burden because of CFPB's new rule.

Plaintiffs are trade associations whose members are regulated by CFPB and bear the burden of complying with CFPB's revised manual.  *See* Doc. 41 at 4.  Having to bear an "increased regulatory burden typically satisfies the injury in fact requirement."  *Career Colls.*, 98 F.4th at 234 (quotation omitted).  The revised manual "broaden[s] the kinds of actions that can give rise to" liability for Plaintiffs' members and "requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols."  *Id.* (quotation marks omitted).  Because Plaintiffs' members have incurred those compliance costs, among others, they have suffered an injury in fact because of CFPB.  It is as simple as that.

CFPB argues that Plaintiffs cannot have standing because they and their members swear off discrimination for reasons other than the revised manual.  *See* CFPB Br. at 30–33.  According to CFPB, Plaintiffs' members may have incurred compliance costs based on corporate policy decisions not to discriminate, or because they are worried about enforcement actions from some other regulator or lawsuits from some private litigant.  *Id.*

CFPB's argument jumps the shark, both as a matter of law and fact.  As a matter of law, if a business (or person) were

18

stripped of standing every time it faced regulation from multiple agencies or private litigants, judicial review would quickly become a mirage. CFPB argues that declarations prepared for litigation challenging CFPB action are not actually about CFPB action. *Id.* at 30–32. That is a bizarre position on its face. The whole point of the declarations is to explain the impact the revised manual has had on Plaintiffs' members. Indeed, each declaration states that the "purpose of this declaration is to discuss the effects of a rule announced by the CFPB" and uses the header: "The CFPB's new UDAAP rule is forcing members to incur burdensome compliance costs." *See* Doc. 17-1 at 3, 4; Doc. 17-2 at 3, 4; Doc 17-3 at 3, 4; Doc. 17-4 at 2, 4; Doc. 17-5 at 2, 4; Doc. 17-6 at 2, 4; Doc. 17-7 at 2, 4. What else could the declarations even be about?

And CFPB misrepresents what the declarations say. CFPB singles out testimony about "Member B" of the Chamber of Commerce, which had to update "its policies, controls, and training materials to include discrimination considerations for non-credit products." CFPB Br. at 29. CFPB says that the "declaration does not establish why Member B updated its policies." *Id.* at 30. What? The very first sentence of that paragraph of the declaration states: "Members of the Chamber have already begun complying with CFPB's new rule by

expanding their UDAAP compliance systems[.]" Doc. 17-1 at 7.
Member B's policy changes are obviously about CFPB's revised
manual (this entire lawsuit is). CFPB's speculation about
Chamber members' potentially secret motives for incurring
compliance costs is a distraction that cannot erase standing.

What's more, CFPB's underlying contention is that nobody
has standing to challenge its regulations until CFPB brings an
enforcement action. *See* CFPB Br. at 28, 30, 39–40. Under
CFPB's view, it could issue sweeping regulations under which
even one violation could bankrupt a company—and nobody could
do anything about it unless a business dared to risk a potentially
business-ending enforcement action. These are mafia tactics, not
justiciability rules.

Complying with CFPB's regulations is not optional, and of
course the costs of compliance are not, as CFPB dismissively calls
them, "self-inflicted." *Id.* at 28. People typically do not have to
wait to be crippled by regulations that will certainly be enforced
against them before they can sue. *See, e.g.*, *Virginia v. Am.
Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Tennessee*, 104 F.4th
at 602. That is especially true when someone incurs compliance
costs to deal with a greater regulatory burden. *See, e.g.*,
*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266

(5th Cir. 2015). This Court should not allow CFPB to strong-arm an industry into obeying its commands while avoiding judicial review by claiming it has not enforced those commands.

## III. The updated examination manual encroaches on States' traditional authority without clear statutory authorization or notice-and-comment rulemaking.

Because "[a]dministrative agencies are creatures of statute" they "possess only the authority that Congress has provided." *NFIB v. U.S. Dep't. of Labor*, 595 U.S. 109, 117 (2022). The APA embodies this rule by requiring reviewing courts to set aside any agency action "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). The Dodd-Frank Act charges CFPB with enforcing the ban on any "unfair, deceptive, or abusive act or practice under Federal law." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). CFPB has asserted that this provision also authorizes it to punish discrimination within the consumer finance industry. *See* Doc. 17-11. The district court correctly ruled that CFPB misreads the Act's text and ignores basic separation of powers and federalism canons of construction. *See* Doc. 41 at 12–18. CFPB does all this while illegally ignoring notice-and-comment procedures.

**1.** Start with the text.  The Dodd-Frank Act's ban on unfair acts and practices is just that—a ban on unfair acts and practices, not a ban on discrimination.  Both the statutory definition and common usage confirm the distinction.  The statutory definition of "unfairness" makes no mention of discrimination.  *See* 12 U.S.C. § 5531(c).  "[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).  And in everyday use, "unfairness" and "discrimination" are different words denoting different concepts.  *Compare Unfair*, Black's Law Dictionary (11th ed. 2019) ("Not honest, impartial, or candid; unjust"), *with Discrimination*, Black's Law Dictionary (11th ed. 2019) ("[A] failure to treat all persons equally when no reasonable distinction can be found….").

The Dodd-Frank Act itself treats the two words as distinct concepts.  The general "[o]bjectives" Congress listed for CFPB direct the agency to protect consumers against "unfair, deceptive or abusive acts and practices *and* from discrimination."  Doc. 41 at 15 (quoting 12 U.S.C. § 5511(b)(2) (emphasis added)).  It would be surplusage to read "discrimination" as merely falling within "unfair" practices—and it would make little sense for Congress to list them both if one was meant to include the other.  *See, e.g.,*

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc). And Congress did not list "discrimination" in § 5531, just "unfair, deceptive, or abusive acts." 12 U.S.C. § 5531(b). Ordinarily, "identical words used in different parts of the same act are intended to have the same meaning," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 319 (2014) (quotation omitted), so the way Congress used "unfair" in § 5511(b)(2) is the same way it used "unfair" in § 5531: as something distinct from and not inclusive of "discrimination."

Statutory context confirms the point. There were many anti-discrimination statutes when Congress passed the Dodd-Frank Act. Two such statutes *were* incorporated into CFPB's jurisdiction. *See* 12 U.S.C. § 5493(c), (c)(2)(A) (empowering CFPB to oversee the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act to "ensure … nondiscriminatory access to credit"). But the Act did *not* incorporate other federal antidiscrimination statutes or confer upon CFPB a general power to combat discrimination in the consumer finance industry. In other words, where Congress wanted CFPB to tackle discrimination, it told CFPB to do so. Yet Congress included no such instruction when it empowered CFPB to enforce the ban on unfair practices. *See* 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). When

"Congress includes particular language in one section of a statute but omits it in another section of the same Act, [courts] generally take the choice to be deliberate." *Badgerow v. Walters*, 596 U.S. 1, 11 (2022) (quotation omitted). Congress knows the difference between unfairness and discrimination. As the district court rightly concluded: "Congress knew how to clearly add nondiscrimination to the CFPB's portfolio when it meant to do so." Doc. 41 at 16.

CFPB's new antidiscrimination requirements also ignore how the terms "unfair" and "discrimination" are consistently used elsewhere in the U.S. Code. CFPB's novel interpretation of "unfair" departs from the well-established understanding that the term does *not* include discrimination. The Federal Trade Commission Act, 15 U.S.C. § 45(n), from which the Dodd-Frank Act borrowed its unfairness language, has generally been understood to define unfairness without reference to discrimination. *See Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("Where Congress borrows terms of art" with a settled meaning, "it presumably knows and adopts the cluster of ideas that were attached to each borrowed word") (alteration adopted). And CFPB itself has never before understood "unfairness" to include discrimination. *See* Doc. 17-12 (2012 enforcement manual

noticeably lacking any mention of discrimination in the unfair practices section).

Federalism concerns confirm what the text makes plain. When the executive branch invokes powers that would "significantly alter the balance between federal and state power," Congress must authorize that change with "exceedingly clear language." *Ala. Ass'n of Realtors*, 594 U.S. at 764. This rule derives from "basic principles of federalism embodied in the Constitution," which permits a federal statute to "intrude[] on the police power of the States" only when plainly authorized by Congress. *Bond v. United States*, 572 U.S. 844, 859–60 (2014). Employer regulation, antidiscrimination, consumer protection— these are all fundamental aspects of the States' police power. Again, States already have antidiscrimination statutes, they already protect consumers, and they already regulate these types of entities. If CFPB is going to intrude on that sphere of authority, it must have *clear* authorization to do so, and it simply does not.

The major questions doctrine likewise requires a narrower understanding of CFPB's power, as the district court recognized. Doc. 41 at 13–14. Regulation of all forms of discrimination (vaguely defined to include even disparate impact claims) across

25

an entire industry is an enormous power.  *See* Doc. 17-1 at 8 (noting that some companies will incur more than $1 million in annual compliance costs).  Where an agency purports to exercise a power of such "vast economic and political significance," it must show that Congress clearly authorized the action at issue.  *NFIB*, 595 U.S. at 117.

CFPB cannot clear this high bar merely by reference to the Dodd-Frank Act's general prohibition on "unfair" practices. "Extraordinary grants of regulatory authority," after all, "are rarely accomplished through … vague terms" or "implicit delegation."  *West Virginia*, 597 U.S. at 722, 723 (quotation omitted).  That is especially true where, as here, the agency's proposed reading is a novel departure from the established understanding of the statute's meaning.  *See id.* at 722–23.  And it is especially true because CFPB proposes regulating even disparate impact discrimination, which is a power Congress rarely authorizes at all.  CFPB's decision to arrogate to itself the authority to root out discrimination (and disparate impact) across the consumer finance industry where it had never done so before is not a mere fill-in-the-blank situation; it is a significant policy decision about what harms it has the authority to address—the sort of decision we would expect Congress to make.  *See Indus.*

*Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in the judgment) ("[F]undamental policy decisions" are the "essence of legislative authority under our system" and "must be made by the elected representatives of the people").

CFPB tries to sidestep the major questions doctrine but trips over its own feet. According to CFPB, the major questions doctrine turns on whether CFPB would think any specific "hypothetical[]" example of discrimination would be unfair. CFPB Br. at 4, 55–56. It poses the question: "Would it be a major question for [CFPB] to conclude that it was unfair for a bank to intentionally charge a consumer a higher fee based on their race?" *Id.* at 56. Unsurprisingly, CFPB seems to be making *itself* the arbiter of what is a major question. But whether CFPB thinks something is unfair is not the "major question" that matters. What matters is "whether *Congress* in fact meant to confer the power the agency has asserted." *West Virginia*, 597 U.S. at 721 (emphasis added). The revised manual claims the power to regulate all forms of discrimination—including disparate impact— across an enormous industry. That power is clearly "highly consequential," *id.* at 724, and giving CFPB vast authority to

27

regulate disparate impact is exactly the kind of thing we would expect Congress to provide "clear … authorization" for.  *Id*.

**2.** On top of all this, CFPB has tried to accomplish its goals while avoiding notice-and-comment rulemaking.  The Administrative Procedure Act requires setting aside any substantive rule promulgated without an opportunity for notice and comment.  *See* 5 U.S.C. §§ 553(b)–(c), 706(2)(D).  Any rule that has "the force and effect of law" is a substantive rule.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015).  That is true of the updated manual because it "impose[s] new … duties" on Plaintiffs. *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022).

CFPB has not even tried to explain why it declined to issue this policy change as a new rule.  That is probably because none of the exceptions even arguably apply.  This new rule is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A). Interpretative rules go to understanding *previous* rules, they do not create *new obligations*.  *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999).  Nor could CFPB have "good cause" to "find[] (and incorporate[] the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure

thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). CFPB did not even try to avail itself of this exception.

Notice and comment are essential for ensuring that "unrepresentative agencies" remain accountable to the public when issuing substantive rules. *United States v. Reynolds*, 710 F.3d 498, 520 (3d Cir. 2013) (quotation omitted). And it is especially important for *States* to have an opportunity to object to new federal rules where those rules impinge on state interests or spheres of authority. *See Ala. Ass'n of Realtors*, 594 U.S. at 764 (warning against regulations that intrude upon matters within "the particular domain of state law").

It seems that avoiding state input and public accountability is exactly what CFPB wants. But notice-and-comment requirements are not optional, which is sufficient reason to affirm. *See United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009) ("[This Court] may affirm for any reason supported by the record, even if not relied on by the district court.").

## CONCLUSION

CFPB has "gone beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).  This Court should affirm.

Respectfully submitted.

/s/ *Elijah J. O'Kelley*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Elijah J. O'Kelley
  *Assistant Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Amicus States*

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of Alabama*

TREG TAYLOR
*Attorney General of Alaska*

TIM GRIFFIN
*Attorney General of Arkansas*

ASHLEY MOODY
*Attorney General of Florida*

RAÚL R. LABRADOR
*Attorney General of Idaho*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRENNA BIRD
*Attorney General of Iowa*

KRIS W. KOBACH
*Attorney General of Kansas*

DREW H. WRIGLEY
*Attorney General of North Dakota*

DAVE YOST
*Attorney General of Ohio*

GENTNER DRUMMOND
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY JACKLEY
*Attorney General of South Dakota*

JONATHAN SKRMETTI
*Attorney General of Tennessee*

KEN PAXTON
*Attorney General of Texas*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 5,996 words as counted by the word-processing system used to prepare the document.

This document complies with the typeface and type-style requirements of Rule 32(a)(5)–(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

<u>/s/ *Elijah J. O'Kelley*</u>
Elijah J. O'Kelley

# CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley